# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

### Baltimore Division

| | |
|---|---|
| THE ESTATE OF<br>DAMON R. FISHER, by and through<br>Co-Personal Representatives of the<br>Estate of DaMon R. Fisher | **Civil Action No.** |
| Darlene Faith Richardson,<br>35 Dorsey Avenue<br>Annapolis, Maryland 21401<br>Anne Arundel County | |
| and | **JURY TRIAL DEMANDED** |
| Robert Smith, Jr.<br>17 B Bens Drive<br>Annapolis, Maryland 21403<br>Anne Arundel County | |
| Plaintiffs, | |
| v. | |
| The City of Annapolis<br>A municipal corporation<br>160 Duke of Gloucester Street<br>Annapolis, Maryland 21401<br>Anne Arundel County | |
| and | |
| Housing Authority of the<br>City of Annapolis,<br>A public body corporate and politic<br>1217 Madison Street<br>Annapolis, Maryland 21403<br>Anne Arundel County | |

and

Raylyne Shaw
in her official capacity as
Property Manager for the Housing
Authority of the City of Annapolis
1217 Madison Street
Annapolis, Maryland 21403
Anne Arundel County

Defendants.

---

# COMPLAINT

Plaintiff by and through personal representatives and counsel, P. Joseph Donahue and The Donahue Law Firm, LLC, hereby sues the Defendants, and as grounds therefore state as follows:

> **It is the policy of the City, in the exercise of its police powers for the protection of the public safety, public health, and general welfare, to assure equal opportunity to all persons to live in decent housing facilities and to eliminate discrimination in all housing accommodations regardless of race, color, religion, disability, familial status, sexual orientation, gender identity, marital status, sex, source of income, immigration status, citizenship status, or national origin, and to that end to prohibit discrimination in all housing accommodations by any person.**

Annapolis City Code, Ch. 11.32.010.

## NATURE OF ACTION

Plaintiffs file this survival action on behalf the Estate of DaMon R. Fisher. Mr. Fisher was an African American resident of the housing development known as Harbour House, owned and operated by his landlord, the Housing Authority of the City of Annapolis ("HACA" or the "Housing Authority"), which reports directly to, and takes direction from, the City of Annapolis. On June 25, 2020 Mr. Fisher died in the home he rented from HACA.  The proximate cause of his death was toxic mold in the residence that exacerbated his preexisting chronic obstructive pulmonary disease with asthma.  His death by toxic mold poisoning was preventable but for the negligence and wrongful conduct of the Defendants.  Despite the Defendants actual and constructive knowledge of the toxic mold and of Mr. Fisher's ailment, they failed to take actions to remediate the property or relocate Mr. Fisher.

The Plaintiffs are representatives of Mr. Fisher's Estate.  They file his action to vindicate Mr. Fisher's rights under the Fair Housing Act as amended, 42 U.S.C. § 3601, *et seq.*, the Civil Rights Act of 1866, 42 U.S.C. §§ 1982, 1983, 1985, and 1986; and the Equal Protection clause of the Fourteenth Amendment to the United States Constitution, the City of Annapolis Municipal Code, §18.08.010, and under the Maryland Consumer Protection Act, as well as other State causes of action.

## JURISDICTION AND VENUE

1.      This civil action arises under the laws of the United States of America.

This Court has original jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331

(federal question), 28 U.S.C. § 2201 (declaratory relief), and 42 U.S.C. § 3613 (Fair

Housing Act, private right of action for damages and injunctive relief).

2.      Under 28 U.S.C. § 1367, this Court has supplemental jurisdiction over

the claims brought under Maryland law because they are related to Plaintiffs' federal

claims and arise out of a common nucleus of related facts.

3.      Venue herein is proper under 28 U.S.C. §§ 1391 (b)(1) and (2). Plaintiff

resided in the City of Annapolis, Anne Arundel County, Maryland. Defendants City

of Annapolis, the Housing Authority of the City of Annapolis, and Raylyne Shaw,

Property Manager of the Housing Authority of the City of Annapolis, all maintain

their principal place of business in the City of Annapolis, Anne Arundel County,

Maryland; the events or omissions giving rise to the claims occurred in this district

and division.

4.      On June 22, 2020, July 2, 2020, February 4, 2021, and April 9, 2021,

the City of Annapolis and the Housing Authority of the City of Annapolis were

placed on notice pursuant to the Maryland Local Government Tort Claims Act

("LGTCA") that the Estate of DaMon R. Fisher intended to proceed against the City

4

and the Housing Authority for damages related to the violation of Mr. Fisher's civil rights and damages for negligence.

## PARTIES

### Plaintiffs

5.     Plaintiff Darlene Faith Richardson resides at 35 Dorsey Avenue, Annapolis, Maryland 21401, and is one of two personal representatives of the Estate of DaMon Regal Fisher ("Mr. Fisher").  According to the death certificate signed by his treating physician, Mr. Fisher died tragically on June 25, 2020 from "exacerbation of chronic obstructive pulmonary disease with asthma" due to "mold in his residence."

6.     Plaintiff Robert Smith Jr. resides at 17 B Bens Drive, Annapolis, Maryland 21403, and is the brother and second of two personal representatives of the Estate of Damon Regal Fisher.

7.     The Estate of DaMon Regal Fisher, bearing Estate Number 100846, was opened with the Office of the Register of Wills of Anne Arundel County on July 27, 2020, and Darlene Faith Richardson and Robert Smith, Jr. were appointed the Personal Representatives of the Estate.

8.     These representatives are empowered to maintain this cause of action pursuant to the federal law and Maryland law, which grant, as requested here,

remedial relief to the estate of a deceased person whose federal and state rights were violated by defendants prior to their death.

9.     It is also alleged herein that Defendants' failures and violations of Mr. Fisher's federal and state rights were a contributing cause of his death.

## Defendants

10.     Defendant City of Annapolis is a municipal corporation in the State of Maryland.

11.     Defendant Housing Authority of the City of Annapolis ("HACA") is a "public body corporate and politic that: (1) exercises public and essential governmental functions; and (2) has all the powers necessary or convenient to carry out the purposes of this Division II." Md. Code Ann., Hous. & Comty. Dev. §13-103.

12.     Defendant Raylyne Shaw is the Property Manager of Harbour House & Eastport Terrace, is an employee of the Housing Authority of the City of Annapolis, and is sued in her official capacity only. [1]

---

[1] "Because the LGTCA does not allow a plaintiff to bring suit directly against the local government, the suit is brought against the employee." *Beall v. Holloway-Johnson*, 446 Md. 48, 77, 130 A.3d 406, 423 (2016). Pursuant to the LGTCA, Ms. Shaw is a necessary party in her official capacity as the Property Manager for Harbour House, a property owned and operated by the Housing Authority of the City of Annapolis.

## FACTS [2]

13.    For the convenience of the parties, the factual allegations of this Complaint are divided into three sections as follows: (1) Facts Specific to the Estate of DaMon R. Fisher, (2) Facts Similarly Alleged in the Case of *White, et al. v. City of Annapolis, et al*., and (3) Facts Discovered Subsequent to Filing of *White, et al. v. City of Annapolis, et al.*  Furthermore, the allegations of fact found in *White, et al. v. City of Annapolis, et al.*, which are, or could be construed as, material to the allegations of the present Complaint, are hereby incorporated.

### <u>Facts Specific to the Estate of DaMon R. Fisher</u>

14.    The history of segregation in Annapolis, the lack of wealth accumulation that segregation created, and the failure of the City of Annapolis and HACA to do anything about these issues over numerous decades has resulted in lasting health and economic effects for the City's public housing residents, through both acts of commission and omission.  One example of this failure is the toxic mold that was allowed to grow and fester in Mr. Fisher's dwelling, which ultimately caused his death.

---

[2] This action comes in the wake of the settlement of *White, et al. v. City of Annapolis, et al.*, which is still pending in this court, Case No. 1:19-cv-01442-CCB. Unfortunately, the prospective remedies voluntarily agreed to in the *White* consent decree came too late to prevent Mr. Fisher's wrongful death.

15.    On August 28, 2012, Mr. Fisher moved into the Morris H. Blum Senior Apartments ("Blum Senior Apartments").  He had been previously diagnosed with asthma, but he had never suffered serious breathing issues or respiratory distress. He had lived most of his life in his family home on Fleet Street in downtown Annapolis, but at the age of 56 he was forced out of options, and for the first time, took up residence in public housing.

16.    Shortly after moving into Blum Senior Apartments, Mr. Fisher began to encounter serious breathing difficulties.  The following is a timeline of medical interventions that began shortly after he moved into Blum Senior Apartments:

     a.  January 2013 – Taken to ER for shortness of breath.

     b.  February 2013 – Taken to ER for shortness of breath.

     c.  April 2013 – Taken to ER for exacerbation of asthma; a CT scan was ordered as a result of his shortness of breath and what the doctors perceived to be bronchitis.

     d.  July 2013 – Taken to ER for exacerbation of asthma and shortness of breath.

     e.  April 21, 2014 – Mr. Fisher requested a transfer to another apartment with the stated reason as follows: "Due to health and respiratory, infestation of rodents. And poor quality of ventilation."

f.  June 2014 – Diagnosed with Chronic Obstructive Pulmonary Disease ("COPD").  In a letter to HACA, Mr. Fisher's doctor provided as follows:

> Patient is under my care for the following diagnosis: COPD, ASTHMA, Difficulty breathing with exacerbation.  Patient is not able to live with multiple rodents as it affects his breathing and exacerbates it.

g.  September 2014 – Underwent a series of mold allergy testing at the direction of his doctor, which reflected a severe allergy to mold.

h.  November 2014 – Taken to ER for shortness of breath and lower back pain, which the doctors associated with his difficulty breathing.

i.  May – July 2015 – Underwent a series of Outpatient Treatments where he was administered Xolair to treat his ongoing asthma condition.

j.  May 4, 2015 – On behalf of Mr. Fisher, cardiologist, Dr. Sven Ender, writes a letter received by HACA stating as follows:

> Mr. Fisher has been seen in our office for acute asthma exacerbation this week (2 visits).  I am not certain of the trigger for his episodes, but his pulmonologist, Dr. Resnick, has noted he thinks that Mr. Fisher may be suffering from "sick building syndrome" and has advised him to move to another building.

k.  May 8, 2015 – On behalf of Mr. Fisher's pulmonologist, Dr. Steven Resnick, writes a letter to HACA explaining that Mr. Fisher "has

several serious conditions along with severe allergies and it is very important that his home has proper air circulation and is free of any mold or allergens." The note went on to provide that Mr. Fisher's "residence has mold and inadequate air circulation; which has exacerbated his health conditions."

l. October 2015 – Taken to the ER for shortness of breath.

m. October 16, 2015 – In a letter to HACA Officials, one of Mr. Fisher's primary care doctors, Dr. Kari Alperovitz-Bichell, stated as follows:

> Mr. Fisher suffers from extremely severe asthma; his is by far the worst case of any of my current patient panel. He is on virtually every asthma medication we have available, on a daily basis, including chronic steroids, and his asthma is still uncontrollable. His pulmonologist, Dr. Resnick, has repeatedly advised him to move to another building. (Dr. Resnick is firmly convinced that he is allergic to something in this building, and this is repeatedly triggering his severe asthma.)

n. November 18, 2015 – Taken to the ER again for respiratory issues and shortness of breath. The record reflects the visit was for "Extrinsic asthma, severe persistent, with acute exacerbation (primary)."

17. On November 24, 2015, after retaining an attorney, Mr. Fisher was finally moved out of Blum Senior Apartments to 1175 Madison Street, Apartment S2 in the Harbour House community.

18.    His breathing issues subsided for a time, but problems with the Harbour House property soon arose as well.  Beginning at some point in 2016, but no later than January 2018, Mr. Fisher began making complaints to his property manager at Harbour House, Defendant Raylyne Shaw.  Due to the close proximity of Mr. Fisher's apartment to HACA's headquarters – the building is approximately 100 yards away across the baseball field from his apartment balcony – Mr. Fisher made the majority of his complaints orally directly to Ms. Shaw either at her office or when he saw her on the sidewalk near the property.  His main recurring complaint was that he was having difficulty breathing due to the mold in his bathroom and he needed HACA to correct the problem or to move him to another location as they had done previously.

19.    The stench emanating from the bathroom smelled so strongly that Mr. Fisher would stuff a rug under the bathroom door to seal the bathroom air off from the remainder of the apartment.  This was his only recourse in attempting to contain the overwhelming odor of mold which critically impacted his ability to breathe.

20.    The pain and suffering experienced prior to his death started in approximately 2016 – the same year the City of Annapolis last inspected his Harbour House apartment.  However, his medical records indicate that the condition related to the mold in his apartment first required hospitalization starting in March 2018, but then continued painfully and uninterrupted until his untimely death in June 2020

11

– more than two years later.  Mr. Fisher experienced the following harmful episodes as a result of the toxic mold to which the Defendants exposed him:

a.  March 16, 2018 – Taken to the ER for complaints of shortness of breath and wheezing associated with chest tightness.  The doctor noted his past medical history of "Asthma with COPD *Severe. [History] of "Sick Bldg Syndrome per Dr. Resnick.*"  In the "DDx/Assessment/Plan" for Mr. Fisher's treatment the record states as follows:

> Patient initially presented in extremis with acute respiratory distress. He was placed on bipap and multiple therapeutic medications were initiated. It took him a long time to start to respond but eventually he did start to slowly improve. **I initially thought he might need to be intubated** and checked on him frequently during his ED course. Case discussed with Dr. Degani for ICU admission.  (emphasis added)

During this March 2018 hospital admission, he was on a BiPAP Machine in the Intensive Care Unit to assist him with breathing.

b.  April 17, 2018 – Taken to the ER for shortness of breath and exacerbation of COPD.

c.  July 26, 2018 – Taken to the ER for shortness of breath which had lasted for upwards of four days.

d.  August 23, 2018 – Taken to the ER for shortness of breath.

e.  September 6, 2018 – Taken to the ER for shortness of breath which had lasted for upwards of three days.  The notes reflect that Mr. Fisher complained at that time of mold in his apartment.

f.  January 8, 2019 – After participation in a lung cancer screening program, he was advised by the hospital that his recent CT scan "showed no concerning findings."

g.  March 13, 2019 – Taken to the ER for asthma, shortness of breath, and wheezing.  His doctor confirmed that he had "been using his nebulizers to no avail."

h.  April 25, 2019 – Seen by doctor who noted in his record an indication of "Chronic obstructive pulmonary disease with acute exacerbation…."

i.  August 20, 2019 – Taken to the ER again for Asthma.  He reported to his doctor that he has been using his nebulizers at home but "without improvement."  He went on to say that "he cannot smell because of how many nebulizer treatments he is given himself."

j.  September 2019 – Mr. Fisher begins to see Dr. Ira. M. Weinstein of Annapolis, Pulmonary & Sleep Specialists for his worsening asthma symptoms. Dr. Weinstein attributes Mr. Fisher's symptoms to the mold in his apartment.

k. September 2, 2019 – Taken to the ER for shortness of breath.  He complained that his breathing difficulties had been ongoing for "several days, worse today."  The paramedics who responded to his home noted that he was "tripoding," to breathe.   Mr. Fisher explained to the doctor that he was having shortness of breath while he was laying down at home.

l. October 3, 2019 – Taken to the ER for "severe respiratory distress, speaking in 1-2 word sentences."  He reported running out of his prescription prednisone the day before, and then "he woke up at 4 AM today feeling wheezy and congested."  He was stabilized in the ER by placement on oxygen.

m. November 22, 2019 – Taken to the ER for shortness of breath.  He presented to the ER with "COPD/asthma exacerbation, wheezing and [shortness of breath for] 2 days…."

n. December 26, 2019 – Taken to the ER for shortness of breath.  He reported that for "the last 2 to 3 days he has had increasing cough increasing shortness of breath until the last 24 hours where he can barely breath."  He reported that his nebulizer treatments were not working, his coughing was significant, and that his chest was tight.  As a result of his severe breathing issues, the doctor recommended

hospitalization, but observed that his "breathing dynamix improved with … management in the emergency department."  Mr. Fisher spent approximately ten (10) days admitted to the hospital after a diagnosis of pneumonia and other breathing issues.

o. April 20, 2020 – Taken to the ER in respiratory distress.  He reported increasing shortness of breath since the day before and was administered medicine by the paramedics.  He again required hospitalization.

p. May 18, 2020 – Taken to the ER for shortness of breath. He reported that his nebulizer is no longer working.

21.   In early May 2020, continuing to receive no assistance from his Property Manager or the others working at HACA, Mr. Fisher reached out to the City to request assistance with the mold in his apartment. As of May 2020, on account of the City's non-inspection policy for the HACA Properties, discussed *infra*, the Harbour House apartments had not been inspected by the City of Annapolis since May 16, 2016 – four years earlier.

22.   On May 19, 2020, due to the COVID-19 Pandemic, Mary Emrick of the Department of Planning and Zoning conducted a remote inspection of the apartment over Zoom with Mr. Fisher. In her report, Ms. Emrick confirmed the presence of "water damage," "bubbling paint," and "mold/mildew… coming from

around the area where calk is at tub/shower wall area (tiles) repair & recalk tub/shower area." She issued a violation notice to HACA shortly thereafter.

23.    On May 28, 2020, just over a week after the inspection, HACA responded to the City's violation notice by providing Mr. Fisher with a hotel reservation and contemporaneous correspondence. That correspondence read, in pertinent part: "Entry into your unit is very important, not only to the Housing Authority but also for your continued safety and the safety of your neighbors." In that same correspondence, HACA scheduled the "Maintenance Repair/Repair Shower Wall" for June 4, 2020 through June 10, 2020. HACA undertook work in the apartment.

24.    As a result of HACA's work in early June 2020, drywall was replaced in Mr. Fisher's apartment bathroom, but the mold was not properly remediated and removed.  Despite the failure to properly remediate the dangerous conditions, HACA represented to Mr. Fisher that his apartment was safe for him to move back in from the hotel.  The City did not require any follow-up testing of the apartment, as was their policy with all other non-HACA rental properties in the City, prior to Mr. Fisher moving back into the apartment.  As soon as he moved back in, Mr. Fisher's symptoms immediately returned.

25.    At this time Mr. Fisher told numerous individuals that the air in his apartment was going to kill him.  He recognized that the Housing Authority and the

City of Annapolis would do nothing more for him, so he began to pack his belongings and give away items to his neighbors in an effort to downsize and consolidate so he could move somewhere else.  He spoke to family about moving to a distant family member's home in California but planned to move to a shelter until he found something more permanent.

26.    On June 19, 2020, Mr. Fisher's pulmonologist, Dr. Ira Weinstein advised **both** the City of Annapolis and HACA as follows:

> I am writing this letter for my patient Mr. Damon Fisher (DOB: 02/23/1956), who has been under my care since 9/2019, for his diagnosis of Moderate Persistent Asthma. He is currently living in an environment that is hazardous to his health. He had a water leak in his house which produced visible mold. These conditions make it extremely hard for Mr. Fisher to breathe, triggering asthmatic attacks, causing many visits to urgent care. He has been on prednisone 3-4 times in the past 6 months as a result of his exposure to the mold. Mr. Fisher has moved to a new location but has since noticed mold in this unit as well. He did have the mold treated there but once it rained again after treatment, the mold smell has returned as well as his symptoms. He does not experience the same issues breathing when he is outside of the home. It is in my professional medical opinion that Mr. Damon Fisher should be removed from the environment that causes such respiratory distress. If you have any further questions concerning this matter please give my office a call.

27.    On June 22, 2020, counsel for Mr. Fisher corresponded with the City and HACA and placed them both on notice pursuant to the requirements of the Maryland Local Government Tort Claims Act ("LGTCA") of a case against these entities for violations of Mr. Fisher's civil rights as well as tort claims for negligence.

In that correspondence, counsel for Mr. Fisher pled with the City and the Housing Authority to move Mr. Fisher to a safer apartment stating in bold: "**Mr. Fisher needs to be moved to a safe environment immediately**."

28.    Three days later, on June 25, 2020, Mr. Fisher was found deceased in his apartment. On his death certificate, signed by his primary care doctor, Dr. Kari Alperovitz-Bichell, the "Immediate Cause (final disease or condition resulting in death)" is stated to be "Exacerbation of Chronic Obstructive Pulmonary Disease with Asthma." The "Conditions, if any leading to **immediate cause" listed "Mold in Residence."** (emphasis added).  His body was discovered on his mattress in his bedroom.  The majority of Mr. Fisher's personal belongings were organized in piles and packed cardboard boxes, ready to be moved.

29.    On July 2, 2020, counsel for Mr. Fisher sent the City and HACA a notice and litigation hold related to the present matter.  Pursuant to the LGTCA, both the City and HACA were placed on notice of the June 25, 2020 death of Mr. Fisher, as well as a potential forthcoming wrongful-death lawsuit against the City and the Housing Authority.  Further notice was provided on February 4, 2021 and April 9, 2021 as counsel for Mr. Fisher sought to resolve this action through mediation outside of litigation.

**Confirmation of Mold in Mr. Fisher's Apartment After His Death**

30.   On July 31, 2020, the personal representatives of Mr. Fisher's estate arranged for mold testing to be conducted at the residence. "High" levels of exceptionally toxic molds, including Stachybotrys/Memnoniella, Cladosporium, and Aspergillus/Penicillium, were found in various areas within the residence, and specifically in the area around the bathroom.  A "Medium" level of the exceptionally toxic Chaetomium mold was also discovered in the residence.

31.   On August 25 and October 26, 2020, mold testing was conducted by Environmental Solutions, Inc., a contractor hired by HACA. The results confirmed the July 31, 2020 mold testing conducted by the Estate and supported the findings of those results.  These various mold tests confirmed that the toxic conditions of the HACA apartment were not properly remediated by HACA in June 2020.

**Facts Similarly Alleged in the Case of *White, et al. v. City of Annapolis, et al*.**

**Historical Treatment of African Americans by the City of Annapolis**

32.   Throughout its nearly 370-year history, Annapolis has been home to many people of African descent, some of them seeing it for the first time from the perch of the slave auction block that stained its bustling harbor.  Throughout its history, Annapolis has discriminated and continues to discriminate against African Americans as it relates to residential housing.  As was alleged in *White*, the Plaintiffs allege here that "the City's refusal to enforce the licensing and inspection

requirements on HACA properties, and HACA's refusal to follow them, is discriminatory." *White v. City of Annapolis by & through City Council*, 439 F. Supp. 3d 522, 533 (D. Md. 2020).  Moreover, as was alleged in *White*, the Plaintiffs here allege that "in addition to the disparate impact, Annapolis' history supports an inference of intentional discrimination." *Id*.

### The HACA Properties

33.    HACA manages approximately 790 apartments spread over six (6) developments, which are home to approximately 1,600 residents.  Mr. Fisher resided in Harbour House, which was constructed in 1964, and is comprised of 273 units.

### Rental Unit License – A Requirement of the Annapolis City Code

34.    In the early 1980s, the City of Annapolis began to place great emphasis on licenses and inspections of its rental properties.  In fact, after the City first began to enforce its rental inspection regime, it faced a backlash from private property owners who fought the rental inspections as violative of the state constitution.  In response, the City sought and obtained emergency state legislation to remedy the constitutional deficiency.  The remedy gave the City the express authority to charge a rental dwelling license fee of all rental properties in the City.

35.    During the relevant time period, Chapter 17.44.010 of the City Code stated:

> No person shall let for occupancy or use any vacant single rental dwelling unit, multiple dwelling, bed and breakfast home,

roominghouse, or bargehouse without a current operating
license issued by the Department of Planning and Zoning, after
the application for the license has been approved by the Director
of Planning and Zoning, with the concurrence of the Fire Chief,
and the County Health Officer, for the specific named unit,
multiple dwelling, bed and breakfast home, roominghouse, or
bargehouse.

36.    During the relevant time period, Chapter 17.44.020 of the City Code
stated: "No operating license shall be issued or renewed unless the applicant owner
first has made application on an application form provided by the Director of the
Department of Planning and Zoning. The Director shall develop the forms and make
them available to the public."

37.    Pursuant to this and other portions of the City Code, all rental units
require a license issued by the City if they are to be legally authorized to operate.

38.    To obtain a license, rental units must be inspected and found to be in
compliance with the City's Residential Property and Maintenance Code. Annapolis
City Code, Chapter 17.44.010.

39.    During the relevant time period, HACA Properties managed solely by
HACA – including those occupied by Mr. Fisher - were **neither licensed nor
inspected** by the City.  These properties are the **only** rental properties within the
City that were **neither licensed nor inspected**.  They were not licensed because
HACA did not comply with the City Code by applying for rental licenses for its

properties, and the City chose not to do anything about HACA's lack of compliance with the Code. The City Code was simply not enforced on the HACA Properties.

40.   Pursuant to policies of the City's Office of Licenses & Permits Division, when conditions that present a danger to health or safety are found in an apartment that is currently occupied by tenants, a landlord will be required to relocate that tenant, remediate the danger, request a reinspection, and provide other proof at the landlord's expense to the City Inspector demonstrating the danger is no longer present.

41.   During the relevant time period, Chapter 17.44.130 of the City Code stated: "Upon suspension, revocation, denial, or expiration of a license, the director shall have the authority to cause notices to be posted on the property which shall state as follows: OCCUPANCY OF ANY DWELLING UNIT IN THIS BUILDING NOW VACANT OR BECOMING VACANT IS UNLAWFUL UNTIL A LICENSE TO OPERATE HAS BEEN OBTAINED AND IS DISPLAYED ON THE PREMISES."  No such postings are made by the City on the HACA Properties.

### The City's Notice of its Failure to Equally Enforce its Code

42.   Rental licenses have been a requirement of prospective landlords by the City since approximately 1985.  Despite the inspection requirement, the public housing units managed by HACA were rarely, if ever, subjected to any City inspections; they have never all been fully, finally, or properly inspected and

licensed in accordance with the City Code.   The properties where Mr. Fisher lived were not licensed by the City at any time during Mr. Fisher's occupancy of the properties.

43.    Maryland Housing and Community Development Code § 12-403 states: "Except as provided in § 12-506(b)(9) of this title, all housing projects of an authority are subject to the planning, zoning, sanitary, health, fire, housing, subdivision, and building laws, ordinances, codes, rules, and regulations that apply where the housing project is located."

44.    Maryland Housing and Community Development Code § 12-506(b)(9) states: "To aid and cooperate in the planning, undertaking, construction, or operation of housing projects located wholly or partly in the area in which it may act, a State public body, with or without consideration and on terms that it determines, may … plan, replan, zone, or rezone any part of the State public body, make exceptions to its sanitary, building, housing, fire, health, subdivision, or other similar laws, rules, regulations, and ordinances or make any changes to its map or master plan…."

**Rental License Application Process in the City of Annapolis**

45.    During the relevant time period, Chapter 17.44.060 (A) of the City Code stated: "The operator of a multi-family dwelling consisting of fifty or more units who employs a full-time maintenance staff of three or more employees on-site

shall have its license initially issued or renewed for a two-year period. **All other licenses shall be issued or renewed on an annual basis**." (Emphasis added).

46.    All of HACA's 790 units – including Mr. Fisher's – were required to be inspected and re-licensed by the City of Annapolis annually.

47.    The Rental Operating License Application mandated by the City of Annapolis states:

> A property owner must obtain a license prior to operating a rental facility within the City of Annapolis.  License application and rental operating license are non-transferable. Application must include fee of $100.00 per unit. ***Property must be inspected for compliance of the City's Code and International Property Maintenance Code before the license will be issued***.

48.    On May 1, 2016, the City began inspections of the HACA Properties. This initial round of inspections was not completed until July or August 2016.  Of the 790 units inspected there were **2,498** City Code violations uncovered by inspectors.

49.    Each of the six HACA Properties[3] inspected lacked the "Electric Hardwired Smoke Detectors" required by City Code of **all** rental units.  Many of the

---

[3] The six HACA Properties are as follows:  (1) Bloomsbury Square – Rebuilt in 2003, this is HACA's newest property, and it consists of 51 units; (2)  Harbour House – Constructed in 1964, is comprised of 273 units; (3)  Eastport Terrace – Constructed in 1953, is HACA's oldest property and is comprised of 84 units. Eastport Terrace and Harbor House share a property line, and the residents share the same recreational facilities; (4) Morris H. Blum Senior Apartments – Constructed in 1976, are HACA's only dedicated units for the elderly and disabled, and require tenants be 55-years-old (or 50-years-old if disabled) to apply; (5) Robinwood –

battery powered smoke detectors required of HUD's lower inspection standard were not functioning.

50.     Many of the City Code violations presented dangers to health and safety.  Consistent with the City Code, the City **should have required HACA** to relocate tenants pending the correction of the dangerous conditions or to reimburse tenants for their costs related to securing adequate substitute housing.  Even after it conducted the initial inspections, the City did not enforce its own Code remedies for non-compliance with the City Code. Pursuant to the City Code, the City could have revoked the licenses or required the vacation of the HACA Properties and relocation of HACA tenants while affected units were brought into compliance with the Code. The City chose to do neither.

51.     After the initial inspection results were provided to HACA officials in the summer of 2016, the Housing Authority was provided with follow-up inspection dates for when the City would be back out for a second round of inspections.  Some follow-up inspections were conducted, but **none of the six HACA Properties were ever fully and properly licensed.**

---

Constructed in 1970 is comprised of 150 units; and (6) Newtowne Twenty (or "Newtowne 20") – Constructed in 1971 was comprised of 78 units before its demolition in 2020.  It has been demolished and is in the process of redevelopment.

52.   In February 2018 testimony before the City Council, HACA Director Wilbourn stated that "We can't really have a strong housing authority without the full support of the City of Annapolis."

53.   Director Wilbourn then spoke about the various issues faced by HACA when it came to maintenance:

> **Let me be clear, I can't do maintenance. I can't get maintenance to get me away clear on properties that are 40, 50, in the case of Eastport Terrace 65 years old, and in need of major rehab**.  That is where redevelopment comes into play. And that is what we have RAD, that is what we have selected as the redevelopment tool… But the reality is, there is only so far we can get with maintenance.  At a point real estate needs some capital infusion, some major system rehabs, changing out, renewal, even the layouts need to be changed some. Obsolescence comes into play.  **And that's where we are with probably about five of our developments.**   And we are committed to taking that through so that we have in each of our communities, communities that all of us can be proud of.

(Emphasis added).

**Demographic Context and Disparate Impact**

54.   The Housing Authority of the City of Annapolis has six low-income housing properties: Bloomsbury Square; Harbour House; Newtowne Twenty; Eastport Terrace; Robinwood; and Morris H. Blum Senior Apartments.  Morris H. Blum Senior Apartments is restricted to older and disabled persons.

55.   Racial composition of these low-income housing developments is not directly available from public sources, but the racial composition of the Census

block (the immediate neighborhood) where each property is located can be determined from the 2010 Census.  The Census blocks for each of the six low-income housing properties are identified using the street addresses listed by the Housing Authority of the City of Annapolis.  The Census Bureau's American FactFinder street address function identifies Census blocks based on street addresses.

56.     Five of the Housing Authority properties are located in majority Black Census blocks.  Three of the Housing Authority properties (Bloomsbury Square, Newtowne Twenty, and Robinwood) are in blocks where **more than 90% of residents are Black**.  Whites comprise 58.9% of the residents in the block where the Morris H. Blum Senior Apartments is located, 16.3% of the residents are Black and 21.3% of the residents are Latino.[4]  Blum is the only Housing Authority property designated for seniors and disabled people, and it is the only Housing Authority property located in a majority White Census block.

57.   The six Housing Authority properties are in blocks where Blacks comprise 67.5% of the residents, Whites comprise 22.6% of the residents, and Latinos comprise 5.7% of the residents.  In contrast, in the City of Annapolis as a whole, Whites accounted for 53.5% of residents, Blacks accounted for 25.7% of residents, and Latinos accounted for 16.8% of residents.  Residents of the six

---

[4] White refers to Non-Hispanic Whites.

Housing Authority properties are disproportionately Black.  The proportion of Black residents in these properties is 2.6 times greater than the proportion of Black residents in the City of Annapolis.

58.    The five Housing Authority properties **not** designated as senior and disabled housing are in blocks where Blacks comprise 71.5% of the residents, Whites comprise 19.7% of the residents, and Latinos comprise 4.4% of the residents. As noted above, Whites accounted for 53.5% of residents in the City of Annapolis, Blacks accounted for 25.7% of residents, and Latinos accounted for 16.8% of residents.  Residents of the five Housing Authority properties not designated as senior housing are disproportionately Black.  The proportion of Black residents in the neighborhoods where these properties are located is 2.8 times greater than the proportion of Black residents in the City of Annapolis.

59.    *The City of Annapolis Five Year Consolidated Housing and Community Development Plan Federal Fiscal Year 2015-2019* identifies the racial distribution of residents in the public housing properties. Of the 831 public housing units,[5] 759 (91.3%) were identified as occupied by Blacks and 58 (7.0%) were occupied by

---

[5]  This figure of 831 public housing units references the additional HACA units which are located outside of the HACA managed properties in other public/private developments, and incipiently, are inspected by the City.

Whites.[6]  A separate table reports 20 Hispanic residents.[7]  The race of the Hispanic residents is not reported.  This report was submitted in May 2015, so these numbers presumably represent the public housing population in 2015.    In 2010, Whites accounted for 53.5% of residents in the City of Annapolis, Blacks accounted for 25.7% of residents, and Latinos accounted for 16.8% of residents.  Based on the City's report and the 2010 Census data, the proportion of Black residents in these properties is 3.6 times greater than the proportion of Black residents in the City of Annapolis.

## Facts Learned Subsequent to Filing of *White, et al. v. City of Annapolis, et al.*

60.    Allegations contained in the case of *White, et al. v. City of Annapolis, et al.* which related to the agreement between the City and the Housing Authority to no longer enforce the City Code on the HACA Properties were, at the time, based upon information and belief.  However, upon filing of the complaint in that case, various members of the public came forward with information, including documents, which certified those allegations of agreement, policy, and conspiracy.  The present allegations are based upon undisputed facts.

---

[6] Table 24, *The City of Annapolis Five Year Consolidated Housing and Community Development Plan Federal Fiscal Year 2015-2019.*

[7] Table 25, *The City of Annapolis Five Year Consolidated Housing and Community Development Plan Federal Fiscal Year 2015-2019.*

**Executive Director Wilbourn and Mayor Buckley Entered an Agreement to Cease City Inspections of the HACA Properties**

61.     In June 2017 newly appointed Director Wilbourn issued her Executive Director's Report for June 2017.  Director Wilbourn identified the City inspections of the HACA Properties as a hurdle to her success in balancing the HACA budget stating:

> A major assumption to remain within FY 2018 budget pertains to the City of Annapolis **working with** HACA regarding City ordered inspections, repairs and upgrades on HACA property. HACA has experienced unsustainable maintenance overtime, delays in unit turnover, defer [sic] maintenance actions, imposition of fees to the City, and unrealistic deadlines to meet City inspection mandates. **The current relationship with the City cannot continue** if HACA is to achieve its priority of maximizing housing opportunities. I will meet with the City Administrative [sic] this week to discuss the decreased housing opportunities and increased cost overruns caused by the City **unfunded mandates**.

(emphasis added).

62.     Director Wilbourn interpreted the state and city code statutes which require inspections of the HACA Properties – inspections conducted to ensure the health and safety of the occupants – by the City to be "unfunded mandates," on the Housing Authority.  It was Wilbourn's view that a major assumption of the FY 2018 budget required the City of Annapolis to "work" with HACA regarding the City-ordered inspections, repairs, and upgrades on the HACA Properties. The Executive

Director went so far as to say that the "current relationship" – one where the City conducted inspections of the HACA Properties – "cannot continue."

63.     In July 2017, via email, Mary Emrick, a Senior City Inspector, requested that Director Wilbourn advise when the City might receive HACA's next round of applications for license renewals, a logistical step which would have begun the next round of HACA Property inspections.  Director Wilbourn forwarded that email correspondence along to HACA Board Member John Dillon.  In that forward, she advised that she had discussed the inspections with the City Manager Thomas Andrews and relayed to Dillon that her understanding from her conversation with the City Manager was that the City would "work out an agreement going forward on the inspections," but that apparently because Mr. Andrews was out of town on vacation the inspections were being scheduled.

64.     In her email, Director Wilbourn advised that if the issue could not be worked out, she would refer the matter to HACA's attorneys, an action which was interpreted by members of the HACA Board, in a subsequent email, to mean that Director Wilbourn was in favor of bringing suit against the City of Annapolis to prevent inspections of HACA Properties if the City insisted on inspecting the properties.

65.     On approximately August 30, 2017, having apparently failed to reach an agreement regarding the inspections, Mary Emrick was advised by Director

31

Wilbourn that "the city is to not do any inspection until [Director Wilbourn] speaks with the board."

66.    Upon receipt of that correspondence, then Mayor Pantelides countered: "**This is not acceptable!** In our meeting last week we agreed the inspections would move forward.  **Why is she fighting against everyone being treated the same? We are trying to improve their quality of life.**"  (emphasis added).

67.    On approximately September 8, 2017, Director Wilbourn drafted a document titled "Status Report on Scope of Work identified in Employment Agreement."  This document reflects Director Wilbourn's assessment of her actions to date as HACA Director in terms of various line items which had been included under the "Scope of Work" in her Employment Contract. In response to one line item in the scope of work, Director Wilbourn stated:

> Unsuccessfully worked to redefine relationship between HACA and Mayor's office. Unsuccessfully sought City consensus to move from City inspections to REAC inspections, for sustainability, HUD compliance and avoiding unintended liabilities to HACA.

In the final line of the draft, and in response to the line item titled, "Exercise authority to function and take actions deemed necessary to execute Scope of Work," Director Wilbourn provided the following: "**Executive Director's authority is continually undermined by Board members and City**." (emphasis added).  Director Wilbourn

apparently believed that the City was undermining her ability to perform her job by enforcing the state and city code on HACA as a landlord in Annapolis.

68.  City elections were held November 7, 2017.  Mayor Pantelides, who had emphasized during his reelection campaign that he was the "First Mayor to Inspect Public Housing," was unseated by Gavin Buckley.  However, Mr. Buckley would not be sworn in as mayor until the following month.

69.  In November 2017, Director Wilbourn was in the process of negotiating her contract of employment with HACA.  In response to an email regarding the contract negotiation, and highlighting a lack of language within the contract, HACA Board Member Kimberly Cornett pointed out the following: "Largely this looks fine but [I] did want to note that it is silent on the expectations of the Executive Director vis a vis the City inspections which have been an issue between Beverly and the Board."  With the mandated city inspections still a City requirement of the Pantelides administration, and the apparent concern that the Board did not believe Director Wilbourn would follow their decisions regarding the inspections, Board Chairwoman Sandra Chapman responded on November 20, 2017 as follows:

> I would also like to remind you that the City not the board took action on setting up the City inspections. No, it is not a concern that Beverly isn't going to listen to the board on this matter. **Her and I have spoken about improving relationships with the City, and <u>she has already met with our incoming Mayor about this and the inspections</u>**.

(emphasis added). Then Mayor-elect Buckley had not yet been sworn into office on the day this email was sent. Mayor-Elect Buckley and Director Wilbourn entered their agreement to stop inspections of the HACA Properties prior to Mr. Buckley even having taken the oath of office.

### The Mayor, the City of Annapolis Office of Law, and the Housing Authority Worked Together to Try to Evict a HACA Tenant and Formalize the City's Policy of Non-Enforcement of the City Code on the HACA Properties

70.     During approximately the first year and a half of Mayor Buckley's administration – December 2017 through May 2019 – the only evidence of the City's new policy of non-enforcement of the City Code on the HACA Properties were representations to members of the public made by members of the City's Office of Planning and Zoning. Those representations came about when HACA residents called to complain about issues related to their HACA apartments. Representatives from that office explained that the City no longer inspected the HACA Properties.

71.     On March 27, 2019, HACA resident Ladawn Camp was sued by the Housing Authority in the case of *Housing Authority of the City of Annapolis v. LaDawn Camp*, Anne Arundel County District Court Case No. D-071-LT-19-001816. The case was filed for alleged failure to pay rent. In her defense, she raised the fact that she had paid rent and that HACA was mistaken. However, she also brought to the attention of the district court the fact that HACA was not even licensed

by the City to rent their properties, and therefore, pursuant to Maryland law, it was legally foreclosed from filing summary ejectment actions in landlord/tenant court.

72.    In an effort to undermine Ms. Camp's defense, HACA and the City worked together to prosecute her eviction.

73.    In an April 26, 2019 email from a HACA attorney to an Assistant City Attorney, HACA forwarded a draft affidavit for the signature of City Manager Teresa Sutherland.  HACA's attorney went on to express that "HACA needs the assistance of the City, as discussed."  To that end, HACA's attorney stated: **"It would be terrible for HACA and the City if HACA was prohibited from collecting rent because it has no licenses for its units."**

74.    On May 9, 2019, in a follow-up email from HACA's attorney to the City Attorney, the HACA attorney explained that HACA Executive Director Wilbourn would be calling Mayor Buckley that day to discuss with the Mayor his preparation of a potential witness from the City for the May 14, 2019 hearing.  That witness was to be the City's Chief of Code Enforcement.  In that email, HACA's attorney also inquired further into the status of the affidavit.

75.    The following day, May 10, 2019, the City Manager executed an affidavit which reduced to writing the City's non-inspection policy of the HACA Properties.  Under oath, she swore that "no City inspections or licenses are required for HACA to operate its properties lawfully."  This document reflects that as of that

date – May 10, 2019 – the City's stated policy was specifically not to require HACA's compliance with the City Code.  Pursuant to City policy, HACA properties were not required to be inspected or licensed by the City.

76.    At the May 14, 2019 hearing in *HACA v. Camp*, the City's Chief of Code Enforcement testified after his preparation by Mayor Buckley that it was in fact Mayor Buckley who decided to exempt HACA from the City's licensing requirement.   After the hearing, HACA's attorney emailed the City's Chief of Code Enforcement to thank him for testifying on HACA's behalf.  In that email, he copied the following individuals: the City Attorney, the City Manager, Mayor Buckley, and Executive Director Wilbourn.

77.    On May 16, 2019, plaintiffs in the case of *White, et al. v. City of Annapolis, et al.*, Civil Action No. 1:19-cv-01442-CCB, filed suit in the U.S. District Court for the District of Maryland.  In that lawsuit plaintiffs alleged that the City had discriminated against residents of public housing through their jointly agreed upon non-inspection policy as it related to the HACA Properties.

### The City and HACA's Joint Policy of Separate and Unequal Inspection Standards – The "Shadow Policy"

78.    Upon filing of the *White* lawsuit, the Mayor and City Council took swift public-facing actions to correct their plainly discriminatory policy which had been brought to light in the complaint.  On June 10, 2019, less than a month after the lawsuit was filed and before it was even served on the City, the Mayor and City

Council of Annapolis unanimously adopted R-26-19, which resolved that "the City of Annapolis [would once again] begin inspecting HACA units under the City's rental licensing program." Yet despite this resolution, the illegal and blatantly violative conduct continued. Despite the adoption of Resolution R-26-19 and its representation that the Mayor and City Council would begin to treat Housing Authority tenants equally with those citizens who lived in all other rental properties in the City, both City and HACA officials continued behind the scenes to work together to discriminate directly against the tenants of the HACA Properties, including Mr. Fisher.

79.     Despite the resolution, officials from the City and the Housing Authority conspired further to treat the tenants of the HACA Properties differently. On approximately June 28, 2019, the City and HACA agreed to implement a Shadow Policy to conduct inspections on Housing Authority units **differently** than all other rental units throughout the City. In an email from City Manager Teresa Sutherland to HACA Executive Director Beverly Wilbourn, the City Manager outlined ways in which the City would circumvent the requirements of R-26-19 through "waivers" and "grandfathering old violations" in the following ways:

    a. Inspections would be for life safety issues **only**, with the exception of the requirement for hard-wired smoke detectors, which the City agreed to waive.

b. Hard-wired smoke detectors are required in all City rental properties. However, the City waived this requirement for the HACA properties. Instead, unlike all other rental properties in the City, the HACA Properties would be allowed to use battery operated smoke detectors.

c. The City and HACA agreed that the City would not deny a license for a unit for deficiencies in routine maintenance, but would simply note the violations, consider waivers up to one year, and issue the license despite the violations.

d. Disturbingly, the City and HACA agreed that the City might not even withhold a license for "structural or mechanical defects." Rather, whether structural or mechanical defects would result in HACA being denied a license would be decided on a case-by-case basis; the City might consider waivers even for those significant issues.

80.   The City and HACA's agreement to the issuance of a one-year waiver for deficiencies in routine maintenance amounted to a complete waiver of "routine maintenance" violations since the term of a license was one year under the City Code.  In effect, this Shadow Policy gutted R-26-19, while the HACA residents and

citizens of Annapolis were otherwise left to believe that the City was carrying out the law as represented.

81.     Further, the City's 2019 and early 2020 inspections of the HACA Properties which were conducted under the auspices of R-26-19 failed to note many of the very same types of "routine maintenance" violations that had surfaced in the 2016 inspections.  The types of items for which HACA could receive a "waiver" included, among others, the following:

> a.  Chipping paint on walls
>
> b.  Rodent infestations
>
> c.  Defective doorknobs at the entrance to apartments
>
> d.  Inoperable vent fans (which reduce moisture and prevent mold growth)
>
> e.  Broken light fixtures
>
> f.  Defective and broken countertops
>
> g.  Holes in doors and walls
>
> h.  Missing bathroom fixtures
>
> i.  Missing window screens in buildings that did not have air conditioning

82.     In practice, the Shadow Policy agreed upon by the City and HACA resulted in the City's inspectors plainly ignoring numerous routine maintenance

failures that would have been enforced as violations had they been encountered by City inspectors at any other rental property in the City.

83.   As a November 7, 2019 inspection report on the Morris Blum Senior Living Building demonstrated, the City scheduled re-inspections only for "Life Safety" and "Structural and Infestation" violations.

84.   Another inspection in January 2020 inexplicably contained only "Life Safety" and "Structural, Plumbing, Elec" violations and made no effort to even identify the "routine maintenance" failures.

85.   ***In Mr. Fisher's case***, one location where toxic mold was found in his apartment was in his bathroom.  The City and HACA's Shadow Policy treated maintenance of the air ducts and air filters of apartments such as Mr. Fisher's as "routine maintenance" and therefore not subject to City oversight.  For example, in the May 2016 City inspection results of the HACA Properties, there were numerous instances where violations were issued against HACA for clogged or broken "vent fans" in the bathrooms of various apartments.  These fans expel humid air from the bathroom which prevents mold and mildew from forming.  However, after the shadow policy was implemented, those same types of violations were considered "routine," and therefore subject to complete waiver at the City's discretion.  In contrast, if Mr. Fisher had lived in a privately owned apartment, his bathroom air

vent and filters would have been subject to inspections for violation of this routine maintenance which helped to prevent mold growth.

86.    The Shadow Policy continued the City's separate, unequal inspections for Housing Authority units, treating Housing Authority tenants as second-class citizens, not deserving of the same standards of housing as tenants in private rental properties in the City.

87.    The Shadow Policy allowed the City and HACA to intentionally treat the tenants of the HACA Properties differently than tenants who live just across or down the street from a neighbor who lives in a property that is not a HACA Property. HACA not fully complying with City Code and the City applying different, lesser standards to HACA properties in response, is just one further example of how the City and HACA partnered to further perpetuate segregation in the City of Annapolis. Their partnership operated to the detriment of Mr. Fisher's life, health, and safety as well as the life, health, and safety of all other residents of HACA properties.

## COUNT I
### (Violation of Fair Housing Act, 42 U.S.C. § 3601 *et seq.*)
### *Against Defendants City of Annapolis and the Housing Authority of the City of Annapolis*

88.     Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

89.     Defendant's policy of non-enforcement of the City Code on the HACA Properties constitutes a violation of the Fair Housing Act, 42 U.S.C. §3604 *et seq.*, which makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."

90.     Defendants City of Annapolis and the Housing Authority of the City of Annapolis' facially neutral housing acts, policies, and actions challenged herein inflicted disproportionate harm on Mr. Fisher.   The disproportional harm experienced by Mr. Fisher is the direct and immediate consequence of the Defendants' policy of non-enforcement of the City Code on the HACA Properties.

91.     As a result of Defendants City of Annapolis and the Housing Authority of the City of Annapolis' acts, Mr. Fisher was denied the opportunity to live in safe rental housing inspected by the City of Annapolis on an annual basis, a right he would have enjoyed if he had lived in any other rental property in the City that was not managed by the Housing Authority.

92.   Defendants' acts, policies, and practices constitute discrimination in violation of the Fair Housing Act, as amended, 42 U.S.C. §3604, and its implementing regulations, in that:

    a.   Defendants' acts, policies, and practices have made and continue to make housing unavailable because of race in violation of 42 U.S.C. §3604(a). Specifically, HUD regulations provide in pertinent part that "[i]t shall be unlawful, because of race [or] national origin . . . to discourage or obstruct choices in a community, neighborhood or development." 24 C.F.R. § 100.70(a). Such acts "include, but are not limited to: (1) Discouraging any person from inspecting, purchasing, or renting a dwelling . . . because of the race [or] national origin . . . of persons in a community, neighborhood or development." 24 C.F.R. § 100.70(c)(1); and

    b.   Defendants' acts, policies, and practices provide different terms, conditions, and privileges of rental housing on the basis of race, in violation of 42 U.S.C. § 3604(b). Specifically, HUD's regulations implementing § 3604(b) specify that "[p]rohibited actions under this section include, but are not limited to . . . failing or delaying maintenance or repairs of sale or rental dwellings" and "[l]imiting

the use of privileges, services or facilities associated with a dwelling" because of race or national origin. 24 C.F.R. § 100.65.

93.    Additionally, Defendants' acts, policies, and practices perpetuate segregation in violation of the Fair Housing Act which is prohibited.  HUD's regulations implementing the Fair Housing Act state that "[a] practice has a discriminatory effect where it…creates, increases, reinforces, or perpetuates segregated housing patterns because of race[.]"  24 C.F.R. § 100.500(a).

94.    Mr. Fisher is an aggrieved person as defined in 42 U.S.C. § 3602 (d) and (i) and has been injured by Defendants' discriminatory conduct defined by 42 U.S.C. § 3602(f).

95.    Mr. Fisher endured extreme pain, fear, suffering, and death as a direct and proximate result of these discriminatory policies and practices of the City of Annapolis and the Housing Authority of the City of Annapolis.

### COUNT II
### (Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1982)
### *Against Defendants City of Annapolis and the Housing Authority of the City of Annapolis*

96.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

97.    Defendants' discriminatory practices, made in reckless or callous indifference or disregard for the rights of Mr. Fisher, deprived Mr. Fisher of his right to purchase, lease, or otherwise hold or convey property on the basis of race, color,

and national origin and thus deprive them of the same such rights as are enjoyed by White persons in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1982.

98.   Mr. Fisher was advised on multiple occasions by his doctor that he needed to be moved out of his apartment.  Both the City and HACA were aware prior to Mr. Fisher's death of his doctor's direction, that the air in his apartment was making him sick, and that he was forced to be removed from the apartment on at least one occasion as a result of the condition of the apartment.

99.   Mr. Fisher was moved out of his apartment and provided a hotel room for a short time where he was able to breathe normally.  When he returned to his apartment, which had not been properly remediated of the presence of dangerous and toxic mold, had not been inspected by the City of Annapolis for years and was not required by the City of Annapolis to be properly inspected after the alleged remediation and prior to Mr. Fisher moving back into the apartment, which is the policy of the City as it pertains to all other non-HACA rental properties in the City, Mr. Fisher's breathing difficulties immediately returned.

100.  Mr. Fisher endured extreme pain, fear, suffering, and death as a direct and proximate result of these discriminatory policies and practices of the City of Annapolis and the Housing Authority of the City of Annapolis.

## COUNT III
### (Violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States)
### *Against Defendants City of Annapolis and the Housing Authority of the City of Annapolis*

101.  Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

102.  Defendants' discriminatory customs, patterns, practices, and usages in contravention of Mr. Fisher's constitutional and federal statutory rights made in reckless or callous indifference or disregard for the rights of Mr. Fisher, did deprive Mr. Fisher of his right of equal access to housing under color of law in violation of the Federal Civil Rights act of 1871, 42 U.S.C. § 1983, and his rights under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution with regard to housing.

103.  Mr. Fisher endured extreme pain, fear, suffering, and death as a direct and proximate result of these discriminatory policies and practices of the City of Annapolis and the Housing Authority of the City of Annapolis.

## COUNT IV
### (Violation of the Civil Rights Act of 1871, 42 U.S.C. § 1985 Section 3 and the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States)
### *Against Defendants City of Annapolis and the Housing Authority of the City of Annapolis*

104. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

105. Defendants conspired with discriminatory purpose to deprive either directly or indirectly the rights of Mr. Fisher, a member of a protected class, to equal protection of the laws or equal privileges and immunities under the laws, and one or more of the Defendant conspirators did or caused to be done acts in furtherance of the object of the conspiracy, and Mr. Fisher was injured in person or property or deprived of having and exercising their rights as citizens of the United States.

106. Mr. Fisher endured extreme pain, fear, suffering, and death as a direct and proximate result of these discriminatory policies and practices of the City of Annapolis and the Housing Authority of the City of Annapolis.

## COUNT V
**(Violation of the Civil Rights Act of 1871, 42 U.S.C. § 1986 and the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States)**
*Against Defendants City of Annapolis and the Housing Authority of the City of Annapolis*

107. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

108. Defendants, their employees, and their agents were in a position of power and knowledge of the conspiracy to deprive Mr. Fisher of his rights in violation of 42 U.S.C. § 1985.

109.  Defendants were on notice through City Council meetings, both open and closed to the public, as well as communications between the Mayor, City Council, the Executive Director, and Housing Authority officials, that the City had an obligation to inspect the HACA Properties and that the Housing Authority had an obligation to comply with those inspections.  Despite these obligations, the City and Housing Authority agreed to a policy not to inspect the HACA Properties to the same standard of all other rental properties in the City.  In continued refusal of enforcement of City Code, and despite notice of that obligation, Defendants failed to uphold their duty to ensure the health and safety of Mr. Fisher.  Mr. Fisher's civil rights were violated as a result.

110.  Mr. Fisher endured extreme pain, fear, suffering, and death as a direct and proximate result of these discriminatory policies and practices of the City of Annapolis and the Housing Authority of the City of Annapolis.

### COUNT VI
### (Violation of the Maryland State Constitution – Article 24 of the Maryland Declaration of Rights)
### *Against Defendants City of Annapolis and the Housing Authority of the City of Annapolis*

111.  Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

112.  The Defendants, by their acts, have acted under color of law and have violated Article 24 of the Declaration of Rights of the Maryland State Constitution,

(1) by discriminating against Mr. Fisher, and (2) by treating Mr. Fisher on less than equal terms as those similarly situated tenants in the City of Annapolis who are not tenants of public housing.

113.  Defendants' discriminatory customs, patterns, practices, and usages in contravention of Mr. Fisher's Maryland constitutional rights made in reckless or callous indifference or disregard for the rights of Mr. Fisher, did deprive Mr. Fisher of his right of equal access to housing under color of law in violation of Article 24 of the Maryland Declaration of Rights with regard to housing.

114.  Mr. Fisher endured extreme pain, fear, suffering, and death as a direct and proximate result of these discriminatory policies and practices of the City of Annapolis and the Housing Authority of the City of Annapolis.

## COUNT VII
### (Violation of the Maryland Consumer Protection Act)
### *Against Defendants Housing Authority of the City of Annapolis and Property Manager Shaw*

115. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

116. The Consumer Protection Act broadly outlaws unfair or deceptive acts in the rental of consumer residential housing, including failures to state material facts if the failures tend to deceive.  Md. Code Ann., Com. Law § 13-101, *et seq.*

117. At the inception of the lease with Mr. Fisher and at the time of each renewal of the lease, which is required by HACA policy to occur annually, Defendants had both actual and constructive knowledge that the HACA Properties were not properly licensed pursuant to City Code.

118. In the last such renewal dated August 1, 2019, HACA agreed that it was obligated to:

    a.  "Maintain the unit and the development in decent, safe and sanitary condition."

    b.  "Comply with the requirements of all applicable building and housing codes materially affecting health and safety and all applicable U.S. Department of Housing and Urban Development regulations."

    c.  "Make necessary repairs to the unit within a reasonable time…."

    d.  "Maintain in good and safe working order the condition, electrical, plumbing, sanitary, heating, and ventilation and other facilities and appliances… supplied by HACA."

119. Defendant HACA made these affirmative representations to Mr. Fisher at the time of lease inception and at each subsequent renewal.  At the time of these false representations, Defendant HACA was on notice from the City of Annapolis

that the HACA Properties were not in compliance with the City's Fire Safety Code as it pertained to "multiple dwelling rental unit" as defined by the City Code. This misrepresentation that the HACA Properties were of a particular standard amounted to unfair and deceptive trade practices.

120. HACA had an obligation to Mr. Fisher to disclose the material fact that HACA did not hold a license to rent Mr. Fisher's apartment, and HACA failed to advise Mr. Fisher of that fact.

121. Prior to entering the lease and upon each renewal, Defendant HACA affirmatively offered the unit to Mr. Fisher and represented it to be licensed and free of any material defects, including unhealthy indoor molds and water intrusion defects.

122. HACA was aware or reasonably should have been aware that his apartment contained mold that was harmful and presented an unreasonable danger to Mr. Fisher's health and safety, but nevertheless represented to Mr. Fisher that his apartment was free of toxic mold and safe for him to return.

123. Mr. Fisher's unit had design defects, serious safety shortfalls including the lack of appropriate fire safety systems, construction and/or maintenance defects which caused severe water intrusion and extensive mold growth and dangerous air quality issues, all existing at the time the lease was entered into or renewed, and these defects were omitted in the representations made by Defendants.

124. As a proximate and direct result of Defendants unfair and deceptive trade practices in violation of the MCPA, Mr. Fisher endured pain, suffering, and death.

## COUNT VIII
### (Violation of Annapolis Municipal Code § 18.08.010)
### *Against Defendants City of Annapolis, the Housing Authority of the City of Annapolis, and Property Manager Shaw*

125. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

126. As discussed *supra*, Plaintiffs have complied with their obligations related to notice pursuant to the Maryland Local Government Tort Claims Act.

127. Defendants had a duty recognized by the law which required conformance to a certain standard of conduct set forth in their own Municipal Code, which states as follows:

> All residentially leased buildings or dwelling units shall be maintained, by the landlord, in full compliance with the residential housing standards as enumerated in Chapter 17.40 of this code and applicable provisions of the Annotated Code of Maryland.

Annapolis City Code Chapter 18.08.010 (A).

128. That Chapter goes on to state that:

> If, after actual notice to the landlord by the tenant, the landlord fails to take reasonable steps to supply or repair facilities and to restore services required under Subsection A of this section, within a reasonable time, not exceeding forty-eight hours, the tenant may:

1. Bring an action to recover actual damages resulting from the landlord's violation of this section and, if the landlord has willfully violated this section, to recover treble damages;

…

4. Recover costs and attorney's fees in any action under this section.

Annapolis City Code Chapter 18.08.010 (B).

129. Mr. Fisher gave actual notice to the landlord, and the landlord failed to take reasonable steps to repair the mold.  HACA failed to fix it, failed to remediate it, and failed to protect their tenant from deadly mold.

130. The landlord violated this section and that violation proximately caused the death of Mr. Fisher.

131. The landlord's violation of the section was willful.

## COUNT IX
## (Negligence)
### *Against Defendants Housing Authority of the City of Annapolis and Property Manager Shaw*

132. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

133. As discussed *supra*, Plaintiffs have complied with their obligations related to notice pursuant to the Maryland Local Government Tort Claims Act.

134. Defendants had a duty recognized by the law which required conformance to a certain standard of conduct for the protection of others against unreasonable risks.

135. Defendants failed to conform to that standard through a breach of that duty.

136. As a proximate and direct result of Defendants' negligence, Mr. Fisher suffered mental and emotional anguish, pain and suffering, severe health damage, and death.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court grant them the following relief:

        A.    Compensatory damages for the deprivation of Mr. Fisher's civil rights.

        B.    Compensatory damages for pain, suffering, mental anguish, emotional distress, physical impairment, and death in excess of $75,000.

        C.    The Court should issue an order granting Plaintiffs' request for declaratory relief, finding that the Defendants' actions violated the FHA.

        D.    Treble damages pursuant to Annapolis Municipal Code § 18.08.010.

        E.    The Court should award Plaintiffs their reasonable attorneys' fees, costs, and expenses.

        F.    The Court should grant such other relief as it deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all issues in this case.

Respectfully submitted,


**THE DONAHUE LAW FIRM**


By:   /s/ *P. Joseph Donahue*
             P. Joseph Donahue, Esquire
             Bar Number: 06245
             18 West Street
             Annapolis, Maryland 21401
             Telephone: 410-280-2023
             Fax: 410-280-0905
             Email: pjd@thedonahuelawfirm.com