**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

**Baltimore Division**

| | | |
|---|---|---|
| **THE ESTATE OF** | * | |
| **DAMON R FISHER**, *et al.*, | | |
| | * | |
| **Plaintiffs,** | | |
| | * | **Civil Action No.: 1:21-cv-01074-CCB** |
| **v.** | * | |
| | | |
| **THE CITY OF ANNAPOLIS**, *et al.* | * | |
| | * | |
| **Defendants.** | | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT CITY OF ANNAPOLIS'
MOTION TO DISMISS COMPLAINT
OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**</u>

Both the *Estate of Mr. Fisher's* Survival Action and the *Johnson* Class Action are

nonstarters because of the *White* Consent Decree. This is a collateral attack on the enrolled *White*

Consent Decree and final judgment of this Court. The facts show Mr. Fisher retained Plaintiffs'

Counsel prior to the negotiation of the *White* Consent Decree, and after this Court had approved

an unopposed Motion for Leave to add 22 plaintiffs. Plaintiffs' Counsel knew well the process to

get relief for additional plaintiffs. Plaintiffs' Counsel took no actions to protect the rights of

neither the *Estate of Mr. Fisher* nor the *Johnson* Plaintiffs. *Res judicata*, ethics, Rule 11

violations, and more, require a more full inquiry by this Court.

## INTRODUCTION

Plaintiffs and Plaintiffs' Counsel enjoyed and continue to enjoy all the equitable and financial benefits of the *White* Consent Decree including the City's payment of $900,000.00. The City timely filed its first *White* Consent Decree Report on February 1, 2021. The City and HACA are being called away from the heavy lifting that our joint application for a United States Department of Housing and Urban Development ("HUD") Choice Neighborhood Initiative Implementation Grant Application requires to deal with these non-justiciable lawsuits. This case represents a bald attempt to relitigate the City's pre-consent decree actions and is an impermissible collateral attack on the enrolled Consent Decree in *White*, which is now *res judicata*. The City now moves to dismiss the *Estate of Mr. Fisher* and the *Johnson* Class Action.

## TABLE OF CONTENTS

**FACTS** ....................................................................................................................... 3

    1.   The White Lawsuit ........................................................................................... 3

    2.   Plaintiffs' Unopposed Motion for Leave to File Second Amended Complaint in the White Lawsuit ...................................................................................................... 4

    3.   Mediation on August 24 & 27, 2020 in the White Lawsuit ............................... 4

    4.   The enrolled White Consent Decree ............................................................... 5

    5.   The Estate of Mr. Fisher ................................................................................. 7

    6.   The Johnson Class Action Lawsuit .................................................................. 8

    7.   These Lawsuits involves No Post-White Consent Decree Allegations ............. 9

    8.   Post-White Consent Decree Actions of the City & HACA ............................... 9

**STANDARD OF REVIEW** ...................................................................................... 10

**ARGUMENT** ......................................................................................................... 12

    I.   The White Consent Decree is Res Judicata and Prevents Plaintiffs in both The Estate of Mr. Fisher Survival Action and the Johnson Class Action from Recovering Against This Defendant for Damages Arising Out of the Same Factual Transaction Governed by the White Consent Decree. ...................................................................................... 12

A.   *The Estate of Mr. Fisher* and the *Johnson* Class Action Claims arise from the same factual series of transactions as the *White* Consent Decree................................................... 13

B.   The *White* Consent Decree is a Final Order ................................................ 14

C.   *The Estate of Mr. Fisher* and the *Johnson* Plaintiffs are the same as, or in privity with, the *White* Plaintiffs. ......................................................................................... 14

D.   *The Estate of Mr. Fisher* and the *Johnson* Class Action are both precluded by *Res Judicata*. ................................................................................................ 15

II.   This Lawsuit Fails to Include Indispensable Parties including the White Plaintiffs and Plaintiffs' Counsel, and the United States Department of Housing and Urban Development.. 16

A.   The Named *White* Plaintiffs are Necessary and Indispensable parties. ......................... 17

B.   HUD is a Necessary and Indispensable Party Because the Results of HUD's Actual Annual REAC Inspections of HACA Properties Allowed HACA to Continue to Provide Housing to Both the Decedent in *Estate of Mr. Fisher* and the *Johnson* Plaintiffs and Despite HACA's Failing Inspection Scores. ................................................................... 18

III.   Ethically, Plaintiffs' Counsel cannot Serve Three Masters, here the White Plaintiffs, The Estate of Mr. Fisher and the Johnson Class Action Plaintiffs............................................ 21

IV.   Plaintiffs' Counsel Violates Rule 11 and the White Consent Decree by Suing Upon Pre-Consent Decree Action for The Estate of Mr. Fisher and the Johnson Class Action. .............. 24

**CONCLUSION**...................................................................................... 26

## FACTS

### *1.* **The *White* Lawsuit.**

As this Court is aware, in May 2019, Plaintiffs filed an action against this Defendant, the City of Annapolis, and its Mayor Gavin Buckley, and the Housing Authority for the City of Annapolis ("HACA") and its Executive Director Beverly Wilbourn, before this Court. The City requests the Court take judicial notice of the Second Amended Complaint for the *White* Lawsuit where Plaintiffs alleged violations of Plaintiffs' rights under the Fair Housing Act as amended, 42 U.S.C. § 3601, *et seq*.; the Civil Rights Act of 1866, 42 U.S.C. §§ 1982, 1983, 1985, and 1986; the Equal Protection clause of the Fourteenth Amendment to the United States Constitution; the "affirmatively furthering" obligations of the Fair Housing Act, 42 U.S.C. § 3608; and the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq*., in addition to violations of

the Maryland Consumer Protection Act, as well as a Writ of Mandamus, and State Tort Claims

including negligence and gross negligence, civil conspiracy, the Consumer Protection Act,

Breach of Contract and Breach of Warrant of Habitability, and Punitive Damages.

### 2. Plaintiffs' Unopposed Motion for Leave to File Second Amended Complaint in the *White* Lawsuit

On April 17, 2020, Plaintiffs' Counsel petitioned this Court to "add five (5) additional

families including 22 individuals as Plaintiffs." *See* ECF 52-1 in *White* (Plaintiffs' Unopposed

Motion for Leave to File Second Amended Complaint to Add Additional Plaintiffs). There, the

*White* Plaintiffs noted that since "June 12, 2019, counsel for Plaintiffs have been contacted by

additional residents of HACA public housing seeking assistance and representation in asserting

claims that mirror the claims of the current Plaintiffs in this case." *Id*. The *White* Plaintiffs

accurately foreboded that the "most efficient and cost-effective way to address these HACA

residents' claims is to add them as Plaintiffs in this action now, rather than file a new and

separate case which asserts all of the same claims against Defendants as those claims stated in

the instant case." Plaintiffs further noted "[i]n the absence of . . . undue delay, bad faith or

dilatory motive . . . undue prejudice . . . futility of amendment, etc.--the leave sought should . . .

be 'freely given.'" *Id*. (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962) and *Johnson v.

Oroweat Foods Co.*, 785 F. 2d 503 (4th Cir. 1986)). On April 20, 2020, this Court granted the

*White* Plaintiffs' Unopposed Motion to add 22 additional plaintiffs. Plaintiffs' Counsel did not

seek leave of neither the Courts nor the parties to the *White* litigation to add the *Johnson*

Plaintiffs or *The Estate of Mr. Fisher.*

### 3. Mediation on August 24 & 27, 2020 in the *White* Lawsuit

On March 3, 2020, this Court referred *White* for mediation to United States Magistrate

Judge Gauvey. The parties mediated the matter on August 24 and 27, 2020. Over two days and

over 18 hours of negotiation, the parties negotiated a settlement in principle including the equitable relief addressing the *White* lawsuit's allegations and $900,000 in compensatory damages. To this day, Plaintiffs' Counsel neither sought to intervene nor add the additional Plaintiffs Tamara Johnson, Tyonna Holliday, a Class Action, Mr. Fisher, while alive, or the Estate of Damon R. Fisher as Plaintiffs to the *White* lawsuit. On December 3, 2020, the *White* Plaintiffs and the City of Annapolis jointly moved this Court to approve and enter the proposed consent decree. On January 14, 2021, this Court approved the *White* Consent Decree with the City of Annapolis.

### 4. The enrolled *White* Consent Decree

On January 14, 2021, pursuant to a Joint Motion by the *White* Plaintiffs and this Defendant, the City, this Court entered judgment in favor of Plaintiffs on all claims that survived the Motions to Dismiss. Plaintiffs' Counsel presented the draft document which became the *White* Consent Decree. All terms in the enrolled Consent Decree were negotiated at arms-length by and through each party's attorneys. The *White* Consent Decree states:

> The Plaintiffs, past and present tenants of public housing, initiated this action on May 16, 2019, to enforce the provisions of the Equal Protection Clause, Fair Housing Act as amended in 1988, 42 U.S.C. § 3601, et seq. (the "Act"); Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 1982, 1983, 1985, 1986 and 2000d; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"); the Americans with Disabilities Act as applicable, 42 U.S.C. §§ 12101 et seq. ("ADA") as well as state law claims.
>
> The Complaint as amended, alleges policies and practices by the City of Annapolis ("City") and the Housing Authority of the City of Annapolis ("HACA") relating to the licensing and inspection of rental properties including public housing, all of which is owned and operated by HACA, that had the effect of discriminating against the <u>African American and disabled tenants of public housing</u>. As a result of these actions the Plaintiffs allege, they have suffered hardships and injury, and <u>they and other tenants of HACA</u> will in the future suffer injury without changes to the current practices.

*White* Consent Decree at 1 (emphasis added).

Plaintiffs and the City acknowledge and agree that this Consent Order is the compromise of disputed liability claims, and that the actions taken are not to be construed or used by any party or third party as an admission of liability on the part of the City, which expressly denies any and all liability. The City intends merely to avoid further litigation by entering this Consent Order. In recognition of the mutual benefit to Plaintiffs and the City, and to avoid extensive pre-trial discovery, and costly and protracted litigation, Plaintiffs and the City agree as follows:"

*Id*. at 2.

1. The purpose of this Consent Decree is to ensure compliance with and redress violations of Equal Protection Clause, Fair Housing Act as amended in 1988, 42 U.S.C. § 3601, et seq. (the "Act"); Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 1982, 1983, 1985, 1986 and 2000d; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"); Americans with Disabilities Act as applicable, 42 U.S.C. §§ 12101 et seq. ("ADA") as well as state law claims. All actions required to be taken herein are intended to be coextensive with the remedial reach of these statutes and regulations.

*Id*. at 4. Next the Consent Decree defines its scope:

e. "HACA Units" are any one of the 790 units contained within the HACA Properties.
f. "HACA Tenants" are tenants of any of the existing HACA Properties as defined herein.

Clearly the Consent Decree was intended to benefit HACA tenants of any of the HACA

properties.

For the City, a critical point of negotiation in the Consent Decree, was the inclusion of this

Mutual Release and Modification of Decree Provision:

45. In consideration of the terms and commitments of this Consent Decree, Plaintiffs hereby forever waive, release, and covenant not to sue the City, its successors, assigns, agents, employees and attorneys with regard to any and all claims, damages, and injuries of whatever nature, whether presently known or unknown, arising out of the subject matter of the above-captioned case.

Importantly, Paragraph 45 states that the *White* Plaintiffs covenant not to sue the City.

49. The Parties agree to work in good faith to achieve the success of this Consent Decree and to resolve informally any differences regarding interpretation of and/or compliance with the terms of this Consent Decree.

Paragraph 49 requires good faith participation in the Consent Decree.

56. The Parties acknowledge and agree that this Consent Decree is entered into in order to compromise disputed claims and that nothing contained herein or the promises contained herein shall be construed or used to establish admission of liability or improper conduct on the part of any Released Parties.

Paragraph 56 required the *White* Plaintiffs could not use the Consent Decree to be construed or used to establish liability and requires good faith participation in the Consent Decree.

57. In consideration of the actions and payments set forth in this Consent Decree, Plaintiffs hereby, release, acquit, and forever discharge the City, its assigns, agents, servants, officials, in their individual and official capacities, employees, officers, successors, insurers, and all other persons, firms, corporations, associations, or partnerships (collectively referred herein as the "Releasee" or the City) of and from any suits, claims, actions, causes of action, demands, and/or rights that Plaintiffs ever had, now have whether known or unknown, against City for any and all claims generally arising out of, as a consequence of, resulting from, for, upon or by reason of, or relating in any way relating to the operative Complaint in the above-captioned matter.

58. Each Plaintiff agrees to hold harmless and indemnify the Releasee for any sums which the Releasee may be required to expend or pay as a result of any subsequent claims or litigation brought by that specific Plaintiff or their agent related to any claims released herein, except that this paragraph does not operate to make any individual Plaintiff responsible for the acts or any liens of any other Plaintiff.

59. Each of the undersigned hereby individually warrants that s/he is entitled to enforce and settle the aforesaid claim and to give a full and complete release therefrom on behalf of herself and all interested parties.

Lastly, Plaintiffs' Counsel, P. Joseph Donahue, is a signatory to this agreement as Plaintiffs' Counsel in *White*. On February 1, 2021, the City filed its first Consent Decree Compliance Report detailing our full compliance with the terms thereof. ECF 86 in *White*.

## 5. *The Estate of Mr. Fisher*

On June 22, 2020, Mr. Fisher attorney, here Plaintiffs' Counsel, sent Local Government Tort Claim Act notice letters to City and HACA alleging violations of Mr. Fisher's civil rights as well as tort claims for negligence. Plaintiffs' Counsel, however, did not

seek to intervene in, nor add Mr. Fisher to the *White* Lawsuit where the Court had previously granted Plaintiffs' unopposed Motion to add 22 Plaintiffs in *White*.

On July 2, 2020, Plaintiffs' Counsel, sent the City and HACA another LGTCA notice regarding the June 25, 2020 death of Mr. Fisher, as well as a potential forthcoming wrongful-death lawsuit against the City and HACA. Again, Plaintiffs' Counsel, however, did not seek to intervene in, nor add Mr. Fisher to the *White* Lawsuit where the Court had previously granted Plaintiffs' unopposed Motion to add 22 Plaintiffs in *White*.

In this survival action, Plaintiffs are representatives of the decedent's estate seeking to "to vindicate Mr. Fisher's rights under the Fair Housing Act as amended, 42 U.S.C. § 3601, *et seq.*, the Civil Rights Act of 1866, 42 U.S.C. §§ 1982, 1983, 1985, and 1986; and the Equal Protection clause of the Fourteenth Amendment to the United States Constitution, the City of Annapolis Municipal Code, §18.08.010, and under the Maryland Consumer Protection Act, as well as other State causes of action*." Fisher* Complaint at 3. The alleged violations concerned the decidedly pre-*White* Consent Decree allegations of the City not inspecting HACA properties: "This action comes in the wake of the settlement of *White, et al. v. City of Annapolis, et al.*, which is still pending in this court, Case No. 1:19-cv-01442-CCB. Unfortunately, the prospective remedies voluntarily agreed to in the *White* consent decree came too late to prevent Mr. Fisher's wrongful death." *Id.* at 7 n 2.

### 6.   The *Johnson* Class Action Lawsuit

In this purported class action, Putative Plaintiffs, Johnson and Holliday seek to "vindicate their rights and the rights of putative class members under" the Fair Housing Act as amended, 42 U.S.C. § 3601, *et seq.*, the Civil Rights Act of 1866, 42 U.S.C. §§ 1982, 1983, 1985, and 1986; and the Equal Protection clause of the Fourteenth Amendment to the United States Constitution, and the City of Annapolis Municipal Code, §18.08.010. *Johnson* Complaint at 2. The alleged

violations concerned the decidedly pre-*White* Consent Decree allegations of the City not inspecting HACA properties. Plaintiffs rely on this Court's ruling in the Motion to Dismiss in *White*, 439 F. Supp. 3d 522, ruling that Plaintiffs stated a claim for: (1) disparate impact and/or disparate treatment under the Fair Housing Act; (2) violation of the Equal Protection Clause; (3) conspiracy to deprive Plaintiffs of their civil rights or privileges; (4) disparate impact under the Americans with Disabilities Act and Rehabilitation Act; and (5) breach of contract under Maryland law. None of the allegations in this instant case alleges any actions of the City of Annapolis after January 14, 2021, which is the effective date of the *White* Consent Decree.

7. **These Lawsuits involves No Post-*White* Consent Decree Allegations**

The Court should note there have been no reported violations of the Consent Decree and this Court has not been called upon to adjudicate any disputes from the *White* Consent Decree.

8. **Post-*White* Consent Decree Actions of the City & HACA**

After the initiation of the *White* lawsuit, HACA initiated a strategic review of redevelopment opportunities for the Phase II portfolio, including Harbour House, Eastport, Robinwood, and Bloomsbury Square. HACA retained consultants HACA's consultants, EJP Consulting Group, LLC, who prepared the "Portfolio Assessment and Preliminary Recommendations" recommending a wide-scale community planning process for the repositioning and redevelopment of the Harbour House and Eastport properties (inclusive of HACA office complex), which a HUD Choice Neighborhood Planning Grant could support.

Choice Neighborhoods Planning Grants support the development of comprehensive neighborhood revitalization plans which focus on directing resources to address three core goals: Housing, People and Neighborhoods. In March, 2021, the HACA Board of Commissioners authorized the submission of a Choice Neighborhood Planning Grant application. The City of

9

Annapolis agreed to pledge $32,000 to share the costs of supporting a wide-ranging community planning effort, including partnering on the Choice Neighborhoods Planning Grant application.

In the Consent Decree, the City agreed to modify City policies to facilitate an expedited redevelopment of HACA Properties. The City agreed to undertake efforts to negotiate with County and State legislators. The City holds weekly meetings with HACA's redevelopment staff and consultants to create the City's and HACA's CNI Implementation Grant Application. The CNI Implementation Grant is part of the City's duty under the Consent Decree to assist HACA with identifying and obtaining financing options for public-private development of the HACA Properties.

The City of Annapolis continues to affirmatively pursue programs that have substantive effects on affordable housing and will support negotiations and engagement with relevant County, State, and federal officials, as well as prioritize HACA development projects. These actions are not only consistent with the *White* Consent Decree, but also required by it. Among the critical parts of the CNI Grant Application process is that neither HACA nor the City of Annapolis are the subjects of any Fair Housing Violations Lawsuits. Plaintiffs' Counsel now brings these two lawsuits and frustrates the very purpose of the *White* Consent Decree. These types of coordinated redevelopment applications by the City and HACA are the exact aim of the *White* Consent Decree. The City and HACA should be allowed to focus on redevelopment rather than litigating matters previously litigated and resulting in the *White* Consent Decree.

## STANDARD OF REVIEW

The defense of *res judicata* may be raised in a motion to dismiss. *Whitehead v. Viacom*, 233 F. Supp. 2d 715, 719 n.6 (2002), *aff'd*, 63 Fed. Appx. 175 (4th Cir. 2003) (citing *Andrews v. Daw*, 201 F.3d 521, 524 n.1 (4th Cir. 2000) (citing *Thomas v. Consolidation Coal Co.*, 380 F.2d

69, 75 (4th Cir. 1967))). "[W]hen entertaining a motion to dismiss on the grounds of *res judicata*, a court may take judicial notice of facts from a prior judicial proceeding when the *res judicata* defense raises no disputed issues of fact" concerning the accuracy of the record of the prior suit. *Id.* If matters outside the pleadings and record from the prior proceeding are considered, this Court may treat the 12(b)(6) motion to dismiss on the grounds of *res judicata* as a Rule 56 motion for summary judgment. Fed. R. Civ. P. 12(d); *Weathersby v. Ky. Fried Chicken Nat'l Mgmt. Co.*, 804 F. Supp. 756, 760 (D. Md. 1992) (finding that the plaintiff's claims were barred by the doctrine of *res judicata* and entering summary judgment on the defendant's motion to dismiss or, in the alternative, for summary judgment); *see also Leftridge v. Matthews*, No. ELH-11-3499, 2012 U.S. Dist. LEXIS 54312, at *11 n.5 (D. Md. Apr. 18, 2012) (granting motion to dismiss on *res judicata* grounds, but noting that, if conversion to a motion for summary judgment were necessary, the outcome would be the same).

## ARGUMENT

I.    **The *White* Consent Decree is *Res Judicata* and Prevents Plaintiffs in both *The Estate of Mr. Fisher* Survival Action and the *Johnson* Class Action from Recovering Against This Defendant for Damages Arising Out of the Same Factual Transaction Governed by the *White* Consent Decree.**

Based upon this undisputable record, the *White* Consent Decree is *res judicata.* It precludes both *The Estate of Mr. Fisher* and the Johnson *Plaintiffs* from recovery for pre-Consent Decree allegations against the City. *Res judicata* bars the re-litigation of claims that previously were or could have been brought by a party and its privy against a defendant. *Res judicata* "bars a party from re-litigating a claim that was decided or could have been decided in an original suit." *Laurel Sand & Gravel, Inc. v. Wilson*, 519 F.3d 156, 161 (4th Cir. 2008). The doctrine "protect[s] 'litigants from the burden of re-litigating an identical issue with the same party or his privy and [to promote] judicial economy by preventing needless litigation.'" *Id*. at 161-62 (*quoting Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979)); *see also Montana v. United States*, 440 U.S. 147, 153-54 (1979) (recognizing that *res judicata* avoids the "expense and vexation attending multiple lawsuits, conserves judicial resources," and avoids "inconsistent decisions"). Admittedly, it "serves not only 'the defendant's interest in avoiding the burden of twice defending a suit,' but also the important judicial interest in avoiding resolution of an issue that the court has already decided." *Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 655 (4th Cir. 2006) (citation omitted).

Under federal law, a prior judgment is given *res judicata* effect in a subsequent lawsuit when three conditions are met: (1) the subsequent suit presents the "same cause of action" as the prior suit; (2) judgment was rendered "on the merits" in the prior suit; and (3) the subsequent suit involves "the same parties or their privies" as were involved in the prior lawsuit. *Ohio Valley Envt'l Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 210 (4th Cir. 2009) (*quoting Aliff v. Joy Mfg.*

*Co.*, 914 F.2d 39, 42 (4th Cir. 1990)); *see Grausz v. Englander*, 321 F.3d 467, 472 (4th Cir. 2003).

> **A.** **The Estate of Mr. Fisher and the *Johnson* Class Action Claims arise from the same factual series of transactions as the *White* Consent Decree.**

Similarly situated to *White*, *The Estate of Mr. Fisher* it is evident that: "This action comes in the wake of the settlement of *White, et al. v. City of Annapolis, et al.*, which is still pending in this court, Case No. 1:19-cv-01442-CCB. Unfortunately, the prospective remedies voluntarily agreed to in the *White* consent decree came too late to prevent Mr. Fisher's wrongful death." *The Estate of Mr. Fisher* Complaint at 7, n 2. The *Johnson* Plaintiffs plainly understand that the suit arises from the same factual transactions as *White:* "At the simplest level, this case seeks to vindicate the rights of the approximately 1,600 residents who were not party to the *White* case, and to compensate those individuals for the City's blatant violations of those rights." *Johnson* Complaint at 3-4.

For the purpose of *res judicata*, it is sufficient that the claims at issue in a subsequent action arise out of the same transaction or series of transactions that were the subject of a prior claim. Here, the similarities go well beyond that to the very bits and pieces that make up the specifics of the claim. "In finding that the second suit involves the same cause of action, the court need not find that the plaintiff in the second suit is proceeding on the same legal theory he or his privies advanced in the first suit." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 210 (4th Cir. 2009) (citation omitted). Rather, "[a]s long as the second suit 'arises out of the same transaction or series of transactions as the claim resolved by the prior judgment,'" the first suit will have preclusive effect." *Id.* (citation omitted). Indeed, "'[n]ewly articulated claims based on the same [transactional] nucleus of facts may still be subject to a *res judicata* finding if the claims *could have been brought* in the earlier action.'" *Laurel Sand & Gravel*, 519

F.3d at 162 (emphasis added) (citation omitted) (alteration in original). To the extent that any of the legal theories differ, they nonetheless arise from the same transactional nucleus of facts and thus are considered the "same cause of action" for *res judicata* purposes.

### B.     The *White* Consent Decree is a Final Order

Here, this Honorable Court entered the *White* Consent Decree. Whether a judgment entered in this forum precludes claims asserted in a second federal action is controlled by the law of the forum in which the judgment was entered. *In re  McNallen*, 62 F.3d 619, 624 (4th Cir. 1995) (citing *Kremer v. Chem Constr. Corp.*, 456 U.S. 461,  481-82 (1982)); *see also* 28 U.S.C. § 1738. The *White* Consent Decree is now a final non-appealable order since the Parties to a consent decree cannot appeal it and it settled all claims in the *White* matter. No entity has petitioned this Court to intervene or petitioned the Fourth Circuit for review, and the appeals period has expired. Furthermore, the *White* Plaintiffs and Plaintiffs' Counsel continue to enjoy the fruits of the equitable and monetary relief. This Court received the City's first Annual Consent Decree Report outlining the City's vast expenditure of coordinated and collaborative effort between the City and HACA, substantial time and limited financial resources toward meeting the demands of the White Consent Decree terms, and Plaintiffs and Plaintiff's Counsel have been paid the agreed-upon $900,000.00 required by the Consent Decree.

### C.     *The Estate of Mr. Fisher* and the *Johnson* Plaintiffs are the same as, or in privity with, the *White* Plaintiffs.

"If a judgment on the merits was entered against a party as to a claim in an earlier lawsuit, it precludes relitigation of the same claim in a second lawsuit, regardless of whether the party is represented in the second lawsuit by the same attorney, a different attorney, or no attorney at all." *Leftridge*, 2012 U.S. Dist. LEXIS 54312, at \*25-26. The Court has recognized three general "categories of non-parties who will be considered in privity with a party to the prior

action and who will therefore be bound by a prior adjudication": first, a "non-party who controls the original action"; second, a "successor-in-interest to a prior party"; and third, a "non-party whose interests were adequately represented by a party to the original action," a narrow concept that the Fourth Circuit has also termed "virtual representation." *Id.* (*citing Klugh v. United States*, 818 F.2d 294 (4th Cir. 1987)).

There can be no question that *The Estate of Mr. Fisher* and the putative *Johnson* Plaintiffs are members of the class of persons whose interests are adequately represented by a party to the original action and were virtually represented. First, Plaintiffs in the *White* Consent Decree drafted by Plaintiffs' Counsel identified Plaintiffs as "past and present tenants of public housing." The Consent Decree's purpose was clear:

> 1. The purpose of this Consent Decree is to ensure compliance with and redress violations of Equal Protection Clause, Fair Housing Act as amended in 1988, 42 U.S.C. § 3601, *et seq*. (the "Act"); Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 1982, 1983, 1985, 1986 and 2000d; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"); Americans with Disabilities Act as applicable, 42 U.S.C. §§ 12101 et seq. ("ADA") as well as state law claims. All actions required to be taken herein are intended to be coextensive with the remedial reach of these statutes and regulations.

The Consent Decree was intended to provide the benefits of the Consent Decree to not only the *White* Plaintiffs, but also "HACA Tenants" defined as "tenants of any of the existing HACA Properties as defined herein."  There can be no question that both the decedent in *The Estate of Mr. Fisher* and the *Johnson* Plaintiffs were "past and present tenants of public housing" within the meaning of the Consent Decree.

   **D.    *The Estate of Mr. Fisher* and the *Johnson* Class Action are both precluded by *Res Judicata*.**

This Court must dismiss these two action as the three conditions for imposing *res judicata* are met. The City asks this Honorable Court to find, as a matter of law, that (1) these

15

subsequent suits, *The Estate of Mr. Fisher* and the *Johnson* Class Action*, presents the "same

cause of action" as the *White* suit; (2) a final judgment was rendered "on the merits" in the *White*

suit; and (3) the subsequent suits involves "the same parties or their privies" as were involved in

the prior lawsuit. *Ohio Valley Envt'l Coal. v. Aracoma Coal Co*., 556 F.3d 177, 210 (4th Cir.

2009) (*quoting Aliff v. Joy Mfg. Co*., 914 F.2d 39, 42 (4th Cir. 1990)); *see Grausz v. Englander*,

321 F.3d 467, 472 (4th Cir. 2003).

## II.   This Lawsuit Fails to Include Indispensable Parties including the *White* Plaintiffs and Plaintiffs' Counsel, and the United States Department of Housing and Urban Development.

If this case is not barred by *res judicata*, it should be dismissed for failure to include

indispensable parties under Federal Rule of Civil Procedure 12(b)(7). If a party is necessary and

indispensable party is determined under Federal Rule of Civil Procedure 19. First, the Court

"determine[s] whether the party is 'necessary' to the action under Rule 19(a)." *Nat'l Union Fire

Ins. Co. of Pittsburgh, PA v. Rite Aid of S.C., Inc.*, 210 F.3d 246, 249 (4th Cir. 2000). "If the

court determines that the party is 'necessary,' it must then determine whether the party is

'indispensable' to the action under Rule 19(b)." *Id.* If a necessary and indispensable party cannot

be joined, the case should be dismissed, but dismissal "is a drastic remedy ...which should be

employed only sparingly." *Id.* at 250 (citation omitted). Courts pragmatically proceed

"examin[ing] the facts of the particular controversy to determine the potential for prejudice to

all parties, including those not before it." *Id.* (citation omitted). Rule 19(a) states that a party is

indispensable if:

> (1) in the person's absence complete relief cannot be accorded
> among those already parties, or (2) the person claims an interest
> relating to the subject of the action and is so situated that the
> disposition of the action in the person's absence may (i) as a
> practical matter impair or impede the person's ability to protect that
> interest or (ii) leave any of the persons already parties subject to a

> substantial risk of incurring double, multiple, or otherwise
> inconsistent obligations by reason of the claimed interest.

Fed. R. Civ. P. 19(a). This lawsuit must be dismissed for failure to include three indispensable parties, (1) the *White* Plaintiffs and Plaintiffs' Counsel, (2) HACA, and (3) HUD.

### A.     The Named *White* Plaintiffs are Necessary and Indispensable parties.

First, the *White* Plaintiffs and Plaintiffs' Counsel agreed "not to sue the City", to work in "good faith to achieve the success of the Consent Decree", to "release, acquit, and forever discharge the City… of and from any suits, claims, actions, causes of action, demands, and/or rights that Plaintiffs ever had, now have whether known or unknown, against City for any and all claims generally arising out of, as a consequence of, resulting from, for, upon or by reason of, or relating in any way relating to the operative Complaint in the above-captioned matter." Furthermore, each *White* Plaintiff warranted that they were entitled to enforce and settle the case on behalf of herself and all interested parties. The excerpts of the Consent Decree are provided below.

> 45. In consideration of the terms and commitments of this Consent Decree, Plaintiffs hereby forever waive, release, and covenant not to sue the City, its successors, assigns, agents, employees and attorneys with regard to any and all claims, damages, and injuries of whatever nature, whether presently known or unknown, arising out of the subject matter of the above-captioned case. …

> 49. The Parties agree to work in good faith to achieve the success of this Consent Decree and to resolve informally any differences regarding interpretation of and/or compliance with the terms of this Consent Decree. …

> 56. The Parties acknowledge and agree that this Consent Decree is entered into in order to compromise disputed claims and that nothing contained herein or the promises contained herein shall be construed or used to establish admission of liability or improper conduct on the part of any Released Parties.

> 57. In consideration of the actions and payments set forth in this Consent Decree, Plaintiffs hereby, release, acquit, and forever discharge the City, its assigns, agents,

servants, officials, in their individual and official capacities, employees, officers, successors, insurers, and all other persons, firms, corporations, associations, or partnerships (collectively referred herein as the "Releasee" or the City) of and from any suits, claims, actions, causes of action, demands, and/or rights that Plaintiffs ever had, now have whether known or unknown, against City for any and all claims generally arising out of, as a consequence of, resulting from, for, upon or by reason of, or relating in any way relating to the operative Complaint in the above-captioned matter.

58. Each Plaintiff agrees to hold harmless and indemnify the Releasee for any sums which the Releasee may be required to expend or pay as a result of any subsequent claims or litigation brought by that specific Plaintiff or their agent related to any claims released herein, except that this paragraph does not operate to make any individual Plaintiff responsible for the acts or any liens of any other Plaintiff.

59. Each of the undersigned hereby individually warrants that s/he is entitled to enforce and settle the aforesaid claim and to give a full and complete release therefrom on behalf of herself and all interested parties.

Thus, each *White* Plaintiff is a necessary party to this litigation. The *White* Plaintiffs are indispensable to resolving the claims of *The Estate of Mr. Fisher* and the *Johnson* Class Action against the *White* Plaintiffs who recovered financially from the *White* Consent Decree since they agreed to indemnify the City for any suits based on pre-Consent Decree actions. The Court should note the Plaintiffs' Counsel, P. Joseph Donahue, is also an indispensable party because he is a party to the *White* Consent Decree, which these lawsuits collaterally attack.

**B.   HUD is a Necessary and Indispensable Party Because the Results of HUD's Actual Annual REAC Inspections of HACA Properties Allowed HACA to Continue to Provide Housing to Both the Decedent in *Estate of Mr. Fisher* and the *Johnson* Plaintiffs and Despite HACA's Failing Inspection Scores.**

Chief Justice John Marshall opined "The Government of the United States, . . . though limited in its powers, is supreme; and its laws, when made in pursuance of the Constitution, form the supreme law of the land[.]" *McCulloch v. Maryland*, 17 U.S. 316, 406 (1819). "Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona v. United*

*States*, 567 U.S. 387, 398 (2012). The existence of two sovereigns allows for "the possibility that laws can be in conflict or at cross-purposes." *Id*. at 398-99. The Supremacy Clause was adopted with such conflicts in mind, and provides that federal law "shall be the supreme law of the land; and the Judges in every State shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding." U.S. Const. Art. VI, § 2.

Since 1937, the United States has provided funding to assist states and localities in making decent, safe, and sanitary public housing available for low-income families. *See* U.S. Housing Act, Pub. Law 75-412, § 1. Today, approximately 1.2 million families live in public housing managed by roughly 2,900 housing agencies nationwide. Formed in 1937 as one of HUD's earliest housing authorities, HACA currently provides housing to its 800 families under HUD's imprimatur in the City of Annapolis. Public housing's central purpose is to provide decent, safe, and sanitary housing to lower-income families. Therefore, Congress directed HUD, in the U.S. Housing Act, as amended, to promulgate "housing quality standards . . . that ensure that public housing dwelling units are safe and habitable." 42 U.S.C. § 1437d(f)(2).

HUD regulations not only set an overarching mandate for "decent, safe, and sanitary" housing, but also impose specific requirements designed to protect the public health. Among other things, housing agencies must: (1) Ensure that "dwelling units and common areas . . . have proper ventilation and be free of mold." 24 C.F.R. § 5.703(f), and (2) Prevent "infestation by rats, mice, or other vermin." 24 C.F.R. § 5.703(f). These complaints are central to Plaintiffs' claims in this lawsuit.

Additionally, HUD conducts its own superior and superceding annual Public Housing Assessment System ("PHAS") inspections to assess HACA's physical conditions, financial condition, management, and capital funding. See generally 24 C.F.R. Part 902. HUD inspects a

randomly generated subset of apartments at each property, plus building common areas, and scores HACA based on its findings. Excessive deficiencies can lead to adverse consequences ranging from more frequent inspections to the appointment of a receiver to take over HACA. 24 C.F.R. §§ 902.13, 902.73, 902.75, 902.83. Every year, HUD inspects the living conditions at HACA through PHAS inspections. *See generally* 24 C.F.R. Part 902. The City's inspection regime is a surplus inspection, because even if the City decertifies any apartment unit, HUD is the final determinate as to repairs, relocation of residents, and rehabilitation of units.

Interestingly for this litigation, HACA has been on HUD's troubled property list since at least 2010, and removed in 2014. HACA was again designated as "troubled" in 2017 immediately prior to election of Mayor Gavin Buckley. In 2018, on a PHAS scale of 100, Newtowne 20 received a score of 39, Morris H. Blum received a score of 51, and Robinwood received a score of 41, from HUD's annual REAC inspection.

A passing score on the physical conditions component is 60 percent, although higher scores can result in additional, positive consequences for HACA. 24 C.F.R. §§ 902.11, 902.25. For example, low scores can result in HUD-imposed corrective action plans, whereas high scores can lead to relief from certain reporting requirements. 24 C.F.R. § 902.11. If a property receives a physical condition score of less than 80 points, HUD will inspect the property again the following year. But if a property scores between 80 and 90 points, HUD will inspect the property every two years. And if a property scores 90 points or more, the property will skip two years of HUD inspections in a row. 24 C.F.R. § 902.13.

There is no allegation in this lawsuit that HACA had stopped performing the annual REAC inspections of its developments as required by the U.S. Housing Act. 42 U.S.C. § 1437d(f)(3). Rather, while being annual inspected by HUD, this lawsuit claims that the conditions

that these Plaintiffs live in was occasioned by the City's failure to inspect HACA units. IF HUD's inspections allowed HACA to continue operations, the City's inspections could not prevent HACA from operating. HACA is sovereign and separate entity from the City of Annapolis. Because HACA is mandated by the federal government to rent to low-income tenants in exchange for HUD's funding, the City's inspections could not prevent HACA from fulfilling its federal mandate. Thus, HACA, effectively becomes an arm and responsibility of HUD. Federal law provides for the appointment of a receiver to take over the housing agency but leaves no role for the City regarding HACA Property conditions. 24 C.F.R. §§ 902.13, 902.73, 902.75, 902.83.

HUD's control of HACA and its federal mandates to provide "decent, safe, sanitary, and in good repair," 24 C.F.R. § 5.703, and its remedies for a HUD receivership, as well as HUD's separate and superceding annual inspection regime allowed HACA to operate in the troubled conditions.  If this matter is not dismissed as res judicata, the inclusion of HUD in this lawsuit is necessary because HUD's actions are a central element in any recovery, as evidenced by HACA's needing to secure HUD's review and approval of its Consent Decree in the *White* case.

## III.  Ethically, Plaintiffs' Counsel cannot Serve Three Masters, here the *White* Plaintiffs, *The Estate of Mr. Fisher* and the *Johnson* Class Action Plaintiffs.

Quite simply, Plaintiffs' Counsel must abide by the ageless wisdom that a servant cannot serve three masters, here the *White* Plaintiffs, *The Estate of Mr. Fisher* and the *Johnson* Class Action Plaintiffs. Plaintiffs' Counsel's representation of a survival action and a class action collaterally attacking the *White* Consent Decree to which his clients and Plaintiffs' Counsel are parties, should be troubling to any legal observer.

The chronology of the Consent Decree is helpful to the Court's decision. Here, the most important fact is no actions complained of in this instant action, occur after the entry of the Consent Decree. Thus, all allegations are aimed at pre-Consent Decree actions of this Defendant.

Second, there can be no doubt that each of these Putative Plaintiffs knew of the *White* lawsuit and were likely identified by Counsel prior to the entrance of the Consent Decree. This was certainly the case as to Mr. Fisher and his estate. This Court should inquire as to this fact of the *Johnson* Plaintiffs. Third, despite being retained by *The Estate of Mr. Fisher* and likely, the *Johnson* Plaintiffs, Plaintiffs' Counsel jointly filed a Motion with this Defendant to enter the *White* Consent Decree on in December of 2020. Fourth, the entrance of the Consent Decree in January of 2020 forecloses any possibility of *The Estate of Mr. Fisher* and the *Johnson* Class Action Plaintiffs recovering compensation under the *White* Consent Decree.

Plaintiffs' Counsel's duty to the *White* Plaintiffs clearly prevent him from taking any actions against those Plaintiffs' best interest. And he took actions against his *White* Plaintiffs' best interest when he initiated these lawsuits despite being a signatory to the *White* Consent Decree. There, the *White* Plaintiffs released, acquitted, and forever discharged the City from "any suits, claims, actions, causes of action, demands that Plaintiffs ever had, now have whether known or unknown, against City for any and all claims generally arising out of, as a consequence of, resulting from, for, upon or by reason of, or relating in any way relating to the operative Complaint in the above-captioned matter." *White* Consent Decree Para. 57.

Plainly put, the actions of Plaintiffs' Counsel in this matter are flagrant violations of the ethical rules to, at a minimum, his clients in the *White* action <u>and</u> to *The Estate of Mr. Fisher* <u>and</u> the *Johnson* Class Action. Here, the *White* Consent Decree inures to the benefit of the *White* Plaintiffs while foreclosing recovery of *The Estate of Mr. Fisher* and the *Johnson* Putative Plaintiffs. This impermissible conflict of interest is further heightened when Plaintiffs' Counsel clearly intended to settle the *White* action with both equitable and monetary relief in the form of a $900,000 payment. While fully enjoying the benefits of the Consent Decree, Plaintiffs'

Counsel returns to the trough to engorge and aggrandize himself not only on the City's tax payer dollars again, but also United States taxpayers as the United States Department of Housing and Urban Development would also have to approve any settlements rendered against HACA. If these lawsuits are not dismissed, the City, in its answer, will file a third-party complaint against each and every *White* Plaintiffs and Plaintiffs' Counsel for violations of the *White* Consent Decree and to hold *White* Plaintiffs responsible for their agreement to indemnify the City and not sue the City based on pre-Consent Decree actions. A violations notice under the *White* Consent Decree will issue contemporaneously with the filing of this Motion.

Pursuant to Local Rules 703 and 704, all attorneys practicing before this Court are subject to the Maryland Lawyer's Rules of Professional Conduct ("MRPC"). *See* Local Rules 703, 704 (D. Md.). Thus, these actions should prompt this Court to investigate whether Plaintiffs' Counsel's actions violates a litany of Maryland Rules of Professional Conduct, including, but not limited to:

1. *Competence*, MRPC Rule 19-301.1:  An attorney shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

2. *Confidentiality of Information*, MRPC Rule 19-301.6(a): An attorney shall not reveal information relating to representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation, or the disclosure is permitted by section (b) of this Rule.

3. *Conflict of Interest*, MRPC Rule 19-301.7(a): Except as provided in section (b) of this Rule, an attorney shall not represent a client if the representation involves a conflict of interest. A conflict of interest exists if:
   a. the representation of one client will be directly adverse to another client; or
   b. there is a significant risk that the representation of one or more clients will be materially limited by the attorney's responsibilities to another client, a former client or a third person or by a personal interest of the attorney.

4. *Conflict of Interest; Current Clients; Specific Rules*, MRPC Rule 19-

23

301.8(b): An attorney shall not use information relating to representation of a client to the disadvantage of the client unless the client gives informed consent, except as permitted or required by these Rules.

5. *Meritorious Claims and Contentions*, MRPC Rule 19-303.1: An attorney shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes, for example, a good faith argument for an extension, modification or reversal of existing law. An attorney may nevertheless so defend the proceeding as to require that every element of the moving party's case be established.

The Court should note that any attorney of basic competence should have realized that the ethical requirements to the *White* Plaintiffs conflicts with his representation of these The *Estate of Mr. Fisher* and the *Johnson* Putative Plaintiffs. Furthermore, the *White* Consent Decree negotiated by Plaintiffs' Counsel foreclosed not only *The Estate of Mr. Fisher* but also the *Johnson* Class Action.

**IV.    Plaintiffs' Counsel Violates Rule 11 and the *White* Consent Decree by Suing Upon Pre-Consent Decree Action for *The Estate of Mr. Fisher* and the *Johnson* Class Action.**

Plaintiffs' Counsel is counsel to all plaintiffs in *White*, *The Estate of Mr. Fisher* and the *Johnson* Class Action. Plaintiffs' Counsel knew that the allegations against the City in *White*, *The Estate of Mr. Fisher* and the *Johnson* Class Action arose from the same factual predicate allegations, but failed to add them to the *White* litigation. If added, all Plaintiffs would have benefitted from the *White* Consent Decree. Whether by avarice or incompetence, Plaintiffs' Counsel clearly intended to successively sue the same defendants for the same allegations with different plaintiffs and recover ever mounting attorney's fees. Rinse. Wash. Repeat. Rule 11 violation.

Under Rule 11(b) of the Federal Rules of Civil Procedure, an attorney party presenting any document to the Court must certify that to the best of his or her "knowledge, information, and belief, formed after an inquiry reasonable under the circumstances":

a. it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

b. the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

c. the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

d. the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

The "primary purpose of Rule 11 is to punish violators and deter parties and their counsel from pursuing unnecessary or unmeritorious litigation." *Moody v. Arc of Howard Cty., Inc.*, 474 F. App'x 947, 950 (4th Cir. 2012). A legal argument violates Rule 11 when, "'applying a standard of objective reasonableness, it can be said that a reasonable attorney in like circumstances could not have believed his actions to be legally justified.'" *Morris v. Wachovia Sec., Inc.*, 448 F.3d 268, 277 (4th Cir. 2006) (quoting *Hunter v. Earthgrains Co. Bakery*, 281 F.3d 144, 153 (4th Cir. 2002)). And, factual allegations "fail to satisfy Rule 11(b)(3) when they are 'unsupported by any information obtained prior to filing.'" *Morris*, 448 F.3d at 277 (quoting *Brubaker v. City of Richmond*, 943 F.2d 1363, 1373 (4th Cir. 1991)).

Here, Plaintiffs' Counsel initiates two lawsuits on behalf of Plaintiffs that who knew or should have known about *White* litigation and *White* Consent Decree. In fact, there is an open question as to whether Putative Plaintiffs Tamara Johnson and Tyonna Holliday are related to *White* Plaintiffs Lakeedrah Johnson and Tyneice Holliday, respectively. Having participated in the *White* Consent Decree which was a hard-fought agreement involving massive effort by this Court and the Parties, Plaintiffs' Counsel knew or should have known that *res judicata* applied to both these lawsuits.

The fact that Mr. Fisher had retained Plaintiffs' Counsel prior to the *White* Consent

Decree, and after this Court had approved an unopposed Motion for Leave to add 22 plaintiffs

shows that Plaintiffs' Counsel knew well the process to get relief for additional plaintiffs, but did

not take any actions to protect the rights of neither *The Estate of Mr. Fisher* nor the *Johnson*

Plaintiffs. Instead, Plaintiffs' Counsel reserved these claims in the hope of further extorting

remuneration from the City.

Local Rule 105.8(b) states: "Unless otherwise ordered by the Court, a party need not

respond to any motion filed under Fed. R. Civ. P. 11 . . . . The Court shall not grant any motion

without requesting a response."  The City respectfully requests that this Court order that

Plaintiffs' Counsel respond to these Rule 11 allegations.

**CONCLUSION**

For the foregoing reasons, the City respectfully request that this Court grant its Motion to

Dismiss or, in the alternative, for summary judgment, and enter judgment in favor of the City.

**CITY OF ANNAPOLIS**
**OFFICE OF LAW**


By:  _____/s/_____
D. Michael Lyles, City Attorney #13120
160 Duke of Gloucester St.
Annapolis, MD 21401
(410)-263-7954
(410)-268-3916
dmlyles@annapolis.gov


By:  _____/s/_____
Joel Braithwaite, Assistant City Attorney
#28081
jabraithwaite@annapolis.gov

26
