## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ESTATE OF DAMON R. FISHER, *et al.* | Civil Action No. CCB-21-1074 |
| v. | |
| CITY OF ANNAPOLIS, *et al.* | |

## MEMORANDUM

Now pending are two motions to dismiss (or, in the alternative, for summary judgment) in a suit against the City of Annapolis ("the City") and the Housing Authority of the City of Annapolis ("HACA").[1] The case concerns a longstanding City and HACA policy of not inspecting and licensing public housing in Annapolis. DaMon Fisher was a public housing resident who died from respiratory issues exacerbated by years of mold in his apartment; his estate now sues the City and HACA[2] for violations of the Fair Housing Act, federal civil rights laws, Fisher's state constitutional rights, and state tort law.

The City moved to dismiss or for summary judgment in *Fisher*. (ECF 12; response at ECF 13; reply at ECF 21; surreply at ECF 36). HACA did likewise. (ECF 16; response at ECF 25; reply at ECF 34). The matter has been fully briefed, and no oral argument is necessary. *See* Local Rule 105.6 (D. Md. 2021). For the reasons discussed herein, the court will deny in large part the City's motion and grant in part and deny in part HACA's motion to dismiss.

---

[1] Another case before the court, *Johnson et al. v. City of Annapolis*, CCB-21-1120, featured similar briefing and is being decided separately but with substantially similar reasoning.

[2] Fisher's estate voluntarily dismissed without prejudice all claims against the HACA property manager. (ECF 31).

## BACKGROUND

In ruling on a motion to dismiss, this Court "accept[s] as true all well-pleaded facts in a complaint and construe[s] them in the light most favorable to the plaintiff." *Wikipedia Pound. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)).

The *Fisher* lawsuit follows the events of *White v. City of Annapolis*, No. CCB-19-1442, a 2019 case before this court in which 52 Annapolis public housing residents sued the City and HACA under a variety of federal and state causes of action. The *White* plaintiffs alleged that the City's decision not to enforce inspection and licensing requirements on public housing disparately impacted African Americans and was discriminatory. At the case's conclusion, the parties entered into a consent decree (ECF 98 in CCB-19-1442) enacting a number of prospective equitable remedies intended to improve public housing, as well as paying monetary damages for the plaintiffs.

### Public Housing Licensing and Inspections in Annapolis

The Annapolis City Code requires rental units to have operating licenses. (Annapolis City Code, Chapter 17.44.010). To obtain an operating license, the rental units must be inspected and in compliance with the City's Residential Property and Maintenance Code. (*Id.* 17.44.030 et seq.; ECF 1 ¶¶ 36–38). Landlords must pay a fee to obtain a license or a license renewal. (Annapolis City Code, Chapter 17.44.040(A); *see* ECF 1 ¶ 47). For many years, however, the City did not require inspections and licensing of HACA properties; such properties were the only rental properties in Annapolis that are neither licensed nor inspected. (ECF 1 ¶ 39). This apparently was a longstanding arrangement, as although rental licenses have been required of landlords since approximately 1985, HACA housing units had "have never all been fully, finally, or properly inspected and licensed in accordance with the City Code." (ECF 1 ¶ 42).

2

According to the plaintiff, Annapolis has a troubled history of racism against African Americans and people of African descent, including through discriminatory residential housing policies. (ECF 1 ¶ 32). Fisher's estate alleges that the City's and HACA's policies around licensing and inspecting Annapolis public housing is an instance of that discrimination and has a disparate impact on African Americans. (ECF 1 ¶ 32). HACA manages about 790 units housing about 1,600 residents, spread over six public housing developments. (ECF 1 ¶ 32). Fisher lived in Harbor House. (ECF 1 ¶ 33). Census data suggest that these developments (except for one designated for seniors and people with disabilities) house a significant-majority African-American population. (ECF 1 ¶¶ 54–59).

The Annapolis City Code requires that rental units be licensed annually by the City, and units must be inspected and found compliant with the City's maintenance code to obtain a license. (ECF 1 ¶¶ 35–38; 45–47). When an inspector finds conditions dangerous to health or safety, the landlord must relocate the tenant, remediate the danger, request a reinspection, and provide other proof to the City inspector that the danger is no longer present. (ECF 1 ¶ 40). Annapolis has, since the early 1980s, emphasized the important of licenses and inspections and went so far as to obtain emergency state legislation to protect its regime from challengers who wished to evade the requirements. (ECF 1 ¶ 34).

But leading up to the *White* suit, HACA properties managed solely by HACA were unique among Annapolis rentals in that they were neither licensed nor inspected by the City. (ECF 1 ¶ 39). HACA did not apply for licenses in compliance with the City Code, and the City did not act on this non-compliance. (ECF 1 ¶ 39). State law also required that a housing authority's housing projects are subject to the regulations applicable in that location, except that a State public body may make exceptions to those regulations for a housing authority. (ECF 1 ¶¶ 43–44).

3

**2016 first inspections, 2017 non-inspection regime, 2019 Shadow Policy**

On May 1, 2016, under Mayor Mike Pantelides, the City began an initial round of inspections of the HACA properties, revealing 2,498 City Code violations, many of which presented dangers to health and safety and should have required relocation. (ECF 1 ¶¶ 49, 50). After that summer, the City conducted some follow-up inspections, but no HACA property was fully and properly licensed. (ECF 1 ¶ 51). In 2017, newly appointed HACA Director Beverly Wilbourn identified City inspections as a hurdle to her success in balancing the HACA budget and interpreted the City's inspection requirements as "unfunded mandates." (ECF 1 ¶¶ 61–62). In summer 2017, Wilbourn advised a HACA board member that she had reached an understanding with the City Manager that the City would work out an alternative agreement on inspections, ultimately ordering a halt of all inspections starting in late August 2017. (ECF 1 ¶ 63). Then-Mayor Pantelides, an advocate of inspecting public housing, expressed frustration at HACA's resistance to treating public housing properties the same as private rental units. (ECF 1 ¶ 66).

But Annapolis would soon return to not inspecting public housing. Mayor Pantelides was defeated a few months later in the November 2017 city election; even before new Mayor Gavin Buckley was seated, Wilbourn had discussed the inspection issue with him, with the City and HACA agreeing to stop inspections of HACA properties. (ECF 1 ¶ 69). The only public evidence of the December 2017–May 2019 return to a non-inspection regime came when HACA residents called the City to complain about issues in their apartments, and representatives explained that the City no longer inspected the HACA properties. (ECF 1 ¶ 70). In mid-May 2019, HACA and the City were involved in a lawsuit against a HACA tenant, and at a hearing in the case, a city inspection worker testified that Mayor Buckley had decided to exempt HACA from the City's licensing requirement; afterward, HACA's attorney sent an email thanking that employee for his

4

testimony on HACA's behalf and copying city officials, Mayor Buckley, and HACA Director
Wilbourn. (ECF 1 ¶ 76).

Two days later, the *White* plaintiffs filed their suit, triggering swift, public-facing
commitments from the City government to adopt a June 2019 resolution that would restart
HACA inspections and licensing. (ECF 1 ¶ 77–78). Despite this resolution, HACA and City
officials together developed a policy — called the "Shadow Policy" by Fisher — to conduct
HACA inspections and licensing differently from other Annapolis rentals, for example: awarding
waivers and grandfathering old violations; inspecting for life safety issues only; not denying
licenses for deficiencies in routine maintenance. (ECF 1 ¶ 79). The plaintiffs allege that this
gutted the June 2019 City resolution restarting inspections and allowed the City and HACA to
intentionally treat HACA tenants differently from similarly situated non-HACA Annapolis
renters, perpetuating segregation and hurting the plaintiffs' life, health, and safety (ECF 1 ¶ 82,
86, 87).

**Fisher**

DaMon Fisher was a HACA tenant who had asthma but had never suffered serious
respiratory distress until he moved into a HACA property in 2012 at age 56. (ECF 1 ¶ 15).
Shortly thereafter, he began to have serious breathing difficulties and was hospitalized seven
times in three years, with physicians diagnosing a severe mold allergy and advising HACA that
he needed to be moved to a different building. (ECF 1 ¶ 16). Fisher retained counsel in
November 2015 and was moved to another HACA property, Harbour House. (ECF 1 ¶ 17). His
breathing issues subsided for a time but then returned, and sometime between 2016 and 2018, he
began making complaints to HACA property manager Raylyne Shaw, whose office was nearby
at HACA headquarters. (ECF 1 ¶ 18). He made recurring complaints that there was mold in his
bathroom and he had difficulty breathing. (*Id.*). He went to the emergency room 14 times

5

between March 2018 and May 2020, during which time doctors again confirmed that his symptoms derived from the mold in his apartment. (ECF 1 ¶ 20).

The complaint does not detail precisely when each complaint in Fisher's recurring string of complaints was made. But by early May 2020, he had still received no assistance from HACA, and Fisher reached out to the City for assistance. (ECF 1 ¶ 21). Under the 2019 non-inspection policy, Harbour House had not been inspected since May 2016, and after the June 2019 Shadow Policy, the City had not yet gotten around to inspecting Harbour House. (ECF 1 ¶ 21). On May 19, 2020, the City conducted a Zoom inspection of Fisher's apartment and issued a violation notice to HACA after observing water damage and mold in the bathroom. (ECF 1 ¶ 22). On May 28, 2020, HACA put Fisher up in a hotel and scheduled the mold remediation work for June 4 through June 10. (ECF 1 ¶ 23). HACA told Fisher that his apartment was safe for his return, but the City (unlike for non-HACA properties in Annapolis) did not require follow-up testing of the apartment. (ECF 1 ¶ 24).

Unfortunately, HACA did not properly remove the mold, and Fisher's symptoms returned immediately. (*Id.*). Fisher told others that the air in his apartment was going to kill him and began to plan for a move to a shelter until he could find refuge with distant family out of state. (ECF 1 ¶ 25). His pulmonologist wrote to HACA and the City on June 19; his attorney notified the City and HACA of an incoming lawsuit on June 22. (ECF 1 ¶¶ 26–27).

On June 25, Fisher was found dead in his apartment. (ECF 1 ¶ 28). His death certificate noted that mold in his residence led to the exacerbation of his respiratory disease (ECF 1 ¶ 28), and July 2020 mold testing of his apartment revealed high levels of several toxic molds (ECF 1 ¶ 30). August and October testing by a HACA contractor confirmed those results. (ECF 1 ¶ 31). Fisher's estate now brings this suit against the City and HACA for the following counts:

6

- Count I: Violation of Fair Housing Act (ECF 1 ¶¶ 88–95)
- Count II: Violation of Civil Rights Act of 1866 (ECF 1 ¶¶ 96–100)
- Count III: Violation of Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States (ECF 1 ¶¶ 101–103)
- Count IV: Violation of CRA of 1871, 42 U.S.C. § 1985 Section 3, and the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States (ECF 1 ¶¶ 104–106)
- Count V: Violation of the Civil Rights Act of 1871, 42 U.S.C. § 1986, and the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States (ECF 1 ¶¶ 107–10)
- Count VI: Violation of the Maryland State Constitution – Article 24 of the Maryland Declaration of Rights (ECF 1 ¶¶ 111–14)
- Count VII: Violation of the Maryland Consumer Protection Act (ECF 1 ¶¶ 115–24)
- Count VIII: Violation of Annapolis Municipal Code § 18.08.010 (ECF 1 ¶¶ 125–31)
- Count IX: Negligence (ECF 1 ¶¶ 132–36)

## LEGAL STANDARD

To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted). "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). Additionally, although courts "must view the facts alleged in the light most favorable to the plaintiff," they "will not accept 'legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments'" in deciding whether a case should survive a motion to dismiss. *U.S.*

*ex rel. Nathan v. Takeda Pharm. North Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013)

(quoting *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)).

## ANALYSIS

The City and HACA moved separately to dismiss *Fisher*. The court considers each in turn.

### I.    *Fisher v. City*

The City makes three arguments in its motion to dismiss *Fisher*. First, the City argues that Fisher's claims are precluded as res judicata. Second, the City argues that the *Fisher* suit fails to include indispensable parties, including the *White* plaintiffs, plaintiffs' counsel, and the federal housing department. Finally, the City argues that these suits are impermissible collateral attacks on the *White* consent decree. In addition to these three main arguments, the City accuses plaintiffs' counsel of unethical conduct, accusations this court declines to entertain because they are meritless.[3] All arguments except one fail, and the court will deny the City's motion to dismiss *Fisher* except as to Fisher's § 1986 claim, which will be dismissed as untimely (*see* § I.D *infra*).

#### A.   *Res Judicata*

The Fourth Circuit has laid out the law of claim preclusion as follows:

> "Under the doctrine of res judicata, or claim preclusion, '[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'" *Pueschel v. United States*, 369 F.3d 345, 354 (4th Cir.2004) (quoting *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981)). Three elements must be satisfied for res judicata to apply. "[T]here must be: (1) a final judgment on the merits in a prior suit; (2) an identity of the cause of action in both the earlier and the later suit; and (3) an identity of parties or their privies in the two suits." *Id.* at 354–55. Along with these "three formal elements" of res judicata, "two practical considerations should be taken into account." *Grausz v. Englander*, 321 F.3d 467, 473 (4th Cir.2003).

---

[3] The City also threatened to file a third-party complaint against each of the *White* plaintiffs and their attorney (who is also counsel in this case). This threat is wholly unjustified, and the court declines to consider it further.

8

> First, we consider whether the party or its privy knew or should have
> known of its claims at the time of the first action. *See id.* at 473–74.
> Second, we ask whether the court that ruled in the first suit was an
> effective forum to litigate the relevant claims. *See id.* at 474.

*Providence Hall Associates Limited Partnership v. Wells Fargo Bank, N.A.*, 816 F.3d 273, 276

(4th Cir. 2016).

The City's argument as to claim preclusion is meritless. While Fisher benefits from the

prospective injunctive relief laid out in the *White* Consent Decree, he did not receive a single

cent of the $900,000 in compensatory damages awarded to the *White* plaintiffs. Nor were the

*White* plaintiffs obligated to share those damages with Fisher; those damages went specifically to

the *White* plaintiffs in exchange for their release of their claims. *White* Consent Decree, No. 19-

cv-1442, ECF 98 ¶ 42. The *White* plaintiffs were not in privity with Fisher or his estate, and the

*White* suit was not a class action with all the attendant class certification procedural safeguards.

The City also looks to the text of the consent decree, arguing that it covers "The

Plaintiffs, past and present residents of public housing" and therefore that Fisher has no standing

to bring his own claims but instead may only seek enforcement of the Consent Decree. *White*

Consent Decree at 1. The City seems to read this quote as "the plaintiffs *and* all past and present

residents of public housing," but it is properly read as "the plaintiffs, *who are* all past and present

residents of public housing." The fact that the sentence from the Consent Decree continues

". . . initiated this action . . ." raises questions as to the support for the City's argument.

Finally, the City invokes the Fourth Circuit's doctrine of virtual representation to argue

that Fisher's interests were adequately represented by the *White* plaintiffs. *See Klugh v. United*

*States*, 818 F.2d 294, 300 (4th Cir. 1987). The fact that this new plaintiff seeks monetary

damages neither sought nor awarded in the *White* suit belies the City's puzzling argument.

In sum: Fisher was not a party to the *White* suit, nor were he and the *White* plaintiffs in privity. The City has offered no convincing legal theory under which the *White* plaintiffs could have released the City from the claims of non-parties without safeguards like those offered by class actions. The *Fisher* claims are not precluded as res judicata.

### B.  Indispensable parties

The City next contends that under Rule 12(b)(7) of the Federal Rules of Civil Procedure, Fisher has failed to join as indispensable parties the *White* plaintiffs, *White* plaintiffs' counsel, and the federal housing department.

Rule 12(b)(7) allows a court to dismiss an action for failure to join a party in accordance with Federal Rule of Civil Procedure 19. The court's analysis under a Rule 12(b)(7) motion to dismiss involves a two-step inquiry, of which only the first step is relevant in this case.[4] *Owens-Illinois, Inc. v. Meade*, 186 F.3d 435, 440 (4th Cir. 1999). The court must determine whether the party is necessary to the action. *Id.* Under Rule 19(a), a party is necessary if "in that person's absence, the court cannot accord complete relief among existing parties," or "the person claims an interest relating to the subject of the action" such that a disposition of the action in the person's absence may "(i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest." Fed R. Civ. P. 19(a).

"The inquiry contemplated by Rule 19(a) is a practical one, and is addressed to the sound discretion of the court." *Heinrich v. Goodyear Tire & Rubber Co.*, 532 F. Supp. 1348, 1359 (D.

---

[4]  The second step, analyzed only when a necessary party cannot be joined because its presence would destroy diversity, asks whether the proceeding can continue in the absence of the necessary party or whether that party is indispensable pursuant to Rule 19(b) and the action must therefore be dismissed. *Owens-Illinois, Inc.*, 186 F.3d at 440. This case does not rely on diversity jurisdiction.

Md. 1982) (citing *Coastal Modular Corp. v. Laminators, Inc.*, 635 F.2d 1102, 1108 (4th Cir. 1980)). "Courts are loath to dismiss cases based on nonjoinder of a party, so dismissal will be ordered only when the resulting defect cannot be remedied and prejudice or inefficiency will certainly result." *Owens-Illinois, Inc.*, 186 F.3d at 441.

The *White* plaintiffs are not necessary to this action, and the City's arguments are wholly without merit. When the *White* plaintiffs signed the consent decree in their case, they warranted that they were "entitled to enforce and settle the aforesaid claim and to give a full and complete release therefrom on behalf of herself and all interested parties." *White* Consent Decree, No. 19-cv-1442, ECF 98 ¶ 55. The City thinks that this means they were entitled to enforce and settle the case on behalf of themselves and all interested parties, including non-parties not involved in the suit. The City argues that when the *White* plaintiffs covenanted not to sue the city based on pre-consent-decree events, they were somehow also signing away the legal rights of any other non-party who might later come forward. Further, the City argues, because the 52 *White* plaintiffs recovered financially for their damages, they are necessary parties — presumably as co-defendants — in Fisher's suit to recover for his own damages. These arguments have no basis in the law. The court is capable of according complete relief for Fisher's alleged damages even without the *White* plaintiffs' presence, and there is no risk of duplicative or inconsistent damages where any monetary damages awarded would go only to Fisher for his damages.

Nor is it necessary to have as a party the *White* plaintiffs' counsel, P. Joseph Donahue, who is also plaintiffs' counsel in the *Fisher* suit. In the City's understanding, when the *White* plaintiffs' attorney signed the consent decree in the course of his representation of the *White* plaintiffs, he was promising that he would also not serve as counsel in any future suits against the City arising from these events. Mr. Donahue was not a party to the *White* lawsuit or consent decree, and he is not a necessary party in either of these lawsuits.

11

Nor is HUD necessary to the suit. HUD was never a party to the *White* suit, but the *White* plaintiffs were still able to litigate the suit to resolution. *See White*, No. 19-cv-1442, Am. Compl., ECF 8-1 at 3. If the City wishes to join HUD as a cross-defendant, the City remains free to file an appropriate motion. But Fisher — especially against the backdrop of the successful *White* consent decree — could quite plausibly achieve complete relief in the form of monetary damages even in HUD's absence. The suit need not be dismissed as violating Rule 19.

### C. Impermissible collateral attack

The City argues that *Fisher* is an impermissible collateral attack on the *White* Consent Decree, which would need to be reassessed to provide relief (for example, monetary damages) to Fisher. This is incorrect, and the suit is not an attempt to appeal from or appeal the consent decree. The City does not point to any plausible language in the consent decree that binds nonparties from suing for damages.

Further, the City argues that Fisher was obligated to intervene in *White*. Once again, Fisher was not privy to the *White* record and was under no obligation to intervene, even if that intervention would have been by right. *White* was not a class action; the *White* monetary payments went only to the *White* plaintiffs, and that settlement is not under attack in *Fisher*. *Fisher* need not be thrown out as an impermissible collateral attack.

### D. Statute of Limitations

The City's reply (ECF 21) raises the issue of statutes of limitations to argue that claims in *Fisher* cannot be based on the City's actions before the *White* Consent Decree. (ECF 21 at 13). For the reasons articulated as to HACA's statute of limitations arguments in § II.A, *infra*, Fisher's 42 U.S.C. § 1986 claim that the City neglected to prevent a civil rights conspiracy will be **Dismissed** as untimely, but the other claims will not be dismissed as untimely at this stage of litigation.

E. *Local Government Tort Claims Act*

Finally, the City's reply (ECF 21) argues that because the *White* Consent Decree's damages payouts exceeded the Local Government Tort Claims Act's (LGTCA's) damages cap,[5] "there can be no further damages arising out of the City or HACA's tortious conduct related to the same operative facts as *White* under Maryland law." (ECF 12 at 15). Fisher, meanwhile, argues that the LGTCA does not apply to federal civil rights claims, particularly because a state tort damages cap operates via sovereign immunity, which it cannot assert against federal claims. (*Fisher* ECF 36 at 5). Local governments lack immunity from tort liability for violations of federal constitutional or statutory rights. *Housing Authority of Baltimore City v. Bennett*, 754 A.2d 367, 369 (Md. 2000) (citing *DiPino v. Davis*, 729 A.2d 354, 368–69 (Md. 1999)), *rev'd in part on other grounds*, *Espina v. Jackson*, 112 A.3d 442, 453–54 (Md. 2015) (noting 2001 state legislation responding to *Bennett* and declining to distinguish between state constitutional tort claims and state non-constitutional tort claims in the applicability of the LGTCA damages cap). The LGTCA cap will therefore apply only to Fisher's state claims (counts VI through IX) but not to the federal claims. The interaction of the White Consent Decree settlement and the LGTCA's damages cap need not be determined at this time.

The City's motion to dismiss *Fisher* will be denied except as to the § 1986 claim, which will be addressed below (*see* § II.A, *infra*).

---

[5] The cap is $400,000 per individual claim, and $800,000 per total claims arising "from the same occurrence for damages resulting from tortious acts or omissions." Md. Code Ann., CJP § 5-303(a)(1) (West 2022).

## II.    Fisher v. HACA

HACA moves for dismissal or summary judgment. HACA raises both a statute of limitations argument that the suit is time-barred and a string of merits challenges to the complaint.

### A.  Statute of Limitations

HACA first argues that the *Fisher* suit's May 3, 2021, claims against it are barred by the statute of limitations. The § 1986 action for neglect to prevent a civil rights conspiracy requires a wrongful act after May 1, 2020 (one year); the Fair Housing Act claim requires a wrongful act after May 1, 2019 (two years); and the rest of the claims require a wrongful act after May 1, 2018 (three years).

At issue here is which of three ways this court will understand the factual predicates underlying the *Fisher* suit: as continuing effects of an initial violation; as a continuing violation that is part of a single, ongoing pattern of discrimination and allows consideration of otherwise time-barred events; or as a discrete act of discrimination that starts the clock anew. The "continuing harm" or "continuing violation" doctrine tolls the statute of limitations. *Litz v. Maryland Dept. of Env't*, 76 A.3d 1076, 1089 (Md. 2013). This allows the consideration of facts that are outside the strict statute of limitations period before the filing of the lawsuit, because the continuing wrongful act within the period is an extension of the wrong outside the period. But if only the continuing ill effects of prior tortious acts — rather than new or continuing tortious acts — occur within the limitations period, then the case presents not a continuing violation but rather a "continuing effect" or "continuing injury," which does not toll the statute of limitations.[6]

---

[6] Recovery would be limited to damages incurred within the statute of limitations period. "Although an action for a continuing tort may not be barred by the statute of limitations, damages for such causes of action are limited to

*MacBride v. Pishvaian*, 937 A.2d 233, 240 (Md. 2007) abrogated in part by *Litz*, 76 A.3d at 1076. Finally, the court might understand the events at issue as discrete and independently discriminatory acts. "When an individual engages in a series of acts each of which is intentionally discriminatory, then a fresh violation takes place when each act is committed . . . [and] each discriminatory act starts a new clock for filing charges alleging that act[.]" *Hill v. Hampstead Lester Morton Court Partners LP*, 581 Fed. App'x 178, 180–81 (4th Cir. 2014) (cleaned up) (finding that the most recent denial of a request for a disability accommodation was its own discrete act of discrimination allowing for a timely suit, even though the first denials of requests for that same accommodation occurred outside the limitations period). Even if the plaintiff renews a request for a previously denied action, that plaintiff may sue based on the new "discrete act" of discrimination if the defendant again denies the request. *Id.* at 181.

HACA argues in its motion that Fisher was on notice as of 2016 (or 2018 at the latest), starting the clock for this lawsuit. HACA argues that because HACA's continued inaction of not inspecting his apartment and remediating the mold does not count as a continuing *violation* (but rather a continuing *effect* of the initial violation of the non-inspection policy), the statute of limitations would not be tolled. Further, HACA argues, Fisher has not alleged facts supporting a claim that he personally was injured by the June 2019 Shadow Policy, so the Shadow Policy also does not toll the statute of limitations for this suit.

Fisher, in response, points to several continuing wrongs: (1) near-annual intentional conduct of HACA in working with the City to implement the original non-inspection policy, which was in effect from August 2017 until a June 2019 City Council resolution; (2) HACA's collaboration with the City to implement the Shadow Policy beginning in June 2019; (3)

___

those occurring within the three year period prior to the filing of the action." *Litz*, 76 A.3d at 1089 (internal quotes omitted).

HACA's May 2020 directive for Fisher to stay at a hotel rather than his apartment during mold remediation (ECF ¶ 23); and (4) HACA's June 2020 misrepresentation to Fisher that the apartment was safe after the unsuccessful remediation (ECF 1 ¶ 24). For Counts I–VI (the federal claims and state constitutional claim), Fisher points specifically to (1), (2), and (3) above. For Counts VII–IX (the state non-constitutional claims), Fisher points to (4).

As to the state claims: Fisher alleges that HACA's remediation efforts and misrepresentations about those efforts were negligent, and those took place in June 2020 — well within the three-year statute of limitations. Those actions therefore can sustain Fisher's Maryland Consumer Protection Act claim (Count VII), Annapolis Municipal Code claim (Count VIII), and negligence claim (Count IX). Counts VII–IX are therefore timely.

Fisher's non-FHA federal claims (Counts II–V) and state constitutional claim (Count VI) are less certain, because they depend on whether or not violations occurred as part of a discriminatory inspection regime. Those discriminatory actions must have occurred within the appropriate period before the May 2021 filing of the lawsuit: After May 1, 2019, for the Fair Housing Act claim; after May 2, 2018, for the property rights, deprivation of rights, and conspiracy to interfere with civil rights claims; and after May 1, 2020, for the claim accusing HACA of neglecting to prevent a civil rights conspiracy.

The original period of non-inspection continued through June 2019, just less than two years before Fisher's lawsuit was filed. The natural question, then, is whether Fisher has alleged new discrete acts of discrimination, a continuing violation (HACA deciding not to address his air quality complaints) or merely a continuing effect of an earlier violation (the genesis of the HACA non-inspection policy) made before May 1, 2018. The "distinction between continually recurring violations and continuing effects can be subtle." *McCray v. Housing Authority of*

*Baltimore City*, No. 18-2271-RDB, 2019 WL 4120750 at *6 (D. Md. Aug. 29, 2019).[7] So, too, is

the distinction between a discrete act and a continuing violation. A discrete act can itself be the

source of liability, whereas continuing violations involve repeated conduct, with liability based

on the cumulative effects of multiple individual acts.

The complaint characterizes Mr. Fisher's (mostly oral) complaints to the property

manager as "recurring." (F.1 ¶ 18). HACA seizes upon complaint language that in May 2020,

Fisher was "continuing to receive no assistance from [HACA]," and HACA characterizes this

apparent inaction as a continuing effect of wrongs committed, and first discovered, outside the

statute of limitations. The court instead reads the complaint in a light favorable to Fisher,

indicating that he made recurring (mostly oral) complaints to his HACA property manager

throughout his March 2018–May 2020 period of relatively frequent hospitalizations. (F.1 ¶ 20).

Such complaints during May or June 2019, denied anew by his HACA property manager in

accord with the original non-inspection policy, can sustain his claims under 42 U.S.C. §§ 1982,

1983, and 1985, and Article 24 of the Maryland Declaration of Rights. *See Hill*, 581 Fed. App'x

at 180–81. The situation might properly be understood as continuing effects of a prior violation if

Fisher had complained once outside the statute of limitations period but HACA had continued to

ignore his unit's mold infestation into the two or three years before Fisher's lawsuit. But repeated

denials in the face of recurring complaints are sufficient pleading of either discrete actions or

continuing violations in line with an allegedly discriminatory policy. "While facts may arise at a

later stage that indicate that" these denials did not occur on an ongoing basis, it is not apparent

on the face of the Complaint that the action is barred by the statute of limitations. *Litz*, 76 A.3d at

1091–92, 1090 (noting that the "case has not yet been presented to a trier of fact to determine

---

[7] Unpublished cases are cited not for binding precedent but rather for sound reasoning.

whether the only [wrongful acts happened within the statute of limitations period], and the fact-finder has not had an opportunity to determine if the wrongful acts] were ongoing"). At this stage, the federal and state civil rights claims will not be dismissed as untimely.

The two-year-limited FHA claim (Count I) deserves special consideration. The FHA expressly announces that the period commences "after the occurrence of termination of an alleged discriminatory housing practice." 42 U.S.C. 3613(a)(1). Noting that the policy reasons for limiting the time to sue over discrete acts of discrimination are different from those challenging ongoing housing practices, the Supreme Court remarked: "we . . . conclude that where a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within [two years] of the last asserted occurrence of that practice." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380–81 (1982) (modified to update statute of limitations after change from 180 days to two years); *see, e.g.*, *National Fair Housing Alliance v. Bank of America, N.A.*, 401 F. Supp. 3d 619, 629–30 (D. Md. 2019). The original non-inspection policy continued until June 2019, less than two years before the May 2021 filing of the Fisher suit. The FHA claim is therefore timely.

In contrast, Fisher's 42 U.S.C. § 1986 claim that HACA neglected to prevent a civil rights conspiracy will be **Dismissed** as untimely. Because the original non-inspection policy was abandoned by May 1, 2020, only the Shadow Policy would have been active within the one-year period. But the Shadow Policy was distinct from the prior wholesale non-inspection policy; inspections of HACA properties were underway by 2020, but HACA says Harbor House was "the last property scheduled by the City for the licensing inspection." (ECF 16 at 16 n.6). The Shadow Policy instead concerned inspecting the units (as required by the City Council) but then issuing post-inspection waivers to grant licenses even when the inspections revealed "routine

18

maintenance" violations. (ECF 1 ¶ 80). Fisher's unit was inspected in May 2020, and the complaint does not allege facts regarding how his unit was inspected differently from non-HACA units in accord with the Shadow Policy.

### B.  Fair Housing Act (Count I)

Fisher alleges both disparate impact and disparate treatment theories under the Fair Housing Act ("FHA"). In the Fourth Circuit, an "FHA claim can proceed under either a disparate-treatment or a disparate-impact theory of liability, and a plaintiff is not required to elect which theory the claim relies upon at pre-trial, trial, or appellate stages." *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 421 (4th Cir. 2018). Because Fisher has sufficiently pleaded disparate impact, there is no need to resolve the disparate treatment argument at this time.

In order to survive a motion to dismiss on a disparate impact theory FHA claim, the plaintiffs "must demonstrate a robust causal connection between the defendants' challenged policy and the disparate impact on the protected class." *Reyes*, 903 F.3d at 424 (describing the "three-step, burden-shifting framework" for analyzing FHA disparate impact claims); *see also Texas Dep't of Hous. and Cmty. Affairs v. The Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 542 (2015); *Prince George's Cnty., Md. v. Wells Fargo & Co.*, 397 F. Supp. 3d 752, 766 (D. Md. 2019) (at motion to dismiss stage, only first step at issue).

Fisher challenges HACA's policy of not following the City's inspection and licensing requirements, alleging that this behavior was discriminatory. (ECF 1 ¶ 32). Fisher alleges a disparate impact on African-Americans, who make up a higher proportion of public housing residents than the City overall. (ECF 1 ¶¶ 54–59). And he alleges a causal connection: Years of neglect motivated by discriminatory intent led to the poor conditions that disparately impacted African Americans like Fisher. (ECF ¶¶ 42, 99).

19

HACA, meanwhile, argues (1) Fisher was never actually refused rental housing, (2) HACA was simply following the City's policy without real agency; and (3) there was no racially disparate effect on housing opportunities, because the appropriate comparison group for HACA's role is limited to HACA tenants rather than to all Annapolis renters.

First, as to the refusal of rental housing: Fisher alleges that HACA denied his housing opportunities in two ways: First, HACA made Fisher's apartment unavailable to him when he had to stay at a hotel during the 2020 mold remediation just before his death. *See also White*, 439 F. Supp. 3d at 538–39.[8] Second, HACA failed or delayed maintenance or repairs of his dwelling based on race. *See* 24 C.F.R. § 100.65 (HUD regulation implementing 42 U.S.C. § 3604(b)).

Second, as to HACA's agency: As in *White*, Fisher has sufficiently alleged HACA's involvement in the City's decision to stop inspecting and licensing HACA units. *See White*, 439 F. Supp. 3d at 538 n.15; ECF 1 ¶¶ 68–69 (alleging HACA's collaboration with the City to stop inspections after the mayoral election).

Finally, as to the appropriate comparison group: HACA points to *Edwards v. Johnson Cnty. Health Dep't*, 885 F.2d 1215 (4th Cir. 1989), where the court held that the proper question was whether minority migrant farmworkers suffered more harm than white migrant farmworkers, and not whether the policy disproportionately impacted minorities in the context of the entire community. *Edwards*, 885 F.2d at 1223–24. This court in *White* distinguished *Edwards* by noting that the *Edwards* permits applied specifically to migrant housing, whereas in *White* the code applied to all rental units, with the City and HACA making an exception for HACA properties. *White*, 439 F. Supp. 3d at 537–38. Despite HACA's attempts to erase that distinction,

---

[8] "While Section 3604(a) may not regulate the provision of substandard housing, the amended complaint sufficiently alleges that at least some plaintiffs were forced to leave their apartments for periods of time due to the alleged defects. Therefore, the plaintiffs have sufficiently pled, at this stage, their Section 3604(a) claim." *White*, 439 F. Supp. 3d at 538–39 (citation omitted).

it applies equally in this case that concerns the exact same non-inspection policy. The disproportionate effect the non-inspection policy had on African Americans was not a mere coincidence attributable to which Annapolitans live in public housing; it is the very core of a claim of disparate impact. Additionally, Fisher alleges that the non-inspection policy furthered segregation, as described in the *Edwards* opinion: "Equal adverse impact on white and non-white citizens is not automatically fatal to a [disparate impact] claim; the disputed policy may still produce a racially discriminatory impact in the second sense, that is, it may contribute to continued housing segregation or impede integration efforts." *Edwards*, 885 F.2d at 1224 (continuing that the *Edwards* appellants, unlike here, had not alleged that the government's actions effectively perpetuated segregation or impeded integration efforts among migrant workers or within the county and thus failed to state a claim of racially discriminatory effect). As in *White*, 439 F. Supp. 3d at 539–40, the racially disproportionate impact is an important starting point supported by historical background pointing to discriminatory intent. Fisher has satisfactorily alleged that HACA denied or limited the services or facilities provided to him (including failing to properly maintain, inspect, and license his and other units), a violation of 42 U.S.C. § 3604(b). HACA's motion to dismiss Fisher's FHA claim will be **denied**.

### C. 1982 (Count II)

Under 42 U.S.C. § 1982, "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." An Eighth Circuit case has stated the elements: "(1) membership in a protected class; (2) discriminatory intent on the part of the defendant and (3) interference with the rights or benefits connected with the ownership of property." *Daniels v. Dillard's, Inc.*, 373 F.3d 885, 887 (8th Cir. 2004). Section 1982 may be violated in the case of a

"municipal action benefiting white property owners that would be refused to similarly situated black property owners," "official action that depreciated the value of property owned by black citizens," or action that would hamper black residents "in the use of their property," such as a street closing that "severely restricted access to black homes." *City of Memphis v. Greene*, 451 U.S. 100, 123 (1981). The statute, however, "does not deal specifically with discrimination in the provision of services or facilities in connection with the sale or rental of a dwelling." *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 413 (1968). Some courts have found that the failure to maintain a safe and sanitary dwelling because of the tenant's race violates Section 1982, *Ross v. Midland Mgmt. Co.*, No. 02-C-8190, 2003 WL 21801023, at *2 (N.D. Ill. Aug. 1, 2003), while others have found it does not, *Rhodes v. Adv. Prop. Mgmt. Inc.*, No. 3:10-cv-826 (JCH), 2011 WL 2076497, at *7 (D. Conn. May 26, 2011). No Fourth Circuit case has been identified that addresses the issue squarely.

Fisher has sufficiently alleged that he is part of a protected class and that HACA acted with discriminatory intent (F.1 ¶ 32), and he alleged a defect (the mold infestation) in his apartment sufficient to deprive him of his right to the property. While Fisher's response to the motion to dismiss discusses both the original non-inspection policy and the Shadow Policy, it is not clear what direct injury the Shadow Policy inflicted upon him. This court looks, therefore, only to the original non-inspection policy, under which this court reads Fisher to have pleaded a denial of service within the statute of limitations period.

Without deciding the legal question of whether § 1982 covers claims of racial discrimination in the maintenance of housing, the court will not dismiss the § 1982 claim at this time, because there will be discovery conducted in any event for similar claims in this suit.

D. *1983 (Count III)*

Fisher brings a claim under Section 1983, alleging that HACA violated his constitutional rights under the Equal Protection Clause. To show a violation of the Equal Protection Clause, the plaintiffs must show that they (1) were treated differently from others with whom they are similarly situated, and (2) the unequal treatment was the result of intentional or purposeful discrimination. *Martin v. Duffy*, 858 F.3d 239, 252 (4th Cir. 2017).

As to the first prong, and as described above, Fisher has shown he was treated differently from similarly situated persons (i.e., private renters). Though HACA claims it was merely following City policy, Fisher has pleaded facts pointing to HACA's involvement in the non-inspection policy. (F.1 ¶¶ 73, 76, 61–69). As to the second prong, in determining whether there was intentional or purposeful discrimination, a court should consider factors such as: (1) whether the action bears more heavily on one race than another, (2) whether there are clear patterns of action that are unexplainable on grounds other than race, (3) the historical background of the action in question, (4) the sequence of events leading to the defendant's actions, (5) departures from a defendant's regular course of action, and (6) the legislative or administrative history. *Vill. of Arlington Heights v. Metro. Hous. Develop. Corp.*, 429 U.S. 252, 266–68 (1977); *see N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 220–21 (4th Cir. 2016).

As before in *White*, 439 F. Supp. 3d at 539–40, the question of whether HACA acted with discriminatory intent or purpose is a close one. The non-inspection policy bore more heavily on African Americans, a helpful "starting point" in the analysis. *Arlington Heights*, 429 U.S. at 264–66. Additionally, historical background may also point to discriminatory intent: Fisher refers to the historical treatment of African Americans as alleged in *White* as supporting an inference of intentional discrimination. (F.1 ¶ 32). Further, Annapolis historically has placed

great emphasis on inspections and licensing, even seeking emergency State legislative action when their previous inspection and licensing scheme was held unconstitutional (F.1 ¶ 34), which may make the decision to exempt HACA properties more suspect.

Still, the complaint includes statements from HACA Director Beverly Wilbourn that express a desire for substantial improvements to HACA properties and suggest logistical and financial reasons for the non-inspection policy. (F.1 ¶ 53). Finally, the decision to refrain from enforcing the city code on HACA was a departure from the immediate course of action, but a return to what the City had previously done.

In short, the historical background and disparate impact weigh in favor of a discriminatory motive, though other considerations point to financial or logistical motives. As the case will proceed to discovery on the Fair Housing Act claim, this court will not dismiss the § 1983 claim at this time.

### E.  1985 (Count IV)

Title 42 of the U.S. Code, § 1985, prohibits a conspiracy to deprive persons of their rights or privileges. To state a claim under § 1985(3), the elements are: "(1) A conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy." *Facey v. Dae Sung Corp.*, 992 F. Supp. 2d 536, 540 (D. Md. 2014) (citation omitted).

Fisher alleges that HACA and the City conspired (at least in 2017) to stop inspections and prevent city inspectors from responding to complaints at HACA properties, injuring Fisher and depriving him of his rights. (ECF 1 ¶¶ 61–69). Due to continuing violations (discussed in

24

§ II.A, *supra*), these events are not necessarily time barred. HACA argues that Fisher fails to state how he was specifically injured; that he has failed to allege facts supporting discriminatory intent; and that the non-inspection policy was lawful at the time.

Fisher has alleged specific injuries: As a result of years of neglect and non-inspection, his HACA apartment was infested with mold, leading to years of hospitalizations and eventually his death. (ECF 1 ¶ 20). And as noted in the discussion of § 1983, he has alleged discriminatory intent. What remains is HACA's argument that the applicability of licensing requirements were limited by the Annapolis-HACA cooperation agreement, which allows the City to make exceptions to its licensing ordinances. The cooperation agreement states that the City may, "in so far as local government may lawfully do so, grant such deviations from the building code of the local government as are reasonable and necessary to promote economy and efficiency in the development and administration of such project, and at the same time safeguard health and safety . . ." Fisher, meanwhile, points to the requirement that any deviations be done "lawfully" and must "safeguard health and safety" — in other words, in ways that do not discriminatorily deprive Fisher of his rights. The Cooperation Agreement need not be unlawful as a whole for HACA and the City to have unlawfully pursued deviations from the standard licensing scheme. As with the claims under §§ 1982 and 1983, HACA's motion to dismiss Count IV will be denied without prejudice because the case proceeds to discovery on the FHA claim.

### F.   MDR Art. 24 (Count VI)

For the same reasons Counts II–IV (claims under §§ 1982, 1983, and 1985) survive, Fisher's claims under Article 24 of Maryland's Declaration of Rights also survive, and HACA's motion will be denied without prejudice. *See Littleton v Swonger*, 502 Fed. App'x 271, 274 (4th Cir. 2012) (explaining that Article 24 of the Maryland Declaration of Rights is "construed in pari materia with the . . . Fourteenth Amendment").

*G. Maryland CPA (Count VII)*

Maryland's consumer protection statute prohibits unfair or deceptive trade practices. The MCPA proscribes fourteen categories of such practices, including "[f]ailure to state a material fact if the failure deceives or tends to deceive." Md. Code Ann., Com. Law §§ 13-301(3), 13-303. To state a claim under the MCPA, a plaintiff must plead that "(1) the defendant engaged in an unfair or deceptive practice or misrepresentation, (2) the plaintiff relied upon the misrepresentation, and (3) doing so caused the plaintiff actual injury." *Barr v. Flagstar Bank, FSB*, 303 F. Supp. 3d 400, 416 (D. Md. 2018) aff'd 2020 WL 12947540 (4th Cir. Jan. 7, 2020).

The CPA prohibits any "false, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers" or representation that "consumer realty . . . [is] of a particular standard, quality, grade, style, or model which they are not." Md. Code Com. Law § 13-301. The Court of Appeals of Maryland has previously held that the failure to "disclose the material fact that [the defendant] did not hold a license to rent the premises as a multi-family unit amounted to a violation of the Consumer Protection Act." *Lloyd*, 916 A.2d 257, 278 (2007) (citing *Golt v. Phillips*, 517 A.2d 328). Because CPA actions sound in tort, Sections 5-304(a) and (b) of the Local Government Tort Claims Act require that potential claimants give notice of impending claims within one year of the injury.

Fisher gave LGTCA notice on June 22, 2020, limiting his claim to injuries arising on or after June 22, 2019. His most recent lease renewal was in August 2019, within that notice period. HACA argues Fisher knew of the mold since 2016 or 2018 such that he cannot claim he was misled or that HACA misrepresented the condition of the unit in 2019. Additionally, HACA says it consistently refused to act on the mold throughout the lease period, putting their refusal outside of the LGTCA time bar. In the alternative, if the condition did change in some way during the

lease period, HACA argues that Fisher must prove HACA had notice of the change in the condition.

HACA does not acknowledge the full misrepresentation in question here. The court need not address precisely what Fisher knew about the mold and when, because Fisher has pleaded that HACA represented the unit to be licensed (ECF 1 ¶ 121) when it was not. Licensing, of course, brings with it safety inspections and assurances that a dwelling is habitable. And Fisher has pleaded that HACA agreed in its 2019 renewal that it was "obligated to . . . [C]omply with the requirements of all applicable building and housing codes materially affecting health and safety . . ." (ECF 1 ¶ 118). Accepting these allegations as true, Fisher has plausibly alleged a claim against HACA under the CPA.

## CONCLUSION

For the reasons discussed herein, the City's motion to dismiss *Fisher* (ECF 12) will be Denied except as to the § 1986 claim, as to which it will be Granted. HACA's motion to dismiss *Fisher* (ECF 16) will be Granted in part and Denied in part. A separate Order follows.

3/30/22
Date

_____
Catherine C. Blake
United States District Judge