**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| TAMARA JOHNSON, *et al.*,<br>Plaintiffs | |
| v. | Civil Action No. CCB-21-1120 |
| CITY OF ANNAPOLIS,<br>Defendant and Third-Party Plaintiff | Cross-Docketed in Related Case: *Fisher v. City of Annapolis et al.*, Civ. No. CCB-21-1074 |
| v. | |
| HOUSING AUTHORITY OF THE CITY OF ANNAPOLIS *and* U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,<br>Third-Party Defendants. | |

## **MEMORANDUM**

This civil rights case involves a class of Annapolis public housing residents who claim the City of Annapolis's non-inspection policy discriminates against African Americans. After the court denied the City's motion to dismiss, the City answered the complaint. *See* ECF 19, Mem. Denying City Mot. Dismiss; ECF 20, Order Denying City Mot. Dismiss, ECF 25, City's Answer. Along with answering the plaintiffs' complaint, the City filed two third-party complaints, one against the Housing Authority of the City of Annapolis ("HACA"), ECF 26, City v. HACA Third-Party Compl., and the other against the U.S. Department of Housing and Urban Development ("HUD"), ECF 28, City v. HUD Third-Party Compl.[1]

---

[1] The City also named as a third-party defendant Marcia L. Fudge in her official capacity as Secretary of the Department of Housing and Urban Development. The court refers to the agency and Secretary Fudge collectively as "HUD."

Pending before the court are HACA and HUD's respective motions to dismiss the City's third-party complaints. *See* ECF 51-1, HACA Mot. Dismiss; ECF 75-1, HUD Mot. Dismiss.[2] Both of those motions are fully briefed, and no hearing is necessary. *See* Local Rule 105.6. For the reasons stated here, the court will deny HACA's motion to dismiss and grant HUD's motion to dismiss.[3]

## I.  BACKGROUND

In describing the following background information, the court accepts as true all well-pled facts in the complaint and construes those facts in a light most favorable to the (third-party) plaintiff. *See Wikimedia Found. v. NSA*, 857 F.3d 193, 208 (4th Cir. 2017) (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)).[4]

---

[2] In addition to moving for dismissal under Rule 12(b)(6), HACA has moved, in the alternative, for (1) summary judgment, and (2) judgment on the pleadings.

[3] This Memorandum will be cross-docketed in *Fisher v. City of Annapolis et al.*, CCB-21-1074. The factual allegations between the two cases are substantially similar. *See Fisher v. City of Annapolis et al.*, Civ. No. CCB-21-1074, 2022 WL 959310, at *1 (D. Md. Mar. 30, 2022) (describing factual background). *Fisher*, however, is not a class-action. The plaintiff in *Fisher* named the City and HACA as defendants in the initial complaint. The court denied in part and granted in part the City and HACA's motions to dismiss. *See* ECFs 37, 38 in *Fisher*. The City subsequently answered Fisher's complaint and filed a cross-claim against HACA. *See* ECF 46 in *Fisher*. HACA answered the City's cross-claim. *See* ECF 60 in *Fisher*. The City also filed a third-party complaint against HUD. *See* ECF 47 in *Fisher*. HUD moved to dismiss the City's third-party complaint in *Fisher* for the same reasons that it moved to dismiss the City's third-party complaint here. *See* ECF 85 in *Fisher*. Accordingly, the court will grant HUD's motion to dismiss in *Fisher* for the same reasons it will grant HUD's motion to dismiss in this case.

[4] "Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015). But, under limited circumstances, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015)). Specifically, a court may consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (cleaned up). The City's third-party complaints explicitly incorporate the plaintiffs' complaint by reference. *See* City v. HACA Third-Party Compl. at ¶ 30; City v. HUD

## A.  Annapolis's Public Housing Before the 2019 *White v. City of Annapolis* Decision

HACA is a public housing agency that manages about 790 apartment units. ECF 1, Pl. Compl. at ¶ 23. Collectively, HACA's units provide housing for about 1,600 residents. *Id.* Census data suggest the majority[5] of HACA's residents are African American. *Id.* at ¶¶ 44–49.

The Annapolis City Code requires rental units to have operating licenses. *See* Annapolis City Code § 17.44.010(A). To obtain an operating license, the rental units must be inspected and in compliance with the City's Residential Property and Maintenance Code. *Id.* § 17.44.030. For many years, however, the City did not inspect or license HACA properties; such properties were the only rental properties in Annapolis that were neither licensed nor inspected. Pl. Compl. at ¶ 29. This apparently was a longstanding arrangement, as although rental licenses have been required of landlords since 1985, HACA housing units have never been "fully, finally, or properly inspected and licensed in accordance with the City Code." *Id.* at ¶ 32.

HACA's units are required by City Code to be re-licensed annually. *Id.* at ¶¶ 35–36. But before any such license is issued, the relevant units must be inspected and found compliant with the City's maintenance code. *Id.* at ¶ 37. When an inspector finds conditions dangerous to health or safety, the landlord must relocate the tenant, remediate the danger, request a reinspection, and provide other proof to the City inspector that the danger is no longer present. *Id.* at ¶ 30.

Annapolis has, since the early 1980s, emphasized the importance of licenses and inspections. *Id.* at ¶ 24. In one instance, the City went so far as to obtain emergency state legislation to protect its regime from challengers who wished to evade the requirements. *Id.* But before 2019,

---

Second Am. Compl. at ¶¶ 39–43. Accordingly, the court will refer to the plaintiffs' complaint as necessary to provide context for the pending motions.

[5] The plaintiffs exclude certain developments that mainly house senior citizens and people with disabilities.

HACA properties were unique among Annapolis rentals in that they were neither licensed nor inspected by the City. *Id.* at ¶ 29. HACA did not apply for licenses as required by the City Code, and the City did not act on this non-compliance. *Id.*

On May 1, 2016, under Mayor Mike Pantelides, the City began an initial round of inspections of HACA properties, revealing 2,498 City Code violations, some of which presented dangers to health and safety and should have required relocation. *Id.* at ¶¶ 38–40. After that summer, the City conducted various follow-up inspections, but no HACA property was fully and properly licensed. *Id.* at ¶ 41. In 2017, newly appointed HACA Director Beverly Wilbourn identified City inspections as a hurdle to her success in balancing HACA's budget and interpreted the City's inspection requirements as "unfunded mandates." *Id.* at ¶¶ 51–52. In summer 2017, Wilbourn advised a HACA board member that she had reached an understanding with the City Manager that the City would work out an alternative agreement on inspections, ultimately ordering a halt of all inspections starting in late August 2017. *Id.* at ¶ 53. Then-Mayor Pantelides, an advocate of inspecting public housing, expressed frustration at HACA's resistance to treating public housing properties the same as private rental units. *Id.* at ¶ 56.

But Annapolis would soon return to neglecting public housing. Mayor Pantelides was defeated in the November 2017 city election; even before new Mayor Gavin Buckley was seated, Wilbourn discussed the inspection issue with him, and the City and HACA agreed to stop inspecting HACA properties. *Id.* at ¶ 59. The only public evidence of the December 2017–May 2019 return to a non-inspection regime came when HACA residents called the City to complain about issues in their apartments, and representatives explained that the City no longer inspected HACA properties. *Id.* at ¶ 60. In mid-May 2019, HACA and the City were involved in a lawsuit against a HACA tenant, and at a hearing in the case, a city inspection worker testified that Mayor

Buckley had decided to exempt HACA from the City's licensing requirement. *Id.* at ¶ 66. Afterward, HACA's attorney sent an email thanking that employee for his testimony on HACA's behalf and copying city officials, Mayor Buckley, and HACA Director Wilbourn. *Id.*

Two days later, on May 16, 2019, dozens of Annapolis public housing residents sued the City and HACA under various federal and state civil rights claims. *See White v. City of Annapolis*, No. CCB-19-1442. The *White* plaintiffs alleged that the City's decision not to enforce inspection and licensing requirements on public housing units disparately impacted African Americans. At the case's conclusion, the parties entered a consent decree enacting prospective equitable remedies intended to improve public housing, and awarding monetary damages to the plaintiffs. *See* ECF 98, Consent Decree in CCB-19-1442. Even before entering the *White* consent decree, the City responded to public-facing criticism of its non-inspection regime with a June 2019 resolution that sought to restart HACA inspections and licensing. Pl. Compl. at ¶¶ 68–69.

## B. The Plaintiffs' Class-Action Challenge Post-*White v. City of Annapolis*

Named plaintiffs Tamara Johnson and Tyonna Holliday brought the present case to challenge the public housing inspection policies implemented by the City in the wake of *White*. Tamara Johnson lives in Harbour House, and fellow named plaintiff Tyonna Holliday lives in Eastport Terrace. *Id.* at ¶¶ 4, 12. Both Harbour House and Eastport Terrace are public housing complexes owned and operated by HACA. *Id.* at ¶¶ 6, 13. Johnson and Holliday have lived in their apartments since 2017 and 2016, respectively. *Id.* at ¶¶ 5, 14. Since they have lived there, the City never inspected either of their units. *Id.* Both Johnson and Holliday's children suffer from respiratory conditions exacerbated by persistent mold in their homes. *Id.* at ¶¶ 10–11, 17–18. Johnson's apartment has had sewage leaks and rodent infestations, while Holliday's apartment contains unsafe levels of lead. *Id.* at ¶¶ 8–9, 19. Johnson and Holliday represent a class of all

individuals who lived in HACA properties from May 7, 2018, to May 7, 2021. *See* ECF 97, Order Certifying Class at 3.[6]

The City's post-*White* reforms, according to the plaintiffs, did not end Annapolis's racially discriminatory public housing policies. The plaintiffs allege City officials and HACA hatched a new plan—a "Shadow Policy"—to conduct inspections and licensing on HACA's units differently from other Annapolis rentals. *Id.* at ¶¶ 69–71. For example, the City explained in a private communication to HACA that it would award waivers to certain units, grandfather in old violations, and inspect for life-threatening safety issues only. *Id.* at ¶ 70. The City further explained it would not deny licenses for deficiencies in routine maintenance, even going so far as to suggest it might not withhold a license for "structural or mechanical defects." *Id.* Besides effectively gutting the June 2019 City resolution restarting inspections, the plaintiffs allege the Shadow Policy intentionally treats HACA tenants differently from similarly situated non-HACA Annapolis renters, perpetuating segregation and hurting the plaintiffs' life, health, and safety. *Id.* at ¶¶ 72, 76, 77.

The City initially sought to dismiss the plaintiffs' complaint for failure to state a claim. *See* ECF 7, City Mot. Dismiss. The court denied the City's motion. *See* ECF 19, Mem. Denying City Mot. Dismiss; ECF 20, Order Denying City Mot. Dismiss.

---

[6] "Excluded from the class are: (i) any of the individual Plaintiffs from *White v. City of Annapolis*, Civil Action No. CCB-19-1442, or minor members of their immediate family who resided with them; (ii) any employee or independent contractor of the Defendants; (iii) any relative of an employee or independent contractor of the Defendants; (iv) any employee of the Court where this action is pending, and (v) any person who filed for bankruptcy and received a discharge after ceasing to be a resident in a HACA property." Order Certifying Class at 3.

**C.  The City's Third-Party Complaints**

After the court denied its motion to dismiss, the City filed third-party complaints against HACA and HUD.

        *1.      City v. HACA*

The City's third-party complaint against HACA asserts that the plaintiffs' injuries were caused solely by HACA's failure to maintain its property in a safe and sanitary condition. *See* City v. HACA Third-Party Compl. at ¶ 27. HACA is an independent housing agency that operates as a separate entity from the City. *Id.* at ¶ 25. If the City is ultimately found liable to the plaintiffs, the City claims it is entitled to indemnification (Count I) and/or contribution (Count II) from HACA. *Id.* at ¶¶ 28–35. The City's third-party complaint largely repeats or incorporates the factual allegations made by the plaintiffs.[7] But the City particularly emphasizes the plaintiffs' allegation that the City "conspired with" HACA to continue its non-inspection policy. *Id.* at ¶ 19. Further, the City alleges HACA had a non-delegable duty to provide decent, safe, and sanitary housing to its residents. *Id.* at ¶¶ 24, 26.

        *2.      City v. HUD*

The City's operative third-party complaint against HUD contends that the plaintiffs' injuries were caused mainly by HUD's failure to properly fund HACA. *See* City v. HUD Second Am. Compl. at ¶¶ 37, 44, 48–49, 58, 61.[8] The City also asserts HUD failed to enforce regulatory requirements that would have provided the plaintiffs with decent, safe, and sanitary housing. *Id.* at ¶¶ 51, 61. For example, the City claims that HUD has "not moved to place HACA in a receivership

---

[7] The City's pleading includes a disclaimer that the City "denies any and all liabilities to the plaintiffs." *See* City v. HACA Third-Party Compl. at ¶ 29.

[8] The City amended its third-party complaint twice. *See* ECF 36, City v. HUD First Am. Compl.; ECF 64, City v. HUD Second Am. Compl. The City's Second Amended Third-Party Complaint is the operative complaint against HUD.

as required by its regulations." *Id.* at ¶ 58. HUD's failures, according to the City, were the true culprit behind racially inequitable public housing in Annapolis. *Id.*

To frame these allegations, a brief explanation of the funding and regulatory scheme surrounding public housing authorities like HACA is helpful. With the passage of the Housing Act of 1937, Congress aspired to provide "decent and affordable housing for all citizens." 42 U.S.C. § 1437(a)(4).[9] But Congress recognized "the Federal Government cannot through its direct action alone provide for the housing of every American citizen." *Id.* § 1437(a)(2). So, the statute aimed to "promote and protect the independent and collective actions of private citizens to develop housing and strengthen their own neighborhoods." *Id.* To that end, Congress required HUD to fund and regulate state and local public housing authorities ("PHAs") like HACA. *See id.* §§ 1437a(b)(6), 1437g. PHAs manage housing units for low-income residents that generally cannot afford housing in the private market.[10]

PHAs receive federal funding through two funding mechanisms: the Capital Fund and the Operating Fund. *See* 42 U.S.C. § 1437g. The Capital Fund provides PHAs funding for "capital and management activities," such as "the development, financing, and modernization of public housing projects." *Id.* § 1437g(d)(1)(A). The Operating Fund provides PHAs funding for the "operation and management of public housing," such as security, insurance, and energy costs. *Id.* §§ 1437g(e)(1)(C),(F)-(G). Congress replenishes these Funds through annual appropriations legislation. *See, e.g.*, Consolidated Appropriations Act, 2019, Pub. L. 116–6, 133 Stat. 13, 439

---

[9] The Housing Act of 1937 was amended by the Housing and Community Development Act of 1974. The court refers to the current version of the statutory framework as "the Housing Act."

[10] *See* U.S. Dep't Hous. & Urb. Dev., *HUD's Public Housing Program*, https://www.hud.gov/programdescription/phd; *see also* 42 U.S.C. § 1437a(b)(6)(A) (defining "public housing authorities" as any "[s]tate, county, municipality, or other governmental entity or public body . . . authorized to engage in or assist in the development or operation of public housing").

8

(Feb. 15, 2019). The Secretary of HUD, in turn, develops formulas to determine how much funding each PHA will receive in a fiscal year from the Funds. *Id.* §§ 1437g(d)(2), 1437g(e)(2).[11] HUD then distributes money from the Funds to PHAs through Annual Contributions Contracts ("ACCs"). *See* 42 U.S.C. § 1437c. These contracts strike a simple bargain: in exchange for receiving funding from HUD, a "PHA agrees to comply with HUD requirements for the development and operation of its public housing projects." *See* 24 C.F.R. § 990.115.

As a result, PHAs have a significant "amount of responsibility and flexibility in program administration," 42 U.S.C. § 1437(a)(1)(c), but must still respect HUD's regulatory guardrails. For example, HUD requires PHAs to maintain public housing in a safe and habitable condition. *See* 42 U.S.C. § 1437d(f). As part of HUD's Public Housing Assessment System, these standards grade PHAs on several indicators, such as the physical condition of housing units. *See* 24 C.F.R. § 902.9(a).[12] HUD's standards, however, "do not supersede or preempt state and local building and maintenance codes with which [a] PHA's public housing must comply. PHAs must continue to adhere to these codes." *Id.* § 902.20(e).

A PHA's overall score from this assessment determines whether HUD designates the agency as a "high performer," a "standard performer," a "substandard performer," or a "troubled performer." 24 C.F.R. §§ 902.9, 902.11. PHAs with excessive deficiencies may face adverse consequences ranging from more frequent inspections to the appointment of a receiver for the PHA. *Id.* §§ 902.11, 902.13, 902.73, 902.75, 902.83.

---

[11] HUD promulgates these formulas through notice-and-comment rulemaking. *See* 24 C.F.R. §§ 905.400, 990.110.

[12] A PHA is assessed on other indicators beyond the physical condition of the units it operates. *See* 24 C.F.R. § 902.9(a) ("Each PHA will receive an overall PHAS score, rounded to the nearest whole number, based on the four indicators: Physical condition, financial condition, management operations, and the Capital Fund program.").

HUD has regularly placed HACA on the "troubled performer" list. *See* City v. HUD Second Am. Compl. at ¶ 31. Despite HACA's status as a "troubled performer," HUD has not placed it under receivership. *Id.* at ¶¶ 32–33. By pointing to the plaintiffs' identification of the racial demographics of HACA residents, the City asserts HUD's relationship with HACA exacerbated racial discrimination in Annapolis's public housing. *Id.* at ¶¶ 38–43. And because HUD controls HACA's funding, the City asserts the condition of HACA properties "continue[d] to degrade whether or not inspections at HACA properties [were] conducted." *Id.* at ¶ 50. The City's third-party complaint asserts that HUD's decision-making was not neutral; rather, HUD "allow[ed] HACA to continually place City residents" in substandard properties "[b]ecause of the race and economic levels of the plaintiffs." *Id.* at ¶ 53.

Consequently, the City filed a third-party complaint against HUD which alleges the federal agency's lack of enforcement against HACA, in addition to its underfunding of HACA, violated (1) the Housing Act, 42 U.S.C. § 1437, (2) the Fair Housing Act, 42 U.S.C. §§ 3601, 3602, 3604, and (3) the equal protection clause of the Fifth Amendment to the U.S. Constitution.

## II. LEGAL STANDARD

### A. Rule 12(b)(1)

A motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) "addresses whether [the plaintiff] has a right to be in the district court at all and whether the court has the power to hear and dispose of his claim." *Holloway v. Pagan River Dockside Seafood, Inc.*, 669 F.3d 448, 452 (4th Cir. 2012). Issues of sovereign immunity and standing are analyzed under the rubric of a motion to dismiss pursuant to Rule 12(b)(1). *See, e.g.*, *Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Def.*, 990 F.3d 834, 841 (4th Cir. 2021) (sovereign immunity); *Taubman Realty Grp. Ltd. P'ship v. Mineta*, 320 F.3d 475, 480–81 (4th Cir.

2003) (standing). The plaintiff bears the burden of establishing subject matter jurisdiction. *Demetres v. East West Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015). A defendant may challenge subject matter jurisdiction in two ways: (1) "by attacking the veracity of the allegations contained in the complaint;" or (2) "by contending that, even assuming that the allegations are true, the complaint fails to set forth facts upon which jurisdiction is proper." *Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013). When a defendant uses the latter method to contest subject matter jurisdiction, the plaintiff "is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (quoting *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)).

## B.  Rule 12(b)(6)

The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint, not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)).[13] A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (internal citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements."

---

[13] Motions to dismiss third-party complaints "are governed by the provisions relating to motions generally applicable in other contexts." *See* 6 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1453 (3d ed. 2022).

*Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted). "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). Although courts "must view the facts alleged in the light most favorable to the plaintiff," they "will not accept 'legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments'" in deciding whether a case should survive a motion to dismiss. *U.S. ex rel. Nathan v. Takeda Pharm. North Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (quoting *Wag More Dogs, LLC v. Cozart,* 680 F.3d 359, 365 (4th Cir. 2012)).

## C.  Rule 12(c)

HACA's motion requests the court, in the alternative, enter judgment on the pleadings under Rule 12(c). *See* HACA Mot. Dismiss at 1. The same standard applies to Rule 12(c) motions for judgment on the pleadings as to Rule 12(b)(6) motions to dismiss for failure to state a claim. *Massey v. Ojaniit*, 759 F.3d 343, 347 (4th Cir. 2014). "[I]n disposing of a Rule 12(c) motion, 'courts may consider relevant facts obtained from the public record, so long as these facts are construed in the light most favorable to the plaintiff along with the well-pleaded allegations of the complaint.'" *Id.* at 353 (quoting *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013)).

## D.  Rule 56 Conversion

HACA also moved, in the alternative, for summary judgment under Federal Rule of Civil Procedure 56. *See* HACA Mot. Dismiss at 1. A motion with this caption implicates the court's discretion under Federal Rule of Civil Procedure 12(d). *See Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436–37 (D. Md. 2011). The court declines to convert HACA's motion into a motion for summary judgment because HACA has not identified any

materials beyond the pleadings that the court would need to evaluate in resolving the motion. *See Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (explaining that the notice requirement for converting a motion to dismiss is satisfied "[w]hen a party is aware that material outside the pleadings is before the court").

## III. DISCUSSION

### A. HACA's Motion to Dismiss

HACA asserts the court must dismiss the City's third-party complaint because the City fails to state claims for indemnification or contribution under Maryland law. The court disagrees.[14]

*1.     Indemnification*

The City seeks indemnification from HACA on a tort-based theory of implied indemnification.[15] HACA argues it need not indemnify the City because the plaintiffs' theories of liability turn on the City's active negligence. Because the pleadings do not conclusively establish the City's active negligence, however, the court declines to dismiss the City's indemnification claim at this procedural stage.

Maryland law provides a tort-based right to indemnification "when there is a great disparity in the fault of two tortfeasors, and one of the tortfeasors has paid for a loss that was primarily the responsibility of the other." *Int'l Surplus Lines Ins. Co. v. Marsh & McLennan, Inc.*, 838 F.2d 124,

---

[14] Little authority analyzes the elements of contribution or indemnification in the context of a defendant to a federal civil rights suit seeking relief as a third-party plaintiff. The lack of case law addressing these issues may be due to federal preemption concerns. *See, e.g.*, *Equal Rts. Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 602 (4th Cir. 2010) (indemnification); *Hepburn ex rel. Hepburn v. Athelas Inst., Inc.*, 324 F. Supp. 2d 752, 759–60 (D. Md. 2004) (contribution). Because the parties have not yet raised this argument, however, the court will not consider it at this time.

[15] Maryland recognizes three types of indemnification: (1) express contractual indemnity; (2) implied-in-fact indemnity based on a special relationship between the parties; and (3) tort indemnity, which exists where equitable considerations require indemnification. *Pulte Home Corp. v. Parex, Inc.*, 942 A.2d 722, 730–31 (Md. 2008). Here, neither an indemnification contract nor an implied "special relationship" exists between the City and HACA.

127 (4th Cir. 1988) (citations omitted). In evaluating indemnification claims, courts must determine whether the third-party plaintiff faces allegations of active or passive negligence. *See Bd. of Trs. of Baltimore Cnty. Cmty. Coll. v. RTKL Assocs., Inc.*, 559 A.2d 805, 811 (Md. App. 1989) (citing *Pyramid Condo. Ass'n v. Morgan*, 606 F. Supp. 592, 596 (D. Md. 1985)).[16] "Under this analysis, a party is only entitled to indemnification when the party's actions, although negligent, are considered to be passive or secondary to those of the primary tort-feasor." *Id.* Indeed, "one who is guilty of active negligence cannot obtain tort indemnification." *Franklin v. Morrison*, 711 A.2d 177, 187 (Md. 1998). "Although there remains ambiguity as to the outer reaches of when a third party-plaintiff may seek indemnity from another defendant, at base, the distinction between active and passive negligence turns on whether the third-party plaintiff was negligent or whether its liability is entirely dependent on the negligence of another defendant." *Potomac Elec. Power Co. v. Midwest Mole, Inc.*, Civ. No. 19-3037-AAQ, 2022 WL 17362679, at *6 (D. Md. Dec. 1, 2022) (citations omitted).[17]

HACA argues the City was actively negligent in not enforcing its inspection and licensing regime on HACA properties. *See* HACA Mot. Dismiss at 13–15. At this stage of the litigation, however, the record is not sufficiently developed to foreclose the possibility that the City could be held liable on a "passive negligence" theory. *See Max's of Camden Yards v. A.C. Beverage*, 913 A.2d 654, 663 (Md. App. 2006) (requiring a motion to dismiss an indemnification claim to establish "from the alleged underlying facts, regardless of the theories alleged, that the third-party plaintiff could not possibly be held liable on any passive negligence theory"). HACA points to the

---

[16] The Maryland Court of Appeals, the state's high court, is now named the Supreme Court of Maryland ("Md.") and the intermediate Court of Special Appeals is now the Appellate Court of Maryland ("Md. App.").

[17] Unpublished opinions are cited for the soundness of their reasoning, not for any precedential value.

plaintiffs' allegations that the City's non-inspection policy was a deliberate and calculated decision; such an intentional decision, according to HACA, surely constitutes "active negligence." But the fact that a third-party plaintiff "took some affirmative action itself does not automatically make its negligence active." *See Potomac*, 2022 WL 17362679, at *7 (cleaned up).

For example, in *Hartford Accident and Indemnity Co. v. Scarlett Harbor Associates Ltd. Partnership*, 674 A.2d 106 (Md. App. 1996) (Hollander, J.), *aff'd*, 695 A.2d 153 (Md. 1997), the Appellate Court of Maryland explained that if "a developer whose property is in violation of the building code has committed no independent negligence, and is required to pay damages solely because of its breach of its nondelegable duty to comply with the code, the developer may obtain indemnification from its independent contractor whose negligence actually caused the breach." *Id.* at 136. In that case, the developer-defendants were alleged to "have falsely told unit purchasers that [a] [c]ondominium would conform to plans and specifications." *Id.* Despite the plaintiffs' allegations of the defendants' intentional deception, the *Hartford* court concluded the defendants "may be able to recover indemnification from a contractor whose faulty work was the primary cause of the lack of conformity to plans and specifications[.]" *Id.*

Although the plaintiffs allege the City's failure to inspect HACA's public housing units constituted intentional discrimination, the harm experienced by the plaintiffs arguably flows most proximately from HACA's alleged failure to maintain those units in the first place. Consider, for instance, the allegation that Johnson's daughter suffers from a mold-induced respiratory illness. Pl. Compl. at ¶¶ 10–11. While the City's lack of inspections left mold problems unattended, HACA—Johnson's operative landlord—is alleged to have actively covered up the problem. *Id.* at ¶ 10. By simply painting over the mold, HACA's actions were closer to the scene of the plaintiffs'

direct injuries. *Id.* at ¶ 10. In that sense, the City has plausibly stated that HACA's "faulty work was the primary cause" of the harm. *See Hartford*, 674 A.2d at 136.

But the court need not resolve this fact-intensive dispute on a motion to dismiss. *See Potomac*, 2022 WL 17362679, at *6 (quoting *Nat'l Lab. Coll., Inc. v. Hillier Grp. Architecture N.J., Inc.*, No. DKC 09-1954, 2012 WL 3264959, at *8 (D. Md. Aug. 9, 2012)) ("At this stage of the litigation [i.e., the dismissal stage], it is sufficient that [the plaintiff] has alleged negligence claims against [the defendant/third-party plaintiff] and that [the defendant/third-party plaintiff], in turn, has alleged that [the third-party defendant] was the princip[a]l tortfeasor."). The plaintiffs' complaint against the City does not foreclose the inference that the City was passively negligent in failing to inspect HACA properties. Accordingly, the court will deny HACA's motion to dismiss the City's indemnification claim.

### 2.   Contribution

Under Maryland law, contribution is available among joint tortfeasors under the Uniform Contribution Among Tort–Feasors Act ("UCATA"). *See* Md. Code Ann., Cts. & Jud. Proc. §§ 3–1401, *et seq.* "Contribution rests on common liability, not on joint negligence or joint tort. Common liability exists when two or more actors are liable to an injured party for the same damages, even though their liability may rest on different grounds." *See Potomac*, 2022 WL 17362679, at *9 (citing *Richards v. Freeman*, 179 F. Supp. 2d 556, 560 (D. Md. 2002)) (internal brackets omitted). In other words, a claim for contribution does not require "joint negligence in the sense that all the wrongdoers fail in the performance of an identical duty[.]" *See Richards*, 179 F. Supp. 2d at 561 (D. Md. 2002) (citing *Parler & Wobber v. Miles & Stockbridge, P.C.*, 756 A.2d 526, 534 (Md. 2000)). Because contribution from a third party defendant is predicated on its direct liability to the plaintiff, there is no right of contribution where the plaintiff has no right of action

against the third party defendant. *Kelly v. Fullwood Foods, Inc.*, 111 F. Supp. 2d 712, 715 (D. Md. 2000) (citing *Montgomery Cnty. v. Valk Mfg. Co.*, 562 A.2d 1246, 1249 (Md. 1989)).

Here, the plaintiffs' complaint alleges the City and HACA jointly conspired to create a discriminatory non-inspection policy. *See* Pl. Compl. at ¶ 69 ("[B]oth City and HACA officials continued behind the scenes to work together to discriminate directly against the tenants of the HACA Properties, including the Named Plaintiffs."). In this regard, the City and HACA's actions resulted in the same alleged harm to public housing residents: adverse health consequences and the deprivation of civil rights. Indeed, similarly situated plaintiffs sued HACA *and* the City in a companion case based on the same allegations here. *See Fisher v. City of Annapolis*, Civ. No. CCB-21-1074, 2022 WL 959310, at *10–14 (D. Md. Mar. 30, 2022) (denying HACA's motion to dismiss except as to the plaintiffs' § 1986 claim, which was granted).

HACA argues that the City does not identify "any non-time barred actions by HACA that could make HACA liable for the [p]laintiffs' claimed damages." HACA Mot. Dismiss at 16. The only HACA wrongdoing alleged in the plaintiffs' complaint, according to HACA, occurred more than three years before May 24, 2022, the date the City filed its third party claim for contribution against HACA. *Id.* at 5. And because it is now too late for the plaintiffs to add HACA as a defendant without violating the relevant statute of limitations,[18] the City's contribution claim fails because the plaintiffs no longer have a right of action against HACA. *See* HACA Mot. Dismiss at 16, citing *Pyramid*, 606 F. Supp. at 598 ("When a plaintiff has no right of action against a third party, there can be no contribution entitling the defendant to join the third party as a defendant

---

[18] The § 1986 action for neglect to prevent a civil rights conspiracy requires a wrongful act after May 1, 2020 (one year); the Fair Housing Act claim requires a wrongful act after May 1, 2019 (two years); and the rest of the claims require a wrongful act after May 1, 2018 (three years).

under the Uniform Act, notwithstanding the fact that liability under the Act may be joint or several.").

HACA's argument has been explicitly rejected by Maryland courts. The general rule, as HACA correctly identifies, is that a "joint tort-feasor" must be "legally responsible to the plaintiff for his or her injuries," because "contribution under the UCATA . . . is predicated on a wrongdoer's direct liability to the plaintiff." *Valk*, 562 A.2d at 1252. For instance, no claim to contribution exists where an alleged "joint tort-feasor" cannot be held liable in the underlying suit due to certain immunities or the defense of contributory negligence. *See id.* at 1250–51. But "one exception to this general rule relates to the statute of limitations defense." *Gables Constr., Inc. v. Red Coats, Inc.*, 228 A.3d 736, 755 (Md. 2020) (cleaned up). The Supreme Court of Maryland has explained that a "statute of limitations defense is distinct, because that defense does not arise out of the wrongdoing itself but rather depends on litigation procedures transpiring after the wrongdoing has occurred." *Id.* (cleaned up). "In the case of limitations, the third-party defendant could have been held liable to the plaintiff before the statute ran—the plaintiff simply chose not to impose the obligation." *Id.* at 757 n.20.[19] To be clear, the statute of limitations on the City's contribution claim "has not even begun to run, much less operate as a bar to suit." *See Tadjer v. Montgomery Cnty.*, 487 A.2d 658, 660 (Md. App. 1985). That is because the City's right to contribution, if any, "accrue[s] at the time of payment [to the plaintiffs] and not before." *See Heritage Harbour, L.L.C. v. John J. Reynolds, Inc.*, 795 A.2d 806, 814 (Md. App. 2002).[20]

---

[19] Here, the plaintiffs could have sued HACA alongside the City; in fact, the plaintiffs did just that in *Fisher*. The court has already declined to dismiss the plaintiffs' claims on a statute of limitations challenge. *See, e.g.*, *Fisher*, 2022 WL 959310, at *8–9; *Johnson v. City of Annapolis*, Civ. No. CCB-21-1120, 2022 WL 959149, at *6–7 (D. Md. Mar. 30, 2022).

[20] Despite arguing that the City's claims are untimely, HACA also suggests the City's claims are premature. *See* ECF 72, HACA Reply at 6. But it is well-established that indemnification and

Accordingly, the court will deny HACA's motion to dismiss the City's contribution claim.

**B. HUD's Motion to Dismiss**

The City's three claims against HUD seek to hold the federal agency responsible for the injuries suffered by HACA's residents. HUD, according to the City, underfunded HACA and failed to enforce federal habitability requirements in HACA units. Count I of the City's Second Amended Third-Party Complaint alleges HUD violated the Housing Act, 42 U.S.C. § 1437, which "requires HUD to use its funding to help remedy unsafe and unsanitary housing conditions." *See* City v. HUD Second Am. Compl. at ¶¶ 54–59. Count II asserts HUD's actions disproportionately harmed Black Annapolis public housing residents in violation of the Fair Housing Act, 42 U.S.C. §§ 3601, 3602, 3604. *See* City v. HUD Second Am. Compl. at ¶¶ 60–65.[21] Count III alleges that HUD's practices constitute intentional racial discrimination in violation of the equal protection clause of the Fifth Amendment to the United States Constitution. The City seeks only declaratory and injunctive relief for its claims against HUD.

The court will dismiss the City's third-party complaint against HUD for lack of jurisdiction because the City lacks Article III standing to bring its claims.

*1.    Sovereign Immunity*

The court must first address HUD's argument that sovereign immunity precludes the City's suit. Sovereign immunity generally shields the United States and its agencies from suit. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). "Sovereign immunity can, however, be waived." *Strickland v.*

---

contribution claims may "co-exist with their underlying suits in a third-party action *before damages accrue*." *Heritage Harbour*, 795 A.2d at 815 (emphasis in original); *see also Sher v. Luxury Mortg. Corp.*, Civ. No. ELH-11-3656, 2012 WL 5869303, at *13–14 (D. Md. Nov. 19, 2012) (rejecting argument that an indemnification claim brought via a third-party complaint was not ripe).

[21] The court refers to Count I and Count II of the City's Second Amended Third-Party Complaint collectively as the City's "statutory claims."

*United States*, 32 F.4th 311, 363 (4th Cir. 2022). For example, "Congress has enacted certain statutes that both create a cause of action against the federal government and expressly waive the government's immunity from suit for those actions." *Id.* Still, courts must not haphazardly imply the existence of a waiver; any waiver of sovereign immunity "must be unequivocally expressed in statutory text." *See Lane v. Pena*, 518 U.S. 187, 192 (1996) (cleaned up).

Here, however, the court need not resolve whether sovereign immunity bars each of the City's claims against HUD. Even if sovereign immunity precludes the court from considering the City's statutory claims (Counts I and II), the City's constitutional claim is clearly reviewable under the *Larson-Dugan* doctrine (Count III). In Count III, the City alleges that HUD violated the Fifth Amendment's equal protection clause by depriving Annapolis residents of safe and affordable housing based on race. Because the City names the Secretary of HUD as a defendant and requests only declaratory or injunctive relief for an ongoing constitutional violation, the City's Fifth Amendment claim is not barred by sovereign immunity. Indeed, "a plaintiff can obtain injunctive relief against an individual officer or agent of the United States in his official capacity for acts beyond his statutory or constitutional authority because such actions 'are considered individual and not sovereign actions.'" *Strickland*, 32 F.4th at 363 (citing *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949)). "In other words, under the so-called *Larson-Dugan* exception, suits for specific relief against officers of the sovereign allegedly acting beyond statutory authority or unconstitutionally are not barred by sovereign immunity." *Id.* at 363–64 (cleaned up); *see also Little Earth of United Tribes, Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 584 F. Supp. 1292, 1300 (D. Minn. 1983) (rejecting argument that § 1404a independently waives sovereign immunity against HUD but still finding jurisdiction proper for the plaintiff's request for equitable relief under the *Larson-Dugan* exception).

Because sovereign immunity poses no barrier to the court's review of Count III, the court would have to resolve Article III standing issues even if sovereign immunity barred the court from reviewing Counts I and II. So, the court need not address whether sovereign immunity applies to the City's statutory claims in Counts I and II. The ultimate outcome is no different, however, because the City lacks standing to raise any of its claims. *See infra* Section III.B.2.

  2.    *Standing*

Because at least one of the City's claims is not barred by sovereign immunity, the court must turn to a separate jurisdictional inquiry—that is, whether the City has presented a justiciable "case or controversy" under Article III of the U.S. Constitution. A "case or controversy" exists only when a plaintiff has standing to assert their claims. To have standing, a plaintiff must show "(1) an injury in fact; (2) a causal connection between the injury and the conduct complained of, such that the injury is fairly traceable to the defendant's actions; and (3) a likelihood that the injury will be redressed by a favorable decision." *Benham v. City of Charlotte*, 635 F.3d 129, 134 (4th Cir. 2011) (quoting *Lujan*, 504 U.S. at 560–61) (internal quotation marks omitted).

  i.    Injury

To satisfy the injury in fact requirement, a plaintiff must demonstrate that they suffered an invasion of a legally protected interest, which is "concrete and particularized" and "actual or imminent," not "conjectural or hypothetical," *id.* at 135 (quoting *Lujan*, 504 U.S. at 560). The injury requirement is not satisfied by a plaintiff's reliance on "a highly attenuated chain of possibilities," or "speculation about the unfettered choices made by independent actors not before the court." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410, 414 n.5 (2013) (cleaned up). And because the City seeks declaratory and injunctive relief, it must establish an ongoing or future injury that is "certainly impending"; it may not rest on past injury. *Id.* at 401.

Here, the City has not shown how it was individually harmed by HUD. The City's operative complaint simply claims the injuries suffered by Annapolis residents as injuries to the City itself. *See, e.g.*, City v. HUD, Second Am. Compl. at ¶ 18 ("The City contends that *the Plaintiffs' complained-of conditions* result from the policies, actions, and inactions of HUD") (emphasis added); *id.* at ¶ 58 ("HUD's policies and actions have failed to provide sufficient funding to the City and HACA *to provide the Plaintiffs and other African-American city residents* with decent and safe housing.") (emphasis added); *id.* at ¶ 62 ("HUD's policies inflict disproportionate harm *on Plaintiffs and other African-American* city residents") (emphasis added). The City's move to appropriate its residents' injuries as its own cannot be squared with the requirement that a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

It is sometimes possible for municipal governments to satisfy these requirements. For example, the Supreme Court in *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91 (1979), found that a village had standing to sue under the Fair Housing Act because the effects of segregation, while experienced most directly by minority residents, harmed the village's *own interest* in promoting racially integrated neighborhoods. *Id.* at 110–11. The Court recognized that discriminatory housing practices could reduce the number of prospective residents in an area, which would "directly injure[] a municipality by diminishing its tax base." *Id.*

Whether Annapolis residents were harmed is irrelevant to the City's claim of injury; the courthouse doors remain open to individuals, like Ms. Johnson, who attempt to vindicate their own rights. The question here is whether the City suffered an injury separate and apart from those experienced by Annapolis residents. The answer is no. The City failed to state the type of injury recognized in *Gladstone* in its pleadings. The closest the City comes is a vague assertion that

HUD's actions "perpetuate segregation." *See City v. HUD*, Second Am. Compl. at ¶ 64. But such an allegation lacks the specificity required to show the City *itself* suffered from HUD's conduct.

Courts have found that other municipal governments lacked standing to raise similar challenges in the absence of *Gladstone*-style allegations. Take, for example, the Eighth Circuit's decision in *City of Kansas City v. Yarco Co.*, 625 F.3d 1038 (8th Cir. 2010). There, Kansas City alleged that the owners of an apartment complex violated the FHA by imposing a discriminatory curfew policy for its residents. The Eighth Circuit held that Kansas City failed to allege any "injury to itself." *Id.* at 1040. Rather, the city's pleadings referenced only the injuries of certain residents in the apartment complex. *Id.* While recognizing that the "burden of showing injury at the pleading stage is low," the Eighth Circuit still dismissed the case for lack of standing because Kansas City was "silent about harm to its particular interests." *Id.*

The City's next theory of standing turns on speculative assumptions about the underlying suit between the City and Annapolis public housing residents. Broadly speaking, the City contends that the resources it has devoted to defending itself against Ms. Johnson's allegations of racial and housing discrimination constitute an injury to the City. *See* City Opp'n to HUD Mot. Dismiss at 31 ("HUD's actions underscore the essence of the underlying issue in Plaintiffs' complaint to causing injury to the City. Further, the City will also incur significant costs and attorney fees and in litigating the matters. All of this resulted from HUD's policies and inactions."). The court need not address whether the City's litigation costs meet the "injury in fact" requirement. Even if the City could establish a cognizable injury, it cannot satisfy the remaining two requirements for Article III standing: causation and redressability.

      ii.  <u>Causation</u>

The City cannot show a causal connection between its purported injury—that is, the litigation expenses in defending itself against Ms. Johnson's claims—and any action by HUD. *See*

*Lujan*, 504 U.S. at 560. The City's potential liability to Annapolis public housing residents is not fairly traceable to HUD. It is worth highlighting the lengthy and speculative chain of causation at issue. According to the City, the first domino fell when HACA failed to maintain its public housing units and, at times, actively concealed unsafe living conditions like mold growth from its tenants. HACA, as a condition for receiving federal funds, agreed to abide by HUD's regulations governing the habitability of public housing units. But despite HACA's failure to cultivate safe and habitable public housing, HUD did not wield its enforcement tools to compel HACA to comply with the relevant habitability requirements. Meanwhile, public housing residents in Annapolis sued the City based on allegations that the City had an explicit policy to exempt public housing units from inspections. And because HUD could have hypothetically enforced its regulatory requirements against HACA, the City asserts "it is not at all responsible" for depriving the residents of safe housing.

In essence, the City bases its causation argument on a counterfactual narrative in which HUD could have intervened to improve the condition of HACA units, thus saving the City from having to defend itself against claims of racial and housing discrimination. But this theory of causation was rejected by the Supreme Court in *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26 (1976). That case involved low-income individuals who sued the IRS for providing favorable tax breaks to hospitals that did not offer the full range of medical services to indigent patients. *Id.* at 28. There, the plaintiffs lacked standing because there was little more than a tenuous connection between the alleged harm (the lack of indigent medical care) and the challenged conduct (the IRS's tax incentives). *Id.* at 43–44. Justice Powell's majority opinion made clear that the plaintiffs could not satisfy Article III's causation requirement by relying on "the remote possibility, unsubstantiated by allegations of fact, that their situation might have been

better had (defendants) acted otherwise." *Id.* at 44 (quoting *Warth*, 422 U.S. at 507). Indeed, it was "purely speculative" whether removal of the challenged tax breaks would cause the hospitals to expand the scope of the services they offered. *Id.* at 42–43.

The winding causal chain connecting HUD and the City turns entirely on the independent decisions of HACA and the public housing residents who sued the City. These independent decisions prevent the City from fairly tracing its litigation woes to HUD. *See Allen v. Wright*, 468 U.S. 737, 759 (1984) (rejecting assertion of standing where the purported causal chain involved "numerous third parties" whose independent actions had an uncertain and speculative effect). Although HUD had the *ability* to wield regulatory enforcement tools against HACA, whether such an intervention would have materially improved HACA units remains "purely speculative." *See Simon*, 426 U.S. at 42. And based on the City's own pleadings, HACA's independent negligence contributed to the poor condition of the relevant housing units. *See* City v. HUD, Second Am. Compl. at ¶ 18 ("[T]he Plaintiffs' complained-of conditions result from the policies, actions, and inactions of HUD and HACA demonstrated by their failures to properly fund the properties and HACA's failure to maintain them in a safe and sanitary condition[.]"). Further, the City's liability stems from the independent decision made by residents like Ms. Johnson to sue the City, a choice untethered from any discrete conduct by HUD. This is not even considering the glaring possibility that the City's own actions—i.e., the alleged non-inspection policy—exposed the City to the residents' claims of racial and housing discrimination. *See Cameron County Hous. Auth. v. City of Port Isabel*, 997 F.3d 619, 623–24 (5th Cir. 2021) (finding no standing to assert Fair Housing Act claim because the plaintiff's claimed injury "had nothing to do with" the defendant's alleged unlawful conduct but "was the combined result of third-party actions and self-inflicted harm").

Accordingly, the City cannot satisfy the causation requirement of Article III standing.

iii.  <u>Redressability</u>

For similar reasons, the City has also failed to properly allege redressability. The City's only attempt to establish this element is to assert that "[i]f the Court grants the City's declaratory relief, it would relieve the City from the Plaintiffs' allegations against it in the class action." *See* City Opp'n to HUD Mot. Dismiss at 37. The City, however, references no authority to support this counterintuitive proposition. Specifically, the City requests the court declare "that any injuries claimed by the Plaintiffs are a result of HUD policies and actions and not that of the City." *See* City v. HUD Second Am. Compl., Prayer for Relief, ¶ D. But HUD is not in litigation with the resident-plaintiffs, and remedies "operate with respect to specific parties," *California v. Texas*, 141 S. Ct. 2104, 2115 (2021). So, the court's adjudication of the City's claims against HUD would have little consequence for Ms. Johnson's suit against the City. Even if the City were to prevail on each of its claims against HUD, no declaratory or injunctive relief would alter the City's potential liability to the public housing residents suing the City due to *the City's* alleged non-inspection policy. Accordingly, the City cannot show its injury is redressable by this court.

In sum, the City cannot satisfy the standing requirements of Article III, so the court will dismiss the City's third-party complaint against HUD without prejudice.[22]

---

[22] "A dismissal for lack of standing—or any other defect in subject matter jurisdiction—must be one without prejudice, because a court that lacks jurisdiction has no power to adjudicate and dispose of a claim on the merits." *Episcopal Church in S.C. v. Church Ins. Co. of Vt.*, 997 F.3d 149, 154 n.4 (4th Cir. 2021) (quoting *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 185 (4th Cir. 2013)).

### IV. CONCLUSION

For the reasons stated here, HACA's motion to dismiss the City's third-party complaint will be denied and HUD's motion to dismiss the City's third-party complaint will be granted. A separate Order follows.


    5/11/2023                                       /s/

Date                                             Catherine C. Blake
                                            United States District Judge