**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| ESTATE OF DAMON R. FISHER, *et al.*, Plaintiffs, | |
| v. | Civil Action No. CCB-21-1074 |
| CITY OF ANNAPOLIS *and* HOUSING AUTHORITY OF THE CITY OF ANNAPOLIS, Defendants and Third-Party Plaintiff, | |
| v. | |
| CAPITAL CONSTRUCTION LLC Defendant and Third-Party Defendant. | |

<u>**MEMORANDUM**</u>

This suit arises from the death of DaMon R. Fisher in his public housing apartment owned and managed by the Housing Authority of the City of Annapolis ("HACA"). Both Mr. Fisher's Estate and personal representatives (collectively "the Estate"), the original plaintiffs in this case, and HACA, originally a defendant and later a third-party plaintiff, amended their complaints to add claims against Capital Construction LLC ("Capital") for negligence in the case of the Estate, and indemnification, contribution, and breach of contract in the case of HACA. Now pending before the court are Capital's motions to dismiss the amended complaints or in the alternative for summary judgment. Mot. to Dismiss Estate Compl., ECF 141-2 ("Estate Mot."); Mot. to Dismiss HACA Compl., ECF 146-2 ("HACA Mot."). The Estate and HACA opposed the motions, and Capital replied. Additionally, another defendant, the City of Annapolis ("the City"), and Capital filed a joint motion to strike an affidavit submitted by the Estate in support of its opposition to Capital's motion to dismiss, Mot. to Strike, ECF 153, which the Estate opposed. The City and

Capital did not reply. The motions are now fully briefed and ripe for resolution. No oral argument is necessary. *See* Local Rule 105.6. For the following reasons, the court will grant in part and deny in part Capital's motions to dismiss or in the alternative for summary judgment, and grant in part and deny in part the City and Capital's motion to strike.

## BACKGROUND

The underlying facts of this case have been described in several prior decisions, and only a limited review of the general allegations is necessary here. *See Estate of Fisher v. City of Annapolis*, No. 21-cv-1074-CCB, 2022 WL 959310 (D. Md. Mar. 30, 2022).

According to the Estate, Mr. Fisher lived at HACA properties from 2012 until his death in 2020. *Id.* at *3. An asthmatic, Mr. Fisher began experiencing serious respiratory distress shortly after moving into the Morris H. Blum Senior Apartments. *Id.*; Estate Am. Compl. ¶ 16, ECF 121. He was hospitalized seven times during the first three years he lived at HACA properties, and doctors determined that he was suffering from a severe mold allergy. *Fisher*, 2022 WL 959310, at *3. On his doctors' orders, Mr. Fisher moved to another HACA property and his breathing troubles subsided for a time. *Id.* But a few years later he began complaining to HACA that he was once more struggling to breathe because of mold in his apartment. *Id.* Between 2018 and 2020, Mr. Fisher visited the emergency room fourteen times, and doctors again confirmed that his symptoms were mold-related. *Id.* HACA did not assist Mr. Fisher.

In May 2020, Mr. Fisher sought help from the City. Estate Am. Compl. ¶ 22. On May 19, 2020, a City employee remotely inspected Mr. Fisher's apartment and confirmed the presence of "water damage," "mold," and "mildew" in the "tub/shower area" of his bathroom. *Id.* ¶ 23. On May 28, HACA put Mr. Fisher up in a hotel and scheduled repairs for June 4 to 10. *Id.* ¶ 24. The remediation work was assigned to Capital. *Id.* ¶ 26; HACA Am. Compl. ¶ 44, ECF 125.

Capitol did maintenance, renovation, and repair work at HACA properties pursuant to an "Independent Vacant Unit Turn Over Contract" (the "Contract"), which it won in a public bidding process. HACA Am. Compl. ¶¶ 36-38. Capitol signed the Contract in February 2019, and renewed it in April 2020. *Id.* ¶¶ 37, 39. The Contract incorporated work specifications from the Invitation for Bids, and Capitol "proposed to furnish all labor, materials, equipment, and services required to complete all work, as shown" in the Invitation. *Id.* ¶ 40.  Capitol also agreed to indemnify HACA from "all suits, actions and damages or costs, of every name and description to which the HACA maybe subject to put by reasons of injury to persons . . . or property as a result of the work, whether caused by negligence, carelessness or willingness [sic] on the part of [Capitol]." *Id.* ¶ 41.

HACA alleges that it "directed Capital Construction to remediate the mold and replace the bathroom in [Mr. Fisher's apartment]." *Id.* ¶ 44. Capital "demolished and hauled away the existing tile and shower panels, installed new drywall as well as new ceramic, painted the ceiling, walls, and trim." *Id.*; Estate Am. Compl. ¶ 26. However, according to the Estate and HACA, "the mold which should have been removed from the bathroom if properly remediated according to industry standard procedures, was not removed." Estate Am. Compl. ¶ 26; HACA Am. Compl. ¶ 44.

Upon returning to his apartment, Mr. Fisher did not believe that the work had resolved the mold issue, so he began to pack or give away his belongings to move elsewhere. Estate Am. Compl. ¶ 28. After advising the City of continued mold-related health issues on June 19 and 22, Mr. Fisher was found dead in his apartment on June 25. *Id.* ¶¶ 29-31. His death certificate listed the immediate cause as "Exacerbation of Chronic Obstructive Pulmonary Disease with Asthma," and the "Conditions . . . leading to immediate cause" included "Mold in Residence." *Id.* ¶ 31.

Following Mr. Fisher's death, the Estate arranged for mold testing at his apartment. *Id.* ¶ 33. The testing, conducted on July 31, found "High" levels of the toxic molds

"Stachybotrys/Memnoniella, Cladosporium, and Aspergillus/Penicillium" and a "Medium" level of the toxic mold "Chaetomium." *Id.* On August 25 and October 26, HACA conducted additional mold testing, the results of which "confirmed the July 31, 2020 mold testing conducted by the Estate and supported the findings of those results." *Id.* ¶ 34.

The Estate and HACA allege that Capital was "aware that mold was present in [Mr. Fisher's apartment]" and "had a duty to ensure that its renovation and repair task included the remediation and or removal of any mold or conditions contributing to mold in a manner consistent with the standards of industry," but failed to do so. HACA Am. Compl. ¶ 47. HACA also alleges less specifically that Capital breached a contractual and general duty to perform its work professionally so as to alleviate unreasonably dangerous conditions, *id.* ¶¶ 45-46, and more specifically that Capital breached a duty to test surfaces for mold or follow mold removal protocols pursuant to industry standards and procedures, *id.* ¶ 48; *see also id.* ¶ 49.

Capital's motions are styled as motions to dismiss or in the alternative for summary judgment, and Capital submits exhibits and asserts arguments challenging the truth of the allegations made by the Estate and HACA. The Estate and HACA respond with exhibits and factual arguments of their own. The following additional facts are supported by the evidence submitted by the parties and will only be considered for summary judgment.

Capital points out that the Contract does not specifically mention "mold." Estate Mot. Ex. 1, ECF 141-3. The Contract provides that, "[i]n accordance with [the Invitation for Bids] and [Capital's Bid], [Capital] shall perform all required work and shall furnish all professional and skilled labor, services, supervision, tools, equipment, and insurances and all else required to provide vacant unit turn over for units at HACA properties." *Id.* ¶ 2.1. In its Bid, Capital affirmed familiarity "with the local conditions affecting the Work" and HACA's specifications regarding

the work. *Id.* at 8. HACA's Invitation for Bids describes the "Unit Turnaround" work in general terms as "cleaning and performing routine repairs." Estate Mot. Ex. 2 at 3, ECF 141-4. Specifically, the proposed work includes, among other things, cleaning "includ[ing] but not limited to": "[a]ll bathroom accessories . . . and toilet, sink, tub, shower walls, and ceramic tile with disinfectant and all-purpose cleaner," *id.* at 9, and general repairs including "[r]emove and replace all discolored or deteriorated caulking around tubs and sinks," "[r]eplace Sheetrock as needed," and "[r]epair or replace subfloors as needed," *id.* at 10-11. When they renewed the Contract, the parties amended the "Scope of Work" "to state that the vacant units must be turnkey ready when handed over to HACA for inspection, this means the units must be ready for immediate occupation." Estate Opp'n Ex. 5 at 12, ECF 149-6. The Bid winner was required to submit proof of general liability, auto liability, and workers' compensation insurance coverage at $1,000,000 each. Estate Mot. Ex. 2 at 12. The Contract and Invitation for Bids also include several indemnification clauses matching those alleged by HACA. *Id.* at 14; Estate Mot. Ex 1 ¶ 9; *see* HACA Am. Compl. ¶ 41.

According to an affidavit from Majid Chaaban, Capital's Managing Member and majority owner, HACA did not inform Capital of the mold in Mr. Fisher's unit and instead only assigned Capital to "perform standard services." Estate Mot. Ex. 3 ¶¶ 13, 16, ECF 141-5. According to Mr. Chaaban, mold remediation was not part of the work included in the Contract, and HACA has never tasked Capital with mold remediation. *Id.* ¶ 16. Indeed, Mr. Chaaban asserts that Capital does not have any employees who are "certified or trained to conduct testing or remediation of mold," nor does it carry the specialized insurance necessary for mold remediation. *Id.* ¶ 6-9.

Kevin Thornton, HACA's former Maintenance Director from June 2019 to April 2022, avers that "[d]uring [his] employment with HACA, Capital . . . was never tasked with mold

remediation. HACA had a separate vendor for mold remediation, ServPro." Estate Mot. Ex. 4 ¶ 3, ECF 141-6. According to Mr. Thornton, when mold remediation was necessary, ServPro would set up equipment to dry the air in the apartment, perform demolition work necessary to remove mold, and test for mold (which would be verified by a third-party test). *Id.* ¶ 5. Only after the mold tests came back negative were apartments turned over to Capital for repairs. *Id.* ¶ 6. Mr. Thornton personally responded to Mr. Fisher's May 2020 complaint and determined that mold was present in the apartment. *Id.* ¶ 8. After Mr. Fisher was moved to a hotel, another HACA employee, Dale Parker, conducted a mold test which came back positive and then contacted ServPro to remediate the issue. *Id.* ¶ 9. ServPro demolished the wall and removed the mold, and Mr. Parker told Mr. Thornton that subsequent mold tests had come back negative. *Id.* Capital thereafter repaired Mr. Fisher's bathroom. *Id.* ¶ 10. Mr. Thornton asserts that he "never requested Capital . . . to perform mold remediation because [he] knew they were not certified to do so." *Id.* ¶ 16.

The Estate and HACA offer an affidavit from Mr. Parker contradicting Mr. Thornton's account. Estate Opp'n Ex. 2, ECF 149-3. Mr. Parker states that HACA did not hire ServPro to perform work at Mr. Fisher's apartment. *Id.* ¶ 12. According to Mr. Parker, Mr. Thornton investigated Mr. Fisher's apartment and decided not to test for mold or bring in ServPro. *Id.* Mr. Parker claims to "have no record of ServPro having been called for Mr. Fisher's apartment at any time in 2020." *Id.* ¶ 14. Mr. Parker directly disputes the veracity of Mr. Thornton's affidavit. *Id.* ¶ 16. Furthermore, the Estate and HACA submit emails from ServPro stating that it did not perform services at Mr. Fisher's apartment in 2020, Estate Opp'n Ex. 1, ECF 149-2, and a copy of Capital's invoice for the work it performed at Mr. Fisher's apartment, which includes charges for tile and drywall demolition and installation, Estate Opp'n Ex. 4, ECF 149-5.

## LEGAL STANDARDS

To survive a motion to dismiss, a complaint must contain factual allegations that "raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted). "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). Additionally, although courts "must view the facts alleged in the light most favorable to the plaintiff," they "will not accept 'legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments'" in deciding whether a case should survive a motion to dismiss. *U.S. ex rel. Nathan v. Takeda Pharm. North Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (quoting *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)).

When a motion to dismiss is in the alternative one for summary judgment, "a court may in its discretion consider matters outside of the pleadings pursuant to Rule 12(d)." *Head v. Rakowski*, __ F. Supp. 3d __, 2023 WL 6388301, at *3 (D. Md. Sept. 29, 2023). Consideration of such evidence requires the court to proceed under Rule 56 and "all parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Pevia v. Hogan*, 443 F. Supp. 3d 612, 626 (D. Md. 2020) (quoting Fed. R. Civ. P. 12(d)). "[W]hen the movant expressly captions its motion 'in the alternative' as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion

under Rule 12(d) may occur," *id.*, and the nonmovant generally must either oppose the motion with competent evidence or aver that discovery is necessary for its opposition under Rule 56(d), *Head*, 2023 WL 6388301, at *3 (citing *Pevia*, 443 F. Supp. 3d at 627); Fed. R. Civ. P. 56(d). An exception to this rule permits consideration of "documents explicitly incorporated into the complaint by reference," so long as the document before the court is undisputedly authentic, without converting a motion to dismiss into one for summary judgment. *Tate v. Am. Gen. Life Ins. Co.*, 627 F. Supp. 3d 480, 488-89 (D. Md. 2022) (citing *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) and *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015)). Under this exception, a contract can be considered on a motion to dismiss claims that turn on the meaning of the contract's terms. *Id.* at 489; *NAC Consulting, LLC v. 3Advance, LLC*, 650 F. Supp. 3d 441, 446 (E.D. Va. 2023).

If the court proceeds under Federal Rule of Civil Procedure 56(a), summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-48.

The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 656-67 (2014), and draw all reasonable inferences in that party's favor,

*Scott v. Harris*, 550 U.S. 372, 378 (2007). Generally, "when there is a close question and 'reasonable minds could differ' when weighing the facts against the law, then summary judgment is inappropriate." *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 208 (4th Cir. 2014) (quoting *Paroline v. Unisys Corp.*, 879 F.2d 100, 105 (4th Cir. 1989)).

## ANALYSIS

Because the legal and factual arguments focus on different issues, the court begins by analyzing the claims under the motion to dismiss standard before considering the evidence to support any surviving claims under the summary judgment standard.

## I.      Motions to Dismiss

The Estate brings one claim for negligence against Capital. Estate Am. Compl. at 54-57 (Count X). HACA brings claims for indemnification, contribution, and breach of contract. HACA Am. Compl. at 16-19 (Counts III, IV, & V). The court considers the motion to dismiss each amended complaint in turn.

### A.  Estate

A common law negligence claim in Maryland requires the plaintiff to "prove the existence of: (a) a duty owed by the defendant to the plaintiff, (b) a breach of that duty, and (c) injury proximately resulting from that breach." *Barclay v. Briscoe*, 427 Md. 270, 292-93 (2012) (citing *Pendleton v. State*, 398 Md. 447, 458 (2007)).[1] Capital argues that the allegations do not establish the first (duty) and third (proximate cause) of these elements.

---

[1] The requirement of "actual injury or loss" is sometimes stated as a separate element from "proximate cause," *see Doe v. Pharmacia & Upjohn Co.*, 388 Md. 407, 414 (2005), but the framing of the test makes no difference here because there is no dispute that Mr. Fisher's death is an actionable injury.

### 1. Duty

"Duty is 'an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.'" *Doe v. Pharmacia & Upjohn Co., Inc.*, 388 Md. 407, 415 (2005) (quoting *Dehn v. Edgecombe*, 384 Md. 606, 619 (2005)). "There is no set formula for the determination of whether a duty exists," and "[a]t its core, the determination . . . represents a policy question of whether the plaintiff is entitled to protection from the defendant." *Id.* (citing *Coates v. S. Md. Elec.*, 354 Md. 499, 509 (1999) and *Rosenblatt v. Exxon*, 335 Md. 58, 77 (1994)). A court should consider the "foreseeability of harm" and "the relationship of the parties" in answering this question. *Id.* (quoting *Coates*, 354 Md. at 509 and *Dehn*, 384 Md. at 619). In cases involving personal injury or death, "the principal determinant of duty [is] foreseeability." *Jacques v. First Nat'l Bank of Md.*, 307 Md. 527, 535 (1986).

Capital argues that the Estate fails to allege that it owed a relevant duty to Mr. Fisher because its Contract was with HACA alone and its contractual duties did not include mold remediation. Estate Mot. at 4-8.

Capital's argument fails. As the Estate points out, the Maryland Court of Appeals has squarely held that a builder's duty "to use due care in the design, inspection, and construction of [a building] extend[s] to those persons foreseeably subjected to the risk of personal injury created, as here, by a latent and unreasonably dangerous condition resulting from their negligence." *Council of Co-Owners Atlantis Condo., Inc. v. Whiting-Turner Contracting Co.*, 308 Md. 18, 32 (1986). Privity of contract is not required. *Id.* Indeed, the duty Capital owed to Mr. Fisher was independent of its Contract with HACA: "by entering into a contract with A, the defendant may place himself in such a relation toward B that the law will impose upon him an obligation, sounding in tort and not in contract, to act in such a way that B will not be injured." *Id.* at 27 (quoting *Prosser*

*and Keeton on the Law of Torts* § 93, at 667-68 (5th ed. 1984)). "[T]he contractor is liable to all those who may foreseeably be injured by the structure, not only when he fails to disclose dangerous conditions known to him, but also when the work is negligently done. This applies not only to contractors doing original work, but also to those who make repairs, or install parts . . ." *Id.* at 27-28 (quoting *Prosser and Keeton on the Law of Torts* § 104A, at 723 (5th ed. 1984)) (emphasis omitted). Moreover, a contractor's duty to disclose known dangerous conditions is not strictly limited to the precise duties delineated in a contractual arrangement and can extend to conditions that a reasonable contractor in the defendant's position would recognize. *Landaverde v. Navarro*, 238 Md. App. 224, 255-56, 259-61 (2018); *see Cash & Carry Am., Inc. v. Roof Sols., Inc.*, 223 Md. App. 451, 469-71 (2015).

The Estate alleges that Mr. Fisher died because of Capital's negligence regarding the mold in his apartment. Estate Am. Compl. ¶ 146. The Estate straightforwardly alleges that "HACA directed Capital . . . to remediate the mold," which it did negligently, *id.* ¶¶ 26, 144-45,[2] and more generally that Capital was aware of mold in Mr. Fisher's apartment when it undertook its work, and "had a duty to conduct the renovation of Mr. Fisher's apartment in such a manner that would . . . not create an unreasonably dangerous condition through the renovation of the bathroom" but failed to do so. *Id.* ¶¶ 142-44(a). The Estate asserts that a contractor in Capital's position would have identified mold and taken steps to "ensure that [it] was remediated in a manner consistent with the standards of the industry." *Id.* ¶¶ 143, 144(a).

---

[2] That Capital disputes the truth of this allegation is not relevant at the motion to dismiss stage when the truth of the allegations must be assumed. *Fessler v. Int'l Bus. Machs. Corp.*, 959 F.3d 146, 151-52 (4th Cir. 2020). Capital's factual argument will be addressed in the court's ruling on summary judgment. *See infra* Section II.

Taking these allegations as true, *Twombly*, 550 U.S. at 555, the Estate has set forth two plausible theories of duty. First, if it was tasked with remediating the mold, Capital had a duty to perform that work properly; whether such an assignment was consistent with the HACA Contract is irrelevant to the Estate's claim, because the duty Capital owed to Mr. Fisher sounds in tort. *Whiting-Turner*, 308 Md. at 27-28. Second, if Capital was merely aware of mold in Mr. Fisher's apartment, it had a duty to alert Mr. Fisher or HACA to the continued presence of mold rather than performing work that it knew would be insufficient to remediate the danger. *See Landaverde*, 238 Md. App. at 259-60. That the Estate primarily alleges that Capital was tasked with the remediation does not eclipse its allegations supporting this second, more general theory of liability, and both are adequately alleged in any event. Finally, Capital's duty under these theories of negligence is owed to Mr. Fisher because his mold-related injuries were a foreseeable risk of negligent mold remediation or failure to address a mold problem in his apartment.

Of course, the Estate will bear the burden of proving that Capital was either tasked with remediating the mold or was aware of the mold and did nothing about it. But it has sufficiently alleged that one of those scenarios occurred, and, if true, could establish a duty owed by Capital to Mr. Fisher.

## 2. Proximate Cause

To recover against a defendant, the plaintiff must show that its negligence was "a proximate cause of the harm alleged." *Pittway Corp. v. Collins*, 409 Md. 218, 243 (2009) (quoting *Stone v. Chi. Title Ins.*, 330 Md. 329, 337 (1993)). "To be a proximate cause for an injury, 'the negligence must be 1) a cause in fact, and 2) a legally cognizable cause.'" *Id.* (quoting *Hartford Ins. Co. v. Manor Inn*, 335 Md. 135, 156-57 (1994)); *cf. Wadsworth v. Sharma*, 479 Md. 606, 621 (2022) (applying traditional causation elements to statutory wrongful death suits). It is important to keep

in mind that "proximate cause is ordinarily a jury question." *Kiriakos v. Phillips*, 448 Md. 440, 470 (2016) (citing *Lashley v. Dawson*, 162 Md. 549, 562 (1932)).

Here, where the Estate alleges that both HACA and Capital were negligent, the court applies the "substantial factor" test to determine whether Capital's alleged negligence was a cause in fact of Mr. Fisher's injury, asking whether "it is 'more likely than not' that the defendant's conduct was a substantial factor in producing the plaintiff's injuries." *Pittway*, 409 Md. at 244 (citing *Reed v. Campagnolo*, 332 Md. 226, 240 (1993)). In deciding whether a defendant's negligence was a substantial factor in producing the plaintiff's injury, the court should consider "(a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it; (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible; [and] (c) lapse of time." *Collins v. Li*, 176 Md. App. 502, 550 (2007) (quoting Restatement (Second) of Torts § 433 (1965)). If the defendant's negligence was a substantial factor in the plaintiff's harm, liability can still be severed if there is a "rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm." *Pittway*, 409 Md. at 245 (quoting Restatement (Second) of Torts § 431(b) (1965)).

To determine whether negligence is a "legally cognizable cause," the court asks whether "the actual harm to a litigant falls within a general field of danger that the actor should have anticipated or expected." *Id.* at 245 (citing *Stone*, 330 Md. 337). This is essentially a foreseeability test with policy considerations. *Id.* at 245-46. As explained, *see supra* p.12, Mr. Fisher's death was a foreseeable result of inadequate work under the circumstances.

Capital's argument that it was not a proximate cause of Mr. Fisher's injuries focuses on two primary contentions: (1) that its alleged negligence was a minimal factor in Mr. Fisher's death given his years-long history of health issues stemming from mold in his apartment, all of which preceded Capital's renovation work; and (2) that Mr. Fisher was contributorily negligent when he moved back into his apartment after the renovations.[3]

### a. Minimal Factor

Capital's first point appears to be that too many "other factors . . . contribute[d] in producing the harm" and had too great an "effect . . . in producing it" for Capital to be liable. *Collins*, 176 Md. App. at 550 (quoting Restatement (Second) of Torts § 433 (1965)). But a single injury can, of course, have multiple proximate causes, all of which can support liability for that injury. *Yellow Cab Co. v. Hicks*, 224 Md. 563, 567-68 (1961); *see Parler & Wobber v. Miles & Stockbridge*, 359 Md. 671, 686-87 (2000); *Carter v. Wallace & Gale Asbestos Settlement Trust*, 439 Md. 333, 354-55 (2014) (explaining that liability for multiple tortfeasors is joint and several in the case of indivisible injury such as death). Capital's argument essentially asks the court to conclude as a matter of law that negligence cannot be a proximate cause of an injury if it is part of and occurs close to the end of a long period of negligence which cumulatively produced the harm. It identifies no Maryland case reaching a similar conclusion to support its argument. In contrast, in cases where the plaintiff's injury was caused by cumulative exposure to a harmful substance due to multiple parties' negligence, the question of causation has been considered "fact specific" and left for the jury. *See Eagle-Picher Indus., Inc. v. Balbos*, 326 Md. 179, 205-13 (1992) (holding

---

[3] The Estate did not concede the question of proximate cause when it failed to respond to Capital's arguments. *Stevenson v. City of Seat Pleasant, Md.*, 743 F.3d 411, 416 n.3 (4th Cir. 2014) ("[T]he district court . . . has an obligation to review [unopposed] motions to ensure that dismissal is proper."). Moreover, the Estate's arguments about the existence of Capital's duty prove that it did not intend to abandon its negligence claim.

that a jury could find that a cement company's asbestos cement was a proximate cause of decedents' mesothelioma despite their frequent exposure to many sources of asbestos).

It is true that the Estate alleges that Mr. Fisher had mold-related health problems for many years before Capital did any work at his apartment. *See* Estate Am. Compl. ¶¶ 17-21. But the Estate also alleges that Mr. Fisher's symptoms were alleviated when he was away from mold, *id.* ¶¶ 27, 29, and that it was medically advisable for him to leave the apartment after Capital had completed its work, *id.* ¶ 29. Capital's allegedly negligent work was directly responsible for Mr. Fisher's mold exposure for at least some of the final two weeks before his death. Taking these allegations as true, whether Capital's alleged negligence was an insignificant drop in the bucket of years of HACA's negligence or the decisive straw that broke the camel's back cannot be decided by the court on the current record. *Kiriakos*, 448 Md. at 470. The Estate's allegations show that Capital's alleged negligence may have caused additional mold exposure resulting in or contributing to Mr. Fisher's death, and that is sufficient for proximate cause at this stage.

### b. Contributory Negligence

In Maryland, a plaintiff's contributory negligence serves a complete bar to recovery. *Wooldridge v. Price*, 184 Md. App. 451, 461-62 (2009); *see Coleman v. Soccer Ass'n of Columbia*, 432 Md. 679, 690-91, 695 (2013) (declining to abrogate common law contributory negligence defense). Capital contends that Mr. Fisher's decision to return to his apartment following the allegedly defective remediation was "doing . . . something that a person of ordinary prudence would not do, or the failure to do something that a person of ordinary prudence would do, under the circumstances." Estate Mot. at 14 (quoting *Menish v. Polinger Co.*, 277 Md. 553, 558-59 (1976)). Specifically, Capital contends that an ordinarily prudent tenant either would not have returned to the apartment at all or would have "asked for proof that the mold was removed." *Id.*

15

Capital's argument fails for two reasons. First, "a person may rely on assurances of safety made to him by others in a situation where an ordinarily prudent person would do so." *Erdman v. Johnson Bros. Radio & Television Co.*, 260 Md. 190, 204 (1970). Completion of the work in Mr. Fisher's apartment came with the assurance that it was done correctly, and that the motivating mold issue was resolved. *See Miller v. Howard*, 206 Md. 148, 155 (1955). Although it is true that a plaintiff's reliance on assurances can be unreasonable when the circumstances belie the truth thereof, *Erdman*, 260 Md. at 204-05, and the allegations suggest that HACA was not entirely trustworthy, it was not unreasonable for Mr. Fisher to rely on the promise of adequate work for at least a short time, *Lawrence v. Cavanaugh*, 249 Md. 176, 180-181 (1968). This is especially true given that the issue likely *appeared* to have been resolved because of the fresh drywall, ceramic, and paint. *See* Estate Am. Compl. ¶ 26. Second, the allegations make clear that Mr. Fisher otherwise acted reasonably. Within days of returning to his apartment he realized that the mold had not been remediated and began packing or giving away his belongings in preparation to move out. *Id.* ¶¶ 27-28. With no other ready options, he was willing to move to a shelter to escape the mold. *Id.* Sadly, Mr. Fisher passed away before he could find new accommodations. *Id.* ¶ 31. These circumstances reflect the efforts that any reasonably prudent person would take. Mr. Fisher was not required to immediately abandon his home, with nowhere else to go, on the assumption that the people who were obligated to help him would fail to do so. On the Estate's allegations, Mr. Fisher was not contributorily negligent.[4]

The Estate has stated a negligence claim against Capital, and Capital's motion to dismiss will be denied.

---

[4] This analysis also applies to deny Capital's argument that Mr. Fisher assumed the risk of faulty mold remediation. *Lawrence*, 249 Md. at 181 (applying reasoning from contributory negligence cases to assumption of risk defense).

16

### B.  HACA

Because the relationship between HACA and Capital is contractual, the court begins by outlining Maryland's law of contract interpretation. In Maryland, "the interpretation of a contract, including the question of whether the language of a contract is ambiguous, is a question of law." *Myers v. Kayhoe*, 391 Md. 188, 198 (2006). Maryland applies the "objective theory of contract interpretation," meaning that the court "must determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated . . ., when the language is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed." *Id.* (quoting *Dennis v. Fire & Police Emps. Ret. Sys.*, 390 Md. 639, 656-57 (2006)). In determining whether a contract is ambiguous, the court is limited to consideration of the contract's actual language; extrinsic evidence is irrelevant until an ambiguity is found. *Calomiris v. Woods*, 353 Md. 425, 437-39 (1999). Where a document is incorporated by reference into a contract, "that other document is to be interpreted as part of the writing." *Wheaton Triangle Lanes, Inc. v. Rinaldi*, 236 Md. 525, 531 (1964). To resolve Capital's motion to dismiss, the court will consider the parties' Contract, which they agree is authentic. *Tate*, 627 F. Supp. 3d at 488-89; Opp'n to HACA Mot. at 12, ECF 151 ("HACA Opp'n").

HACA brings claims for contractual indemnification, contribution, and breach of contract. The court will consider each in turn.

### 1.  Indemnification

An express contractual indemnification provision is generally valid and will be enforced as written under Maryland law. *Pulte Home Corp. v. Parex, Inc.*, 403 Md. 367, 381-82 (2008); *see Matter of Bridge Watersports, LLC*, 656 F. Supp. 3d 553, 566 (D. Md. 2023). As HACA and

Capital have identified, the Contract contains multiple indemnity clauses. *See* Estate Mot. Ex. 1 ¶

9; Estate Mot. Ex. 2 at 14; *id.* at 30. Each provision is slightly different and appears in a different

context. First, the main Contract contains an "Indemnification" paragraph providing that:

> The Contractor shall indemnify and hold harmless HACA, its affiliates, and its
> respective officers, directors, agents and employees, from any and all claims,
> demands, losses, causes of action, damage, lawsuits, judgments, including
> attorneys' fees and costs, arising out of, or relating to, the Contractor's services
> under this agreement, including any claims related to Contractor's Personnel.

Estate Mot. Ex. 1 ¶ 9. Second, the General Conditions section of the Invitation for Bids (which is

incorporated into the Contract, *see* Estate Mot. Ex. 1 ¶ 12), contains an "Indemnification"

paragraph providing that:

> In the acceptance of award, the Contractor defends, indemnifies, and saves the
> HACA from all suits, actions and damages or costs, of every name and description
> to which the HACA may be subject to put by reasons of injury to persons (bodily
> injury, including death) or property as result of the work, whether caused by
> negligence, carelessness or willingness [sic] on the part of the Contractor, his/her
> employees or agents, or other causes.

Estate Mot. Ex. 2 at 14. And third, the "Protection of Existing Vegetation, Structures, Equipment,

Utilities, and Improvements" section of a HUD-standardized attachment to the Invitation for Bids

contains a paragraph providing that:

> The Contractor shall indemnify and save harmless [HACA] from any damages on
> account of settlement or the loss of lateral support of adjoining property, any
> damages from changes in topography affecting drainage, and from all loss or
> expense and all damages for which [HACA] may become liable in consequence of
> such injury or damage to adjoining and adjacent structures and their premises.

*id.* at 30.

Of the three indemnification provisions included in the Contract, two are relevant. The

"Protection of Existing . . . Structures" indemnification paragraph is inapplicable because it

focuses only on "damage to adjoining and adjacent structures and their premises," none of which

is at issue here. *Id.* at 30. The other indemnification provisions are substantially similar; both

provide that Capital shall indemnify HACA from any suits, claims, damages, and costs imposed for an injury to person or property arising out of or resulting from Capital's work for any reason, including Capital's negligence, carelessness, or willfulness. Estate Mot. Ex. 1 ¶ 9; Estate Mot. Ex. 2 at 14.

Capital offers two arguments why the indemnification provisions should not apply here. First, it contends that mold remediation was not part of the "work" that it contracted to perform, and thus any harm caused by the presence of mold cannot qualify for indemnification. Second, it argues that the indemnification provisions are void under common law and statute as against public policy.

Capital's first argument construes the indemnification provisions too narrowly. Neither paragraph specifically limits Capital's duty to indemnify to the tasks enumerated in the Invitation for Bids. *See* Estate Mot. Ex. 2 at 9-11. Instead, the Contract indemnification provision covers all harm "arising out of, or relating to, the Contractor's services," Estate Mot. Ex. 1 ¶ 9, and the Invitation for Bids provision covers harm caused "as result of the [negligent] work," Estate Mot. Ex. 2 at 14. The Maryland Court of Appeals exhaustively explored the meaning of the phrase "arising out of" in an indemnification provision in *Mass Transit Administration v. CSX Transportation, Inc.* 349 Md. 299, 310-19 (1998). Reasoning that indemnification was intended to serve as liability insurance, the Court of Appeals reviewed liability insurance cases interpreting the phrase. *Id.* at 310-11. Those cases generally interpreted "'arising out of' . . . to mean originating from, growing out of, flowing from, or the like." *Id.* at 311 (quoting *N. Assurance Co. of Am. v. EDP Floors, Inc.*, 311 Md. 217, 230-31 (1987)). In such cases, it does not matter "whether the injury may also be said to have arisen out of other causes further back in the sequence of events," *Id.* at 311-12 (quoting *N. Assurance Co.*, 311 Md. at 230-31), because "while the words import

and require a showing of causal relationship, recovery is not limited by the strict rules developed in relation to direct and proximate cause," *id.* at 313-14 (quoting *Nat'l Indemnity Co. v. Ewing*, 235 Md. 145, 149 (1964)). The Court of Appeals went on to cite several cases that involved expansive understandings of the phrase "arising out of." *Id.* at 318-19 (collecting cases) and concluded that the injury at hand "arose out of" the contracted work even though that work only fortuitously related to injury and other negligence preceded it. *Id.* at 312, 319.

Here, as explained, there are two plausibly alleged theories of Capital's negligence: (1) that Capital was tasked with remediating the mold and failed to adequately perform; or (2) that Capital was aware of the mold, knew it had not been properly remediated, and took no reasonable action to ensure that it was remediated before performing final repair work. In either case, Capital encountered the mold during its normal "work" operations and acted negligently, and any subsequent injuries therefore "arose out of" the contracted work. Whether the original existence of the mold was caused by HACA's negligence does not affect this conclusion. *Mass. Transit Admin.*, 349 Md. at 311-12 (quoting *N. Assurance Co.*, 311 Md. at 230-31). Thus, the indemnification provision applies to the alleged negligence.

Next, Capital argues that the "common law presumption that an indemnifying party need not protect the indemnified party for the indemnified party's own negligence" voids the indemnification clause's application in this case because the mold was present in Mr. Fisher's apartment due to HACA's negligence. HACA Mot. at 14 (quoting *Bd. of Trs., Cmty. Coll. of Balt. Cnty. v. Patient First Corp.*, 444 Md. 452, 465 (2015)). This presumption will not overcome an unambiguous indemnification provision because it "is simply an aid to [contract construction]." *Patient First*, 444 Md. at 467. But where a Contract is ambiguous, "a court will not interpret an indemnification clause 'to indemnify a person against his own negligence unless an intention so

20

to do is expressed in those very words or in other unequivocal terms.'" *Id.* at 465 (quoting *Crockett v. Crothers*, 264 Md. 222, 227 (1972)).

Here, the terms of the indemnification provisions apply only to Capital's negligence and do not feature any unequivocal requirement that Capital indemnify HACA for HACA's negligent acts, whether they be the sole or concurrent cause of an injury.[5] *Cf. Canton R. Co. v. Am. Smelting & Refining Co.*, 504 F.2d 1377, 1378 (4th Cir. 1974) (per curiam) (upholding contract provision that explicitly split liability equally in cases of joint or concurrent negligence); *Bethlehem Steel Corp. v. G.C. Zarnas & Co., Inc.*, 304 Md. 183, 193-95 (1985) (upholding concurrent negligence indemnification provision). To the extent that this silence creates an ambiguity, the common law presumption applies to resolve that ambiguity against HACA. *Patient First*, 444 Md. at 465. The Estate's allegations against HACA make out a clear case of active negligence by failing to take action to remediate the mold in Mr. Fisher's apartment for many years. *See* Estate Am. Compl. ¶¶ 17-24, 27-30. Because it can only be held liable for its own negligence, whether sole or concurrent, and because the indemnification provision is silent as to such liability, HACA's indemnification claim fails.

Under Maryland law, a party can only be indemnified against its own negligence when it contracts for that protection using clear and unequivocal terms. The Contract features no such agreement, and HACA's indemnification claim will therefore be dismissed.[6]

---

[5] The *Mass Transit* holding that prior negligence does not prohibit a conclusion that an injury "arose out of" the indemnitor's negligence does not affect this analysis because the provision in *Mass Transit* unambiguously indemnified the indemnitee for its own negligence. 349 Md. at 310.
[6] The court does not reach Capital's statutory policy argument but observes that the statutory provision cited prohibits indemnification only for the indemnitee's *sole* negligence, Md. Code. Ann., Cts. & Jud. Proc. § 5-401, and has been consistently interpreted to be inapplicable in cases of concurrent negligence, *Helm v. W. Md. Ry. Co.*, 838 F.2d 729, 734 (4th Cir. 1988).

### 2. Contribution

Capital argues that HACA's contribution claim should be dismissed because it owes no tort-based duty to Mr. Fisher, and therefore cannot be a joint tortfeasor with HACA as is necessary for a contribution claim. HACA Mot. at 16-18; *see* Md. Code Ann., Cts. & Jud. Proc. § 3-1402; *Chevron U.S.A. Inc. v. Apex Oil Co.*, 113 F. Supp. 3d 807, 824 (D. Md. 2015) (quoting *Balt. Transit Co. v. State, to Use of Schriefer*, 183 Md. 674, 679-80 (1944)). As the court explained, the Estate has stated a claim for negligence against Capital, including adequately pleading the Capital owed Mr. Fisher a tort-based duty. *See supra* Section I.A.1. The complaints have alleged that Capital and HACA were joint tortfeasors in negligently causing Mr. Fisher's death. Accordingly, HACA has stated a claim for contribution, and Capital's motion to dismiss that claim will be denied.

### 3. Breach of Contract

To assert a breach of contract claim, "a plaintiff need only allege the existence of a contractual obligation owed by the defendant to the plaintiff, and a material breach of that obligation by the defendant." *RRC Ne., LLC v. BAA Md., Inc.*, 413 Md. 638, 658 (2010) (citing *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175 (2001)). HACA asserts two breach of contract theories: (1) that Capital failed to provide the insurance required by the Contract, HACA Am. Compl. ¶ 74; *see id.* ¶¶ 41-43, 49(j)-(l)[7]; and (2) that Capital did not adequately perform its contractual construction and repair duties, *id.* ¶ 73; *see id.* ¶¶ 44-45, 49(a)-(k).

On HACA's insurance theory, the Contract requires that HACA provide $1,000,000 per occurrence of general liability, automobile liability, and workers' compensation insurance, respectively. Estate Mot. Ex. 1 ¶ 13; *see* Estate Mot. Ex. 2 at 12. According to HACA's allegations,

---

[7] Paragraph 49 of HACA's Amended Complaint contains two sub-paragraphs labeled "j." Citations regarding insurance refer to the second sub-paragraph "j."

Capital did not provide that insurance. HACA Am. Compl. ¶¶ 49(j), 74. HACA has plausibly alleged a contractual obligation and a breach thereof, and has therefore stated a claim. Capital's motion to dismiss the breach of contract count will be denied with regard to HACA's insurance theory.

Capital argues that HACA's construction performance theory is unsupported because it had no contractual duty to perform mold remediation services. HACA Mot. at 6-8. HACA acknowledges that mold is not mentioned in the Contract, but contends that the Contract's requirement that "units must be turnkey ready when handed over to HACA for inspection" required Capital to complete all tasks necessary to make a unit safe for occupation, or at least to "advise[] HACA that it had discovered conditions for which it was not qualified to make repairs or clean." HACA Opp'n at 7-8, 12-14.

The court agrees with HACA. When they renewed the Contract, the parties expanded Capital's "Scope of Work" to include a requirement "that the vacant units must be turnkey ready when handed over to HACA for inspection, this means the units must be ready for immediate occupation." Estate Opp'n Ex. 5 at 12. Although many of HACA's allegations contend that Capital did not remediate the mold itself, *see* HACA Am. Compl. ¶¶ 44, 47, 48, 49(d), 49(f)-(j), which does not appear to be a task it was explicitly required to perform, *see generally* HACA Mot. Ex. 2, HACA also clearly alleges that Capital failed to "provide the renovation of HACA's property as leased to Fisher's apartment in such a manner that would provide for the safety of HACA's residential rental property," HACA Am. Compl. ¶¶ 45-46, and did not identify the continued presence of mold or warn HACA that mold persisted, *id.* ¶¶ 49(a)-(b), 49(k). As the court explained in analyzing the Estate's negligence claim, the plaintiffs have alleged that Capital was tasked with repairing Mr. Fisher's apartment and knew about the mold, but did nothing to ensure that the mold

was properly remediated before sealing up Mr. Fisher's wall and handing the keys back to HACA. If it knew that Mr. Fisher's apartment remained unsafe after its work, Capital was contractually obligated to so inform HACA. Estate Opp'n Ex. 5 at 12. HACA has alleged that this was the case, and has therefore stated a claim for breach of contract; Capital's motion to dismiss HACA's breach of contract claim will be denied.[8]

## II.   Summary Judgment

Remaining for resolution under the principles applicable to summary judgment are the Estate's negligence claim and HACA's contribution and breach of contract claims.

As to the plaintiffs' claims centering on Capital's allegedly negligent renovations, negligence, contribution, and breach of contract for faulty performance, summary judgment is inappropriate at this stage because the limited record reflects that practically all of the material facts are genuinely disputed. *Libertarian Party of Va.*, 718 F.3d at 313. Capital's affidavits from Mr. Chaaban and Mr. Thornton assert that Mr. Parker hired ServPro to perform the mold remediation at Mr. Fisher's apartment, that Capital never performed any mold remediation anywhere, and that Capital was not aware that mold was present in Mr. Fisher's apartment. Estate Mot. Ex. 3; Estate Mot. Ex. 4.

---

[8] Although not mentioned by either party, the Contract includes a conspicuously titled "Liability" paragraph providing that:

> [E]xcept with respect to the parties' indemnification obligations, neither party shall be liable to the other for any special, indirect, incidental, punitive, or consequential damages arising from or relating to this agreement, including bodily injury, death, loss of revenue, or profits or other benefits, and claims by any third party. . . . The foregoing limitation applies to all causes of action in the aggregate, including without [sic] limitation to breach of contract, breach of warranty, negligence, strict liability, and other torts.

Estate Mot. Ex. 1 ¶ 11. Because the parties did not acknowledge this provision, the court does not consider its impact on any of HACA's claims.

The Estate's affidavit from Mr. Parker directly contradicts those of Mr. Chabaan and Mr. Thornton and features sworn statements from the very person whom Capital claims hired ServPro averring that *Mr. Thornton* made the decision *not* to hire ServPro to do work in Mr. Fisher's apartment. Estate Opp'n Ex. 2.[9] Further evidence conflicts with Capital's assertion that ServPro handled the mold in Mr. Fisher's apartment: ServPro apparently has no record of doing the work, and Capital's invoice includes charges for demolition that Capital's affiant attributes to ServPro. Estate Opp'n Ex. 1; Estate Opp'n Ex. 4.

The court "cannot weigh the evidence or make credibility determinations." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 569 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)). Therefore, because the evidence in the record does not support any undisputed account of the events surrounding the work done in Mr. Fisher's apartment in June 2020, and it appears that the plaintiffs' theories of liability could be supportable, at this stage summary judgment will be denied without prejudice.

---

[9] Capital and the City moved to strike Mr. Parker's affidavit as untimely because the Estate submitted an unsigned copy with its opposition at the deadline and did not submit a signed copy until four days later. Mot. to Strike. The signed affidavit is identical to the timely filed unsigned copy, *compare* Estate Opp'n Ex. 2 *and* Suppl. to Opp'n, ECF 150, and the Estate explained that a signed copy was forthcoming when it filed its opposition, Opp'n at 5 n.2. Capital identifies no prejudice caused by the four-day delay in obtaining Mr. Parker's signature, and the court, cognizant of the fact that full discovery has not yet been conducted, will not close its eyes to the existence of contradictory evidence merely because it was verified a few days late. *See Bell v. Kolongo*, No. 03-cv-501-GBL, 2004 WL 3247156, at *3 (E.D. Va. Oct. 25, 2004).

Capital and the City also contend that certain statements in Mr. Parker's affidavit should be stricken because they are not admissible. "Rule 56 affidavits must contain factual matters and other information 'such as would be admissible in evidence.'" *Choice Hotels Int'l, Inc. v. Madison Three, Inc.*, 83 F. Supp. 2d 602, 604 (D. Md. 2000) (quoting *Sakaria v. Trans World Airlines*, 8 F.3d 164, 171 (4th Cir. 1993)) (internal quotations and alterations omitted). Several of Mr. Parker's statements are purely speculative or not sufficiently supported by personal knowledge and will be stricken: (1) the final sentence of ¶ 12; (2) the final sentence of ¶ 14; (3) the final sentence of ¶ 15; (4) ¶ 17; and (5) the final sentence of ¶ 19. Estate Opp'n Ex. 2. Striking these statements does not erase the genuine disputes of material fact that preclude summary judgment.

With regard to HACA's insurance-based breach of contract claim, Capital submitted certificates of insurance showing coverage of at least $1,000,000 in general liability, automobile liability, and workers' compensation throughout the contract period from 2019 to 2023. *See generally* HACA Reply Ex. 1, ECF 154-1. HACA did not submit contradictory evidence, nor did it submit an affidavit attesting to the need for additional discovery. *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). Accordingly, although the motion to dismiss this claim was denied, the undisputed evidence establishes that Capital complied with its contractual insurance obligations, and Capital's motion for summary judgment will be granted as it relates to HACA's insurance-based breach of contract claim.

## CONCLUSION

For the reasons stated, Capital's motions to dismiss or in the alternative for summary judgment will be denied as to the Estate and granted in part and denied in part as to HACA. In short, the Estate's claim against Capital for negligence may proceed, as may HACA's claims against Capital for contribution and breach of contract as to performance of work. The denial of Capital's summary judgment motion on these claims will be without prejudice. HACA's claims against Capital for indemnification and breach of contract as to insurance may not proceed. Capital and the City's motion to strike will be granted in part and denied in part as set forth above.

A separate Order follows.


_____3/27/2024_____                                      _____/s/_____
Date                                                    Catherine C. Blake
                                                        United States District Judge

26